```
 1                  IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF CALIFORNIA
 2

 3     UNITED STATES,
                Plaintiff,
 4                                      Sacramento, California
       vs.                              No. 2:19-cr-00090-KJM
 5                                      Monday, March 7, 2022
       ROBERT PIERRE DUNCAN,            1:27 p.m.
 6              Defendant.
       _____/
 7

 8

                          TRANSCRIPT OF PROCEEDINGS
 9                             TRIAL DAY 6
          BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE
10
                              ---oOo---
11

12     APPEARANCES:

13       For the Government:          UNITED STATES ATTORNEY'S
                                      OFFICE
14                                    501 I Street, Suite 10-100
                                      Sacramento, CA  95814
15                                    By:  BRIAN ALEXANDER FOGERTY
                                           SAMUEL E. STEFANKI
16                                    Assistant U.S. Attorneys

17
         For the Defendant:           ORTIZ LAW GROUP, PC
18                                    1510 J Street, Suite 100
                                      Sacramento, CA  95814
19                                    By:  JESSE ORTIZ, III
                                      Attorney at Law
20

21       Official Court Reporter:     Thresha Spencer,
                                      CSR, RPR
22                                    501 I Street
                                      Sacramento, CA 95814
23

24
         Proceedings recorded by mechanical stenography, transcript
25       produced by computer-aided transcription
```

700

```
 1                              INDEX

 2   DEFENDANT'S WITNESS:

 3   ROBERT PIERRE DUNCAN
     DIRECT EXAMINATION BY MR. ORTIZ                    708
 4   CROSS-EXAMINATION BY MR. FOGERTY                   750
     REDIRECT EXAMINATION BY MR. ORTIZ                  786
 5   RECROSS-EXAMINATION BY MR. FOGERTY                 791

 6                             --o0o--

 7

 8

 9

10

11                            EXHIBITS

12   No Exhibits Marked for Identification or Received in Evidence

13                             --o0o--

14

15

16

17

18

19

20

21

22

23

24

25
```

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1          SACRAMENTO, CALIFORNIA, Monday, March 7, 2022, 1:27 p.m.

2                              --o0o--

3          (In open court.)

4               THE CLERK:  Calling criminal case 19-90; United

5     States versus Robert Pierre Duncan.  This is on for jury trial,

6     and today is day six.

7               THE COURT:  All right.  Good afternoon.

8               MR. ORTIZ:  Good afternoon, your Honor.

9               MR. FOGERTY:  Good afternoon, your Honor.

10              THE COURT:  All counsel is present, Mr. Duncan is

11    present.  Housekeeping before we begin with the jury.

12    Ms. Schultz needs to make certain one more person has shown up

13    in the jury, but we do know that juror number two reported in

14    sick this morning.  I told Ms. Schultz to instruct him not to

15    report given his symptoms, so I don't know if you want to

16    register a belated objection to that, but I didn't see any

17    other practical course.

18              MR. FOGERTY:  No objection from the government, your

19    Honor.  Based on what was conveyed to the parties about the

20    COVID-like symptoms of that juror, I think it's appropriate to

21    excuse that juror, especially in light of the fact that we

22    have -- before that juror was excused, we had three alternates

23    remaining.

24              THE COURT:  Mr. Ortiz?

25              MR. ORTIZ:  I have no position on it, your Honor.

1           THE COURT:  All right.  I did not want that person to

2    report to the courthouse given the reported symptoms, and so I

3    have excused juror number two.  So that means that

4    Ms. 101010173 would become the next member of the jury.  We'll

5    advise the jury of that.  Any objection if I told her she can

6    take the seat assigned to juror number two if she wishes but

7    she can also remain where she is?

8       Mr. Fogerty?

9           MR. FOGERTY:  No objection to that.

10          THE COURT:  Mr. Ortiz?

11          MR. ORTIZ:  No objection.

12          THE COURT:  All right.  I'll have Ms. Schultz let her

13   know that.

14      And then I understand that Mr. Duncan does plan to testify;

15   is that correct?

16          MR. ORTIZ:  That's correct, your Honor.

17          THE COURT:  All right.  And he's had sufficient time

18   to consult with you, Mr. Ortiz, and you've had sufficient time

19   to advise him?

20          MR. ORTIZ:  Yes.

21          THE COURT:  All right.  Mr. Duncan, I just want to

22   review with you.  You, of course, as I told you last week, have

23   an essential right to remain silent in the face of the charges

24   against you.  You are not required to say anything.  Anything

25   you do say could be used against you in the government's case

1    which is proceeding.

2        If you remain silent, the government could not argue an

3    inference of your guilt based on your silence.

4        Do you understand all of that?

5             THE DEFENDANT:  Yes, your Honor.

6             THE COURT:  All right.  My understanding is that with

7    that understanding you have decided you do wish to testify,

8    correct?

9             THE DEFENDANT:  Yes, ma'am.

10             THE COURT:  And you've had sufficient time now to

11    think about that and make a fully-informed decision?

12             THE DEFENDANT:  Yes, ma'am.

13             THE COURT:  And you've had a chance to discuss that

14    decision and obtain all the advice and counsel Mr. Ortiz has

15    for you in that respect?

16             THE DEFENDANT:  Yes.

17             THE COURT:  And do you continue to be fully satisfied

18    with the advice, counsel, and representation that Mr. Ortiz has

19    given you?

20             THE DEFENDANT:  Yes.

21             THE COURT:  All right.  Is there anything else you'd

22    like me to cover, Mr. Ortiz?

23             MR. ORTIZ:  No, your Honor.  Thank you.

24             THE COURT:  Mr. Fogerty?

25             MR. FOGERTY:  No, your Honor.

1          THE COURT:  All right.  So the government rested.

2  Would the case begin this afternoon then with Mr. Duncan's

3  testimony, Mr. Ortiz?

4          MR. ORTIZ:  Yes, your Honor.

5          THE COURT:  All right.  Let me address one of the

6  outstanding issues then, which I had deferred not knowing

7  whether or not Mr. Duncan would testify, and that is whether or

8  not the government can impeach Mr. Duncan with his prior

9  felonies.  Looking specifically at two 2015 felony convictions,

10  assault with a semiautomatic firearm and shooting at an

11  inhabited dwelling.

12      I would allow the government to elicit the fact of prior

13  felony convictions in 2015.  That I would allow.

14      Does the government intend to go beyond that, Mr. Fogerty?

15          MR. FOGERTY:  No, not at this time.

16          THE COURT:  All right.

17          MR. FOGERTY:  We'll have to see what he says on

18  direct.  But, no, we don't have any intent of going down that.

19          THE COURT:  All right.

20          MR. ORTIZ:  So just -- I'm sorry, your Honor.  Just

21  so I'm clear, just the fact that he has a felony conviction

22  from 2015, that's the extent of it.

23          THE COURT:  Yes, or even -- there are two separate

24  convictions, correct?

25          MR. ORTIZ:  Correct.

1          THE COURT:  So it could be you have two felony

2    convictions suffered in 2015.

3          MR. ORTIZ:  Okay.

4          THE COURT:  But not the name of the felony

5    conviction, no details.

6          MR. ORTIZ:  Understood.

7          THE COURT:  Now it is possible that Mr. Duncan would

8    open the door, but at this point I'm not seeing that those

9    convictions are relevant to credibility based on the nature of

10   the convictions.

11      So how long do you expect Mr. Duncan's direct to go,

12   Mr. Ortiz?

13         MR. ORTIZ:  I would say a half hour.

14         THE COURT:  All right.  We could go for the half

15   hour.  If the government believes the door is open such that it

16   wishes to probe those convictions, let me know and we could

17   take a break.

18         MR. FOGERTY:  That's understood, your Honor.  I don't

19   plan to get into it.

20         THE COURT:  All right.  Is there anything else we

21   need to discuss before we check to see if we have the full

22   jury, Mr. Fogerty?

23         MR. FOGERTY:  Your Honor, we moved for a witness

24   exclusion order and I just want to reiterate that.  That if

25   there are -- I understand from Mr. Ortiz that there aren't any

 1   other defense witnesses, but in the event that there are,

 2   anyone who could be a witness should be excluded from the

 3   courtroom while Mr. Duncan testifies or any other defense

 4   witness.

 5            THE COURT:  All right.  Are there any other possible

 6   witnesses for the defense case, Mr. Ortiz?

 7            MR. ORTIZ:  No, your Honor.  There is one person in

 8   the audience who is on my list, but I've advised Mr. Fogerty

 9   that Mr. Duncan will be the sole witness for the defense.

10            THE COURT:  All right.  And that's not going to

11   change?

12            MR. ORTIZ:  It's not going to change.

13            THE COURT:  All right.  Understood, Mr. Fogerty?

14            MR. FOGERTY:  It is, your Honor.  Thank you.

15            THE COURT:  All right.  Anything else, Mr. Ortiz?

16            MR. ORTIZ:  No, thank you.

17            THE COURT:  All right.  Let me just ask Ms. Schultz,

18   do we have the jury?  If you can just check quickly and let me

19   know.

20            MR. ORTIZ:  Your Honor, while we're waiting.

21            THE COURT:  Yes.

22            MR. ORTIZ:  Assuming we finish Mr. Duncan before 4:30

23   this afternoon, are we still open in the morning?

24            THE COURT:  I don't believe, based on what I

25   understand, that we'd have enough time to complete everything

1    else today.

2        You're looking at one and a half hours each for closing,

3    correct?

4              MR. FOGERTY:  Correct.

5              MR. ORTIZ:  Yes.

6              THE COURT:  So I think we would excuse the jury

7    early.  We could just do a final check-in on jury instructions,

8    and then tomorrow we'd have closings and instructions.  And

9    then it would go to the jury, so it would go to the jury by

10   around noon.

11             MR. ORTIZ:  Okay.

12             THE CLERK:  We have all the jurors.

13             THE COURT:  All right.  Very good.

14             THE CLERK:  Are you ready for them, your Honor?

15             THE COURT:  Not yet.  Let's move Mr. Duncan into the

16   witness stand, and let's make certain no one comes in that

17   door.  Let's keep those doors closed for now, please.

18             THE DEFENDANT:  Can you hear me?

19             THE COURT:  Madam court reporter, you can hear

20   Mr. Duncan?  All right.  Very good.  Let's bring the jury in.

21       (Jury present 1:37 p.m.)

22             THE COURT:  All right.  You may be seated.  Welcome

23   back, members of the jury.  We hope you had a good weekend, a

24   good break.  We're ready to resume with trial.  You've heard,

25   at least some of you have heard that juror number two did

1   report illness this morning.  And rather than have him come

2   into the courthouse with symptoms, I excused that juror.  And

3   so alternate number two has now become juror number two for the

4   purposes of our seating arrangement today.

5       So we are ready to proceed.  You'll recall that the

6   government rested its case last week.  The defense is now

7   prepared to proceed with its case.  I'll recognize Mr. Ortiz

8   for that purpose.

9           MR. ORTIZ:  Thank you, your Honor.  Mr. Duncan calls

10  himself as the next witness.

11          THE COURT:  All right.  Mr. Duncan is prepared to

12  testify, and Mr. Duncan is in the stand, as you can see.

13          THE CLERK:  Please raise your right hand.

14                    **ROBERT PIERRE DUNCAN,**

15  called as a witness on behalf of the Defendant Duncan, having

16  been first duly sworn, testified as follows:

17          THE CLERK:  Thank you.  Please say and spell your

18  first and last name for the record.

19          THE DEFENDANT:  Robert Duncan, R-O-B-E-R-T,

20  D-U-N-C-A-N.

21          THE COURT:  All right.  You may proceed.

22          MR. ORTIZ:  Thank you, your Honor.

23                    DIRECT EXAMINATION

24  Q.  BY MR. ORTIZ:  Mr. Duncan, good afternoon.

25  A.  Good afternoon.

1   Q.   Mr. Duncan, back in the summer of 2018, what did you do for

2   work?

3   A.   I had multiple jobs.  My main job, I was selling cars, and

4   I was working for temp agencies.

5   Q.   Starting first with the selling of cars.  Who did you work

6   for?

7   A.   My mom owns a car lot, and I worked under our business.

8   Q.   And what city is that in?

9   A.   Sacramento.

10  Q.   You also mentioned working for a temp agency.  Where was

11  that located?

12  A.   In Sacramento, in Natomas.

13  Q.   What kinds of work did you do for the temp agency?

14  A.   Well, they had me doing multiple jobs.  I was cleaning

15  hoarder houses, I was cutting weeds in the fields, and I was

16  lifting boxes for the U.S. Davis Hospital downtown off of

17  trucks.

18  Q.   In the summer of 2018, any other sources of income other

19  than the car dealership and the temp agency?

20  A.   No.

21  Q.   Can we pull up 156, please.

22       Mr. Duncan, you indicated that in 2018, the summer, you

23  worked for your mom's dealership.  Did you drive a vehicle?

24  A.   Yes.

25  Q.   And what kind of vehicle did you drive?

1   A.   I was driving a blue 750Li.

2   Q.   And during the course of this trial have you seen pictures

3   of that BMW shown in evidence?

4   A.   Yes.

5          THE COURT:  Are you looking for that on the screen?

6          MR. FOGERTY:  156 hasn't been admitted.

7   Q.  BY MR. ORTIZ:  Oh, it hasn't, okay.  How did you get the

8   exhibit -- how did you get the car?

9   A.   My mom gave me that car for my 23rd birthday.  It was a

10  birthday present.

11  Q.   Mr. Duncan, if you can look at Exhibit 702, please.  Do you

12  know who Eva Christian is?

13  A.   She my baby mom.

14  Q.   And do you see her shown in Government's Exhibit 702?

15  A.   Yes.

16  Q.   Could you tell us, Mr. Duncan, when it was that you first

17  met Ms. Christian?

18  A.   I met her in August of 2018.

19  Q.   And do you recall where it was that you met Ms. Christian?

20  A.   Yeah.  My grandma -- my Grandma Morgan was living on

21  Stockton Boulevard in Sacramento, and I was visiting my dad,

22  and that's how I met her.

23  Q.   Can you pull up Government's 12, please.  Do you recall the

24  name of the apartment complex that you met her in?

25  A.   No, I don't recall the name.

1    Q.  Up on the screen now is what's been marked as Government's

2    12.  Do you see that?

3    A.  Yes.

4    Q.  And do you recognize what's shown in Government's 12?

5    A.  Yes.  These are my Grandma Margaret's apartments.  I can

6    see my dad's and my Grandma Margaret's building right here

7    where they lived at.

8    Q.  What side of the -- if you're looking at the photograph,

9    which side of the picture is your grandfather's apartment?

10   A.  My grandma.  It's on the left.  It's right here.  Oh, I can

11   touch?  It's right here; this is the apartment complex they

12   lived in.

13   Q.  And back in August of 2018, how often would you go to that

14   apartment complex where your grandma lived?

15   A.  Not all the times, you know, sometimes to visit my dad.  My

16   Grandma Margaret, she really -- I didn't really get along with

17   her like that so I was just visiting my dad then.

18   Q.  Would you go multiple times per month?

19   A.  Yes, absolutely.

20   Q.  And so you said that in this complex is where you met

21   Ms. Christian?

22   A.  Yes.

23   Q.  So describe for us, if you can, Mr. Duncan, how you met

24   her.

25   A.  Well, I had pulled in the apartments right here and I had

1    parked my car right here in the front.  And I see Eva, she was

2    parked right here in the front, and she was smoking some

3    marijuana.

4         So I had approached her car and I asked her, I said,

5    "What's your name, where are you from, and how old are you?"

6    Q.  And was it daytime or nighttime, if you remember, when you

7    met her?

8    A.  It was daytime.

9    Q.  And the entire conversation that you're having with

10   Ms. Christian, can you estimate for us how long that lasted?

11   A.  Probably just about ten minutes.

12   Q.  Was there anybody in the car with her?

13   A.  Yes.

14   Q.  And who was in the car with her?

15   A.  Cheyanne.

16   Q.  Can we pull up Government 700.

17        Do you see Cheyanne shown on Government 700?

18   A.  Yes.

19            THE COURT:  I think you should be able to delete the

20   blue markings.  There you go.

21   Q.  BY MR. ORTIZ:  You indicated you were speaking with

22   Ms. Christian.  Did you also speak with Cheyanne during this

23   conversation?

24   A.  Yes, I asked her the same question I asked my baby mama.

25   Q.  At any point during the conversation, Mr. Duncan, did you

1   exchange telephone numbers with Ms. Christian and Cheyanne?

2   A.  Yes, both of them.  I got both of their numbers.

3   Q.  Did you give them your number as well?

4   A.  Well, I just called them on my phone, and they saved my

5   number in their phone.

6   Q.  After you had this conversation with Ms. Christian and

7   Cheyanne, did you make contact with them again?

8   A.  Well, I started making contact with my baby mom.

9   Q.  And that's Ms. Christian?

10  A.  Yes.

11  Q.  And describe for us the nature of those contacts.

12  A.  Like, can you say that clearer, please.

13  Q.  Sure.  Did you text her, did you call her?

14  A.  Yeah.  I began calling her, and she began coming because

15  she was living in San Jose, she began coming to Sacramento to

16  visit me.

17  Q.  When did you learn she was living in San Jose?

18  A.  When I called her on the phone and talked to her.

19  Q.  From the day that you met her, Ms. Christian --

20  A.  Yes.

21  Q.  -- to the first time she came to Sacramento to visit you,

22  can you estimate for us how much time had passed?

23  A.  Probably like two days, three days.

24  Q.  In those two or three days, did you also communicate with

25  Cheyanne?

1    A.   No.   I was -- I was solely worried about Eva.

2    Q.   And so did she at some point come to Sacramento to visit

3    with you?

4    A.   Yes, she came to my mom's house in Galt.

5    Q.   Is that where you were living at the time?

6    A.   Yes.

7    Q.   After you met her in person at your mom's house, did you

8    meet up with her again?

9    A.   Yeah, she continued to come back.   I continued to meet with

10   her.

11   Q.   I'm going to ask you two different questions.   The first

12   one is after she came in person, how often would you talk over

13   the phone?

14   A.   Very often, like every day.

15   Q.   How about seeing her, how often would she come to

16   Sacramento to see you?

17   A.   Very often.   Like every chance she got she would come.

18   Q.   Can you estimate for us, was it once a week, three times a

19   week?

20   A.   Probably like three times a week.

21   Q.   Did you ever go to the Bay Area to visit with her?

22   A.   Yes.

23   Q.   And how would that come about?

24   A.   Well, we would talk on the phone, you know.   If she didn't

25   want to come out here, I would go out there and meet her.

1   Q.   And do you recall what cities in the Bay Area that you

2   would meet her?

3   A.   I would meet her in Oakland.

4   Q.   When you and Ms. Christian started seeing each other in

5   person, as you've described, how would you describe the nature

6   of your relationship with her?

7   A.   Like how did we get along?

8   Q.   Yes.

9   A.   I felt like it was like the best relationship of my life.

10  Like, you know, I could smile around her, be myself around her,

11  it was amazing.

12  Q.   Did you begin to feel -- have romantic feelings for her?

13  A.   Yes, absolutely.

14  Q.   Did your relationship with Ms. Christian ever become

15  physical, like a sexual relationship?

16  A.   Yes, we had sex the first time she came to my mom's house

17  in Galt like three days after I met her.

18  Q.   At some point was it discussed between the two of you that

19  either you would move to the Bay Area or she would move to

20  Sacramento?

21  A.   Yeah.   She -- she was living in San Jose, and she told me

22  that she was living with, like, her grandma.   And, like, when

23  she would go home sometimes at nighttime, her grandma would

24  lock her out of the house and make her sleep in the car because

25  she came in too late.   So she was complaining that she wanted

1  to move to Sacramento.  She told me she had an apartment in

2  Atlanta, she wanted to move to Sacramento to get closer to me.

3  Q.  Did you encourage her coming to Sacramento to live closer

4  to you?

5  A.  I mean, I don't feel like I encouraged her, you know, but

6  we talked about it, and she decided she was going to come to

7  Sacramento.

8  Q.  Did you want her to move to Sacramento?

9  A.  Yes, absolutely.

10  Q.  Why?

11  A.  Because this is my girlfriend, this is who I was with.

12  Q.  And do you recall when it was that she began the -- well,

13  at some point did she move to Sacramento?

14  A.  Yes.

15  Q.  So do you recall when she began the process of trying to

16  find a place here in Sacramento?

17  A.  It was in September.

18  Q.  Can we pull up 14, please.

19     Did you help Ms. Christian find a place to live?

20  A.  Yes, I helped her.

21  Q.  Did you suggest anyplace in particular that she might want

22  to look at?

23  A.  Yes, I Googled apartments that I thought she might like.

24  Q.  And up on the screen now is Government's 14.

25  A.  Yes.

 1   Q.  Does that look familiar to you?

 2   A.  Yes.  This is my sister's apartment.  This is the Miramonte

 3   Trovas Apartments.

 4   Q.  So your sister lived in that complex?

 5   A.  Yes, I had moved from my mom's house to my sister's

 6   house -- to my sister's apartment, and this was the apartment,

 7   the Miramonte Trovas in North Natomas.

 8   Q.  Did you suggest to Ms. Christian that she might want to

 9   look there for an apartment?

10   A.  Yeah, we filled out a lot of applications, but I filled out

11   an application for this one too.  She filled it out.

12   Q.  Did you pay for any of the money required for a deposit for

13   that apartment?

14   A.  No, sir.

15   Q.  At the time that she's looking for apartments in

16   Sacramento, did you know what she did for work?

17   A.  She told me that she worked in San Jose for a bank, and she

18   was making roughly, like, $20 an hour.

19   Q.  Did she tell you at any time prior to that that she was

20   engaged in prostitution?

21   A.  No.

22   Q.  We talked about your relationship with Ms. Christian.  How

23   about Cheyanne.  After that first time that you met

24   Ms. Christian in the car, did you communicate with Cheyanne

25   anymore?

1    A.   Yes.  When I would go to my dad's apartment, I would still

2    see Cheyanne out and about, you know, in the apartments.

3    Q.   And would you speak with her?

4    A.   Yes.

5    Q.   And would -- would this be a time when Ms. Christian was in

6    the Bay Area?

7    A.   Yes.

8    Q.   Did you and Cheyanne become friends?

9    A.   Yes, I began talking to her and going over there sometimes

10   to see her behind Eva's back.

11   Q.   Did your relationship with Cheyanne ever turn into a sexual

12   relationship?

13   A.   Yes.  Me and Cheyanne, we had sex.

14   Q.   At any time -- well, let me ask it this way.

15        Prior to you having sex with Cheyanne, did she tell you how

16   old she was?

17   A.   The day that I first met Cheyanne and my baby mama, I asked

18   them both their age.  My baby mama told me she was 22, Cheyanne

19   told me she was 18.

20   Q.   Did you ever tell Ms. Christian about your physical

21   relationship with Cheyanne?

22   A.   No, I didn't tell her.

23   Q.   At any point, Mr. Duncan, while you were over at the

24   apartments where your dad and Cheyanne lived, was there an

25   incident between her parents and you?

1    A.   Yes.  One day Cheyanne had called me for a ride home, and I

2    dropped her off in her apartments.  And I called her to ask her

3    did she make it home safe.  And when I was talking to her on

4    the phone, I kind of heard, like, the phone, like, falling or

5    like she was tussling with somebody.  And then somebody picked

6    up the phone and was just, like, "You mother fucking nigger,

7    you know, you're picking on my daughter."

8    Q.   Was it a male voice or a female voice?

9    A.   It was a female's voice.

10   Q.   And did you respond in any way to what was being said to

11   you?

12   A.   Yes.  I said to her, I said, "No, I said I'm not picking on

13   your daughter, I'm not like that.  You know, I will come back

14   over there so we could talk so you could know what type of guy

15   I am because I'm not like that."

16   Q.   And did you go back over there?

17   A.   No.  No.  No.

18   Q.   Why not?

19   A.   No, because she told me that her husband had guns, and if I

20   was to come back over there they were going to kill me.

21   Q.   At any point did you speak with a male on the phone in

22   relation to this incident?

23   A.   Yes, a male got on the phone.

24   Q.   And who did you think it was?

25   A.   The dad.

1   Q.   And did that male voice ask you any questions?

2   A.   Yeah.  He asked me, like, "What's your name?"  You know,

3   and "come back -- can you come back over here."

4   Q.   And did you give the male voice your name?

5   A.   No.

6   Q.   Did you go back over there?

7   A.   No.

8   Q.   You were in court when Deputy Chaplin testified about a

9   phone call?

10  A.   Yes.

11  Q.   And he testified that you told him you were 16 years old?

12  A.   Yes.

13  Q.   Did you say that?

14  A.   Yes.

15  Q.   Why did you say that?

16  A.   Because I didn't want him to know who I was because I

17  thought he was the dad, and I didn't want them to know who I

18  was.

19  Q.   Did you ever go back to that apartment that day?

20  A.   No.

21  Q.   What did you do after you had this incident with -- with

22  the phone call?

23  A.   I made my way to Natomas to my sister's apartment, and I

24  called my baby mama and I told her what happened.

25  Q.   And where was she?  Where was Ms. Christian when you told

1   her this?

2   A.  She was in San Jose.

3   Q.  Was there any discussion about getting a new phone when you

4   spoke with Ms. Christian that day?

5   A.  Yeah, I told her what had happened.  And I told her mom was

6   harassing me and threatening me, and I told her I was going to

7   get a new phone.

8   Q.  And did she suggest anything to you about that?

9   A.  She told you, "Baby, I'll get you a new phone."

10  Q.  And did she ultimately get you a new phone?

11  A.  Yes.

12  Q.  Can we pull up Government's 51, please.

13      Mr. Duncan, prior to the incident that you just described

14  for us, what was your telephone number?

15  A.  It was this 370-1486 number.

16  Q.  Is this the number that you spoke to the female and the

17  male voice on that day?

18  A.  Yes.

19  Q.  If we can pull up Government's 52.

20      You indicated, Mr. Duncan, that Ms. Christian got you a new

21  phone.  Do you recall what the telephone number was for the

22  phone that Ms. Christian got you?

23  A.  Yes.  It was this (916) 745-2096 number.

24  Q.  Did you go with Ms. Christian to open up this cell phone

25  account?

1  A.  No, she was in San Jose.

2  Q.  There's some information contained in Government's 52.  Did

3  you provide any of that information to Ms. Christian?

4  A.  No.

5  Q.  All right.  Can we go to Government's 53.

6      Mr. Duncan, up on the screen now is what's been marked as

7  Government's trial Exhibit 53.

8      Do you see that?

9  A.  Yes.

10 Q.  Do you know who's number (916) 745-2322, who's number that

11 is?

12 A.  No, I don't know.

13 Q.  Was that a number that you used at any point?

14 A.  No, I never used this number.

15 Q.  So after the incident that you shared with us with

16 Cheyanne's parents, did you keep in contact with Cheyanne in

17 any way?

18 A.  No, I had lost contact with Cheyanne for a minute because

19 her mom had her phone.

20 Q.  Did you ever ask Ms. Christian to get a new phone for

21 Cheyanne?

22 A.  No.

23 Q.  At some point did Ms. Christian move to Sacramento?

24 A.  Yes.  In October that's when she moved to Sacramento.

25 Q.  Do you recall whether it was the beginning of October or

1   middle of October?

2   A.  It was the beginning.

3   Q.  Did you help her move in, as far as physically help her?

4   A.  No.

5   Q.  Did you pay for any of the costs associated with

6   Ms. Christian moving to Sacramento?

7   A.  No.

8   Q.  Once she was here in Sacramento, was it in the Miramonte

9   and Trovas Apartments?

10  A.  Yes.

11  Q.  And would you visit her there?

12  A.  Yes.

13  Q.  Would you stay the night there?

14  A.  No, I wasn't allowed to stay the night at her house.

15  Q.  What do you mean?

16  A.  I was on a curfew from 9 p.m. to 8 a.m. in the morning, so

17  I wasn't allowed to sleep at her house.

18  Q.  Mr. Duncan, have you suffered any prior felony convictions?

19  A.  Yes.

20  Q.  And were those two from 2015?

21  A.  Yes.

22  Q.  And is that why you were on house arrest?

23  A.  Yes.

24  Q.  At any point, Mr. Duncan, did you have concerns about text

25  messages that you had seen on Ms. Christian's phone?

1   A.   Yes.   I was -- I was with her, and I went to her phone and

2   I seen her talking to other guys.

3   Q.   And would this have been when she was now living in

4   Sacramento?

5   A.   Yes, around that time.

6   Q.   And what was concerning to you about these text messages?

7   A.   Her talking to other guys.

8   Q.   And did you confront her with that?

9   A.   Yes.   I asked her, "What is this?"

10   Q.   And did she tell you?

11   A.   Yes.

12   Q.   And what did she say?

13   A.   She told me she was prostituting.

14   Q.   How did you react to that when she told you that?

15   A.   I was upset, and I asked her, like, "Why didn't you tell me

16   this when we first started talking?"

17   Q.   Did you break up with her?

18   A.   No.

19   Q.   Why not?

20   A.   Because, like I said, it was the best relationship of my

21   life.   You know, she had all the characteristics.   She was

22   smart, she was funny, you know she was sweet, you know, she was

23   perfect.

24   Q.   And did you decide to stay in the relationship?

25   A.   Yes, I continued to talk to her.

1    Q.   Do you know whether or not she continued prostitution?

2    A.   Yes, she continued.

3    Q.   And where would she go prostitute?  What would she tell

4    you?

5    A.   Wherever -- wherever she wanted to go.

6    Q.   Did you get involved in any of the planning or arrangements

7    for her prostitution?

8    A.   No.  She's been prostituting way before I even met her.

9    Q.   Did you ever ask her for any money that she made during her

10   prostitution?

11   A.   No.  She made her own money, and I made my own money.

12   Q.   You indicated earlier that you lost contact with Cheyanne;

13   is that right?

14   A.   Yes.

15   Q.   At some point, though, did you have contact with her again?

16   A.   Yes.

17   Q.   Describe for me how that happened.

18   A.   Well, on the 2096 number that I was using, one day when I

19   was over there at my sister's house Eva had came over and she

20   had called Cheyanne on that phone.

21   Q.   And did you guys have a conversation with Cheyanne from

22   that phone?

23   A.   Yes, and we had FaceTime.  I FaceTimed her.  We FaceTimed

24   her.

25   Q.   Can we pull up Government's 160, please.

1         And the conversation itself took place from inside the

2    apartment on -- inside of Ms. Christian's apartment?

3    A.  Yes.

4    Q.  Up on the screen now is Government's 160.  Do you see that?

5    A.  Yes.

6    Q.  And you recognize what's shown in this exhibit?

7    A.  Yes.

8    Q.  And what is it?

9    A.  This is me, my baby mama, and Cheyanne.

10   Q.  And is this the FaceTime that you were describing for us

11   just a few moments ago?

12   A.  Yes.

13   Q.  Was this the first time that you had any communication with

14   Cheyanne since the incident at the apartment complex?

15   A.  On this FaceTime?

16   Q.  Yes.

17   A.  No, I believe that we talked to her on the phone first.

18   Q.  Right.  Around the same time as the FaceTime?

19   A.  Yes.

20   Q.  How about after the FaceTime, did you keep in contact with

21   Cheyanne?

22   A.  Yes, I was calling her on the phone.

23   Q.  Did you ever see her in person?

24   A.  No.

25   Q.  At some point in late October did you ever learn that

1   Ms. Christian was arrested for prostitution?

2   A.  No, she never told me.

3   Q.  Up to the point of this FaceTime that you talked about,

4   Mr. Duncan, did you know whether or not Cheyanne was engaged in

5   prostitution?

6   A.  No, I didn't know.

7   Q.  During this FaceTime that you've talked about, did you know

8   where Cheyanne was living?

9   A.  In this FaceTime right here?

10  Q.  Yes.

11  A.  I figured she was there at home.

12  Q.  With her parents?

13  A.  Yes.

14  Q.  If we can pull up Government's Exhibit 13, please.

15      Mr. Duncan, during the course of this trial you heard

16  testimony from an individual from a group home.  Do you recall

17  that?

18  A.  Yes.

19  Q.  At any point did you know that Cheyanne was at a group

20  home?

21  A.  No, I never knew that she was at a group home.

22  Q.  Up on the screen now is Government's 13.  Do you see that?

23  A.  Yes.

24  Q.  And have you ever been to the address of 316 North Walnut

25  Street in Woodland?

1   A.   No.

2   Q.   So did your relationship with Cheyanne, did it get

3   stronger?   Describe for me how your relationship developed.

4   A.   No.   I was in a relationship with Eva.

5   Q.   Right.   But as far as Cheyanne is concerned, did you only

6   stay by phone, did you ever see her in person?

7   A.   No, I was talking to her on the phone.

8   Q.   How often?

9   A.   Often, but not too often.

10   Q.   On a weekly basis, could you estimate for me how often you

11   would speak to Cheyanne?

12   A.   A couple times a week.

13   Q.   At any point did you lose or stop having contact with

14   Cheyanne?

15   A.   Yes.

16   Q.   And when was that?

17   A.   Around November/December.

18   Q.   Of what year?

19   A.   2018.

20   Q.   Okay.   Now going back to Ms. Christian.   How would you

21   describe your relationship as you were leading toward the end

22   of 2018?

23   A.   We started getting more serious.

24   Q.   What do you mean by that?

25   A.   Like, you know, we started getting more serious, taking

1   each other more serious.

2   Q.  Did you guys at some point move in together?

3   A.  Yes.

4   Q.  And when was that?

5   A.  This was in 2019.

6   Q.  And do you recall where it was that you moved -- where you

7   moved with Ms. Christian?

8   A.  On Florin at my sister's apartment.

9   Q.  And who resided there?

10  A.  My sister and me and Eva.

11  Q.  At some point did Ms. Christian get pregnant?

12  A.  Yes.

13  Q.  And do you recall approximately when that was?

14  A.  About March.

15  Q.  Of 2019?

16  A.  Yes.

17  Q.  So would that have been around the time that you guys moved

18  in together on Florin Road?

19  A.  Yes, right around the time, yes.

20  Q.  Once you found out you were having a baby with

21  Ms. Christian, how did that make you feel?

22  A.  I was kind of scared.

23  Q.  Why?

24  A.  Because I didn't feel like I was ready for a child.

25  Q.  How about your relationship with Ms. Christian at that

1   point, would you consider it strong?

2   A.  Yes, she was still the sweet person she was.

3   Q.  Did you begin making plans with Ms. Christian on the rest

4   of your lives together?

5   A.  Yes, absolutely.

6   Q.  At some point did that come to a stop?  Did you stop making

7   plans with Ms. Christian?

8   A.  Well, we got arrested.

9   Q.  And do you recall when that was?

10  A.  May 31st, 2019.

11  Q.  And where was it that you got arrested, if you can

12  remember?

13  A.  At the probation office downtown.

14  Q.  After you were -- at some point were you placed in

15  handcuffs?

16  A.  Yes.

17  Q.  After you were placed in handcuffs, did you at some point

18  attempt to escape?

19  A.  Yes.

20  Q.  Why?

21  A.  Because I was expecting a baby with Eva, and I didn't want

22  to be in jail while my baby was being born.

23  Q.  Were you told why you were being arrested?

24  A.  Yes.

25  Q.  How did you react when she told you what the charges were?

1   A.  I was upset, I was shocked, you know, I was mad, you know,

2   and I was stressed out.

3   Q.  Why were you shocked?

4   A.  Because I didn't do what they saying I did.

5   Q.  At some point you were arrested?

6   A.  Yes.

7   Q.  And taken to jail?

8   A.  Yes.

9   Q.  While you were in jail, did you ever learn that

10  Ms. Christian also was arrested?

11  A.  Yes.

12  Q.  And put in jail?

13  A.  Yes.

14  Q.  How did you learn that?

15  A.  I don't really recall how I learned it.

16  Q.  But at some point you learned that she was in jail too?

17  A.  Yeah, I think my family told me she was in jail.

18  Q.  While you were in jail and Ms. Christian was in jail, were

19  you able to communicate with her in any way?

20  A.  Yes, absolutely.  You know, when she went to jail she was

21  pregnant with my child.  So I would send her packages, I would

22  put money on the phone for her just in case she didn't have

23  nobody to call.  You know, she could call home even if it was

24  just to talk to my family.  You know, that was my baby momma so

25  I felt like that was my job as a man.

1    Q.  As far as sending notes or written communication with her,

2    were you able to do that even though you were in jail?

3    A.  Yes.

4    Q.  So you were in court when Ms. Christian described sending

5    mail or notes through the toilets.  Do you remember her talking

6    about that?

7    A.  Yes.

8    Q.  And was that accurate the way she described it?

9    A.  Yes.

10   Q.  How many notes would you say you passed back and forth

11   between the two of you using this toilet system of mail?

12   A.  Hundreds.  Hundreds of notes and pictures.

13   Q.  Can we have Government's 800.

14       Mr. Duncan, you were in Court when Ms. Christian testified

15   about Government's 800?

16   A.  Yes.

17   Q.  And do you recognize this exhibit?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's a letter I wrote her.

21   Q.  And why did you write this letter to her?

22   A.  Because she told me she was going to lie to get out of

23   jail.  When she came to court, she was going to tell the truth.

24   Q.  And so if she was going to tell the truth, why did you have

25   to write this letter?

1   A.  Because she told me she was worried about getting a perjury

2   charge.

3   Q.  In the letter you make reference to her forgetting things.

4   Do you see that written in the letter?

5   A.  Yes.

6   Q.  And why are you telling her to say those things?

7   A.  So she wouldn't get a perjury charge that she was worried

8   about.

9   Q.  Also in the letter there's a reference to not knowing

10  somebody was 17 years old.  Do you remember that reference in

11  the letter?

12  A.  Yes.

13  Q.  And you put that in the letter?

14  A.  Yes.

15  Q.  Why?

16  A.  Because I was worried about getting a rape charge for

17  having sex with Cheyanne.

18  Q.  At some point did you learn that Cheyanne was 17 years old?

19  A.  Yes.

20  Q.  And when did you learn that?

21  A.  When I went to jail.

22  Q.  Mr. Duncan, Ms. Christian testified that you were her pimp.

23  Do you remember her saying those things?

24  A.  Yes.

25  Q.  Did you ever act in that capacity with Ms. Christian?

1   A.   No.  She was doing it way before I met her.

2   Q.   At any point did you ever take the money that she earned

3   from prostitution from her?

4   A.   No.

5   Q.   Did you ever direct her prostitution activities at any

6   point?

7   A.   No, I never directed nobody to prostitute.

8   Q.   At some point did you learn that Cheyanne was engaged in

9   prostitution?

10   A.   When I went to jail.

11   Q.   At any point did you ever direct Cheyanne to engage in

12   prostitution activities?

13   A.   No.

14   Q.   Did you ever take money from Cheyanne for any reason?

15   A.   No.

16   Q.   There was testimony by Ms. Christian that there was

17   physical abuse in your relationship.  Do you remember her

18   talking about that?

19   A.   Yes.

20   Q.   At any point in your relationship did you ever lay a hand

21   on her?

22   A.   No, I never hit my baby mama.

23   Q.   Can we pull up Government's 5, please.

24        MR. FOGERTY:  It's not admitted.

25   Q.  BY MR. ORTIZ:  Mr. Duncan, do you know somebody by the name

 1    of Jaquorey A. Carter?

 2    A.   Yes.

 3    Q.   How do you know Mr. Carter?

 4    A.   He's my childhood friend.

 5    Q.   During the course of this trial, do you recall hearing

 6    conversations between you and Mr. Carter?

 7    A.   Yes.

 8    Q.   I'm going to ask you about some of those, okay?

 9         Do you have a binder in front of you?  Are there binders in

10    front of you?

11              THE COURT:  They're behind him.

12              MR. ORTIZ:  A trial binder, exhibit binders.

13              THE COURT:  On the cart behind Mr. Duncan.

14              MR. ORTIZ:  Can I come over there?

15              THE COURT:  Yes, you may.

16              MR. ORTIZ:  Thank you.

17    Q.   BY MR. ORTIZ:  Can you go to Exhibit 62A, Mr. Duncan.

18    A.   Oh, yes.

19    Q.   Are you there?

20    A.   Yes, I believe so.

21    Q.   So if you can turn to page 2 of 62A.  The top left corner

22    says 9/8/2018.  Do you see that?

23    A.   Yes.

24    Q.   So do you have that in front of you?

25    A.   Yes.

1   Q.   Do you remember hearing this conversation played during the

2   course of this trial?

3   A.   Yes.

4   Q.   I have a couple questions for you on this, okay?

5   A.   Yes.

6   Q.   Do you recall hearing your voice saying the following, "My

7   other little San Jose bitch, my little San Jose bitch."  Do you

8   remember talking about -- hearing that in the phone call?

9   A.   Yes.

10  Q.   And do you recall what you were talking about when you said

11  those things?

12  A.   Yes.

13  Q.   And what were you talking about?

14  A.   What do you mean?  Can you be clearer, please.

15  Q.   Sure.  So why did you say that?

16  A.   My little San Jose bitch?

17  Q.   Yes.

18  A.   Can you please be clearer than that.

19  Q.   Sure.  Do you know what was meant by San Jose bitch?

20  A.   Yeah, a female that I was talking to.

21  Q.   And who were you talking to?

22  A.   Who was I talking about right here?

23  Q.   Yes.

24  A.   Her name is Shaymoney.

25  Q.   Shaymoney?

1    A.   Shaymoney.

2    Q.   Were you referencing Ms. Christian in this phone call?

3    A.   No.  Eva's from San Jose too, but I talked to multiple

4    girls from San Jose.

5    Q.   Right.  If you go down toward the bottom of the page, do

6    you see the last three entries where you're talking?

7    A.   Yes.

8    Q.   And it's basically talking about having your bitches press

9    on people?

10   A.   Yes.

11   Q.   Was that your voice in that phone call?

12   A.   Yes.

13   Q.   And why were you saying things like that to Mr. Carter?

14   A.   Well, you know, I haven't seen -- I hadn't seen Mr. Carter

15   for a long time, you know.  And when I went to Oakland I seen

16   him out there, and that's when I had got his number, you know,

17   we started exchanging conversations, you know.  This is the

18   stuff that he was -- he would bring on me, this is stuff he was

19   showing me, you know, so I was trying to fit in with this man.

20   So, you know, this is why I was telling him these things, I was

21   trying to fit in.

22   Q.   Were you making things up?

23   A.   No, I wasn't making things up.

24   Q.   Okay.  Can we pull up Exhibit 500, please.  Mr. Duncan, up

25   on the screen right now is Government's 500.  Do you see that?

1    A.   Yes.

2    Q.   And do you remember hearing Ms. Christian talk about this

3    during the course of her testimony?

4    A.   Yes.

5    Q.   At any point did you direct Ms. Christian to rent hotel

6    rooms in the Oakland area?

7    A.   No.   She was getting these rooms way before I met her.

8    Q.   Exhibit 501 is another Motel 6 receipt.   I'm not going to

9    show it to you, but again, did you ever have Ms. Christian or

10   direct Ms. Christian to rent a room for prostitution purposes?

11   A.   No.

12   Q.   How often would you, yourself, go out to Oakland?

13   A.   Pretty often.

14   Q.   When did you first start going out there?

15   A.   Maybe in August.

16   Q.   And was it at your suggestion or her suggestion?

17   A.   No, I'm from Sacramento.   My baby mama is from the Bay

18   Area, you know.   All I've known is Sacramento my whole life,

19   so, you know, when I was going to the Bay Area at first I was

20   going with her.

21   Q.   And would that include Oakland?

22   A.   Yes.

23   Q.   There was a lot of discussion about the area of

24   International Boulevard.   Do you remember hearing all that

25   testimony?

1   A.  Yes.

2   Q.  Would she take you to that general area?

3   A.  Yes.

4   Q.  How about for work, did you also go to Oakland on occasion

5   for work?

6   A.  Well, a couple times, yeah, I would go out there and sell a

7   couple cars out there and stuff.

8   Q.  Last week -- I believe it was last Wednesday there was some

9   testimony from a special agent regarding cell phones and cell

10  phone towers.  Do you remember hearing that testimony?

11  A.  Yes.

12  Q.  And there were some slides that showed your phone being in

13  the area making multiple phone calls of International

14  Boulevard?

15  A.  Yes.

16  Q.  Do you deny that you were out in the Oakland area during

17  those times?

18  A.  No, I'm not denying being in Oakland, I was in Oakland,

19  that's a fact.  But I don't know if it was the same time --

20  days, you know, but I was in Oakland.

21  Q.  Can you go back to the binder, Mr. Duncan.  This time I'm

22  going to ask you to go to Exhibit 63A, page two.

23      Are you there?

24  A.  Yes, it is 9/26/18?

25  Q.  Yes, sir.

1   A.  Yes.

2   Q.  If you look at the last entry for your voice, the last

3   sentence says, "Somebody told this bitch mama everything."  Do

4   you see that?

5   A.  Yes.

6   Q.  And are you -- this was the phone call you were having with

7   Mr. Carter?

8   A.  Yes.

9   Q.  Why are you saying these things to Mr. Carter?

10  A.  I was referring to Cheyanne's mom.

11  Q.  And what was going on at that time?

12  A.  She kept calling my phone, harassing me, you know.  She was

13  telling me that she knew all my information, all my personal

14  business.

15  Q.  Did you feel like she was going on to your social media

16  accounts?

17  A.  Yeah.  She was telling me -- yes, that's what she was

18  telling me.

19  Q.  Go to 64A.  Are you there, Mr. Duncan?

20  A.  Is it 9/26/18 again?

21  Q.  Yes.

22  A.  Yes.

23  Q.  And the first line -- the first sentence in this phone call

24  says, and I'll just read it, "The white bitch looked like --

25  like she don't look like, I mean, she looked like she could be

1    a hoe.  You feel me, like."

2        Do you remember hearing that?

3    A.  Yes.

4    Q.  And do you recall why you were saying that?

5    A.  It was because I didn't know if Cheyanne was a prostitute

6    or not, so I was trying to figure out, like, what her mom was

7    saying was true or not, you know.

8    Q.  And is that why you said it looked like she could be a hoe?

9    A.  Yeah, because, you know, after I thought about it, you

10   know, like the makeup and the clothes she was wearing.

11   Q.  And if you go down one more entry there's a sentence that

12   you said, "You see my white bitch, she look hella young, she

13   look like she fucking 13 years old."

14       Do you see that?

15   A.  Yes.

16   Q.  And why were you saying that?

17   A.  It was just an exaggerated point -- it was exaggerated

18   statement to prove my point to Mr. Carter that my belief is

19   white females, no matter how old they are, look young.

20   Q.  And why were you referring to this person as your white

21   bitch?

22   A.  She would do something that, you know, I was itching with

23   somebody I was talking to.

24   Q.  Was it meant to indicate that she was your prostitute?

25   A.  No, a prostitute is a prostitute.

1    Q.  And then go to 66A now, please.

2    A.  Is it 926 again?

3    Q.  Yes.

4    A.  I'm there.

5    Q.  And then the last line in the paragraph where you're

6    talking it said, "Somebody told this bitch everything about me,

7    brother."

8        Do you see that?

9    A.  Yes.

10   Q.  And what were you referring to there?

11   A.  Somebody told her all my personal business.

12   Q.  And who's her?

13   A.  Cheyanne's mom.

14   Q.  Similar to the previous phone call that we've just talked

15   about?

16   A.  Yes.

17   Q.  All right.  I'm going to -- can we pull up 707, please.

18   We're done with the binders, Mr. Duncan.

19       On the screen now, Mr. Duncan, is Government's 707.  Do you

20   see that?

21   A.  Yes.

22   Q.  And there's a telephone number referenced on here ending

23   2096.  Do you see that?

24   A.  Yes.

25   Q.  And do you recognize that number?

1    A.  Yes, this is my phone.

2    Q.  If you look at the first entry on this text message

3    during -- it looks like you were sent a message from somebody

4    asking you to join their Life360?

5    A.  Yes.

6    Q.  Did you ever ask Ms. Christian to join Life360?

7    A.  No.

8    Q.  Did she ask you?

9    A.  Yes.

10   Q.  And what were the circumstances surrounding her asking you

11   to join Life360?

12   A.  Well, it first started -- you know, it's like we were

13   sharing locations, you know, like in our relationship to, like,

14   see if, like, I was cheating or not.  You know, like she wanted

15   to share locations, it was like me showing her that I was being

16   faithful, you know, in our relationship.

17   Q.  And so did you have Life360 on your phone?

18   A.  Yes.

19   Q.  Was that the only reason why you had that on your phone?

20   A.  No, I was -- I had Life360 on my phone with my family, two

21   of my sisters and my brother and my mom.  We all had Life360s

22   on our phone in case of an emergency.

23   Q.  And if you look going down the -- that first page, the

24   707 --

25   A.  Yes.

1    Q.   -- there's a text at number 12.  Do you see that?

2    A.   Yes.

3    Q.   And it reads, "Better not, nobody stop at gas station store

4    or nothing else.  Park the car, get out and drive back, no

5    stops."

6         Do you see that?

7    A.   Yes.

8    Q.   Do you remember sending that text message?

9    A.   Yes.

10   Q.   And why would you send that?

11   A.   Because when Eva told me she was going to the Bay Area I

12   was upset, but I know I couldn't stop her.  So, basically, I

13   was telling her, "Do what you've got to do and come back.

14   Don't go nowhere else."

15   Q.   And did you know what she was doing out in the Bay Area at

16   that point?

17   A.   Yes.

18   Q.   What was she doing?

19   A.   She was prostituting.

20   Q.   The following text from Ms. Christian to you says "Dude

21   WTF."  Do you see that?

22   A.   Yes.

23   Q.   Would she talk to you that way on occasion?

24   A.   I mean, you know, honestly Eva was very sweet, you know,

25   but she does have a mouth on her, you know, but I look at her

1   as a very sweet person.  But, yeah, she could talk crazy.

2   Q.  All right.  If you could turn -- if you could go to page 2

3   of 707, please.  If you look at entry number 20, Mr. Duncan.

4   Do you see that?

5   A.  Yeah.

6   Q.  And it says, "You've been there too long, you have to move.

7   Tell her to stay there."

8       Do you see that?

9   A.  Which one?  Can you say it again, which one?

10  Q.  Sorry, number 20.

11  A.  Number 20, yes.

12  Q.  So do you recall that text message?

13  A.  Yes.

14  Q.  And the "her" in this text message, do you remember who you

15  were referring to?

16  A.  No.  She just -- no.  She told me that she was going to the

17  Bay Area with her friend, but she didn't tell me which friend.

18  If she would have told me which friend, I would have been

19  saying the friend's name.

20  Q.  So why did you send this text massage to her?

21  A.  Because I was being insecure, and I was thinking that she

22  was standing around talking to other guys.  So I was trying to

23  get her to move and get away from her friend.

24  Q.  And it is followed up with another text, "Since 10:12 you

25  two have been sitting there."

1    Do you see that?

2    A.   I meant to say "You've been sitting there."

3    Q.   And why did you send that?

4    A.   The same reason -- what I just said the first one I sent.

5    I was being insecure thinking she was talking to other guys.

6    Q.   At number 22, another text saying, "So you move, split up.

7    You all can stop the talking because I know what you all are

8    doing."

9    Do you see that?

10   A.   Yes.

11   Q.   Why did you say that?

12   A.   Because I knew that the people that my baby mama hung

13   around, they were talking to other guys, they were talking to a

14   lot of guys.  And I felt like you are who you're hanging out

15   with.  If your friend is talking to other guys then you're

16   doing this too."  You know, I was just being insecure.

17   Q.   And if you go down even further, if you can just read to

18   yourself lines 27, 28, and 29.

19   A.   27.  (Witness reviewing.)  Yes, I see.  Yes.

20   Q.   And why were you saying these things in the text messages?

21   A.   Can you be clear, what things?

22   Q.   So on line 27 you -- it reads, "You haven't showed me no

23   faggot shit yet or out-of-pocket shit yet."

24   Do you see that?

25   A.   Yes.

1    Q.   Why were you saying that?

2    A.   Saying the faggot shit?

3    Q.   Yes.

4    A.   Well, faggot shit is just like, you know, you basically

5    haven't been -- I don't really explain the faggot shit.  It is

6    just like I haven't caught you cheating yet.  I haven't caught

7    you cheating yet.  I haven't caught you talking to other guys.

8    Q.   Is that what you're referring to in these text messages?

9    A.   Yes.

10   Q.   That she hasn't cheated on you, and you have no reason to

11   not trust her?

12   A.   Yes, I haven't caught her.

13   Q.   And if we can go to page 4 of 707.  Do you see item 53?

14   A.   Yes.

15   Q.   It says, "I'm done with this FKN Oakland, I do better in

16   Frisco, and it is like we get out of here hella late."

17        Do you see that?

18   A.   Yes.

19   Q.   And did you know what she was referencing in that text

20   message to you?

21   A.   Yes, she was talking about prostitution.

22   Q.   Did you ever direct her to go to either Oakland or San

23   Francisco to prostitute?

24   A.   No, absolutely not.

25   Q.   If we can bring up Exhibit 163, please.

1      Mr. Duncan, do you recognize what's shown in Government's

2  163?

3  A.  Yes.

4  Q.  And what is it?

5  A.  This is Life360.

6  Q.  And who -- who is Ashley?

7  A.  That's my baby mama, that's Eva.  That's just one of her

8  aliases that she was using.

9  Q.  Ashley?

10 A.  Yes.

11 Q.  Go to 164, please.

12         MR. FOGERTY:  That hasn't been admitted.

13         MR. ORTIZ:  Okay.  Can we go to 708?

14 Q.  BY MR. ORTIZ:  Mr. Duncan, Exhibit 708 is a multi-page

15 exhibit with a bunch of text messages.  Do you remember hearing

16 testimony about that last week?

17 A.  Yes.

18 Q.  And this references the telephone number (916) 745-2322?

19 A.  Yes.

20 Q.  Did you ever use that telephone number?

21 A.  No, this is not my phone number.  The 2096 number is my

22 phone number.  This one is not my phone number.

23 Q.  So did you send any of the text messages that are shown in

24 Exhibit 708?

25 A.  No, this is not my phone number.

 1    Q.  If we can pull up 715, please.

 2        Again, Mr. Duncan, do you recall hearing testimony about an

 3    extraction report from a phone that was taken from Cheyanne

 4    with a bunch of text messages last week?

 5    A.  Yes.  Yes.

 6    Q.  And this relates to the number ending in 2322?

 7    A.  Yes.

 8    Q.  Did you send any of the text messages that are referenced

 9    in this exhibit?

10    A.  No, this is not my phone.

11    Q.  If we can go to Exhibit 400.  And then 401.

12        So you saw those two exhibits, Mr. Duncan, 400 and 401?

13    A.  Yes.

14    Q.  Did you create either one of those exhibits?

15    A.  No.

16    Q.  When did you learn that those postings were in existence?

17    A.  When I went to jail.

18    Q.  Mr. Duncan, when was the last time that you had a

19    conversation with Ms. Christian?

20    A.  Probably, like, a couple months ago.

21    Q.  And was that -- describe for me how that happened.

22    A.  What do you mean?

23    Q.  Was it a phone call, was it a letter?

24    A.  Yeah, we was on the phone talking.

25    Q.  You heard Ms. Christian testify during this trial, correct?

1    A.  Yes.

2    Q.  And how did it make you feel hearing her say those things

3    about you?

4    A.  I can't even explain that.  The worst day I ever had in my

5    life.

6    Q.  Do you still love her?

7    A.  I love her as my daughter's mom, yes.

8    Q.  Did anything that she said about you being her pimp, was

9    any of that true?

10   A.  No.

11   Q.  Was anything that she said about you and Cheyanne true?

12   A.  No.

13   Q.  Have you ever engaged in that kind of activity, pimping?

14   A.  No, I'm not a pimp.

15          MR. ORTIZ:  All right.  That's all I have.

16          THE COURT:  All right.  Mr. Fogerty?

17          MR. FOGERTY:  Thank you, your Honor.

18                        CROSS-EXAMINATION

19   Q.  BY MR. FOGERTY:  Good afternoon, Mr. Duncan.

20   A.  Good afternoon, sir.

21   Q.  Do you need a second?

22   A.  No, I'll be all right.

23   Q.  So you had sex with 17-year-old Cheyanne, right?

24   A.  17-year-old Cheyanne.  She told me she was 18 years old.

25   Q.  The question is, did you have sex with 17-year-old

1   Cheyanne?

2   A.  Yes.

3   Q.  You had sex with her when she was 17?

4   A.  Yes.

5   Q.  Sex means intercourse, right?

6   A.  Yes.

7   Q.  Did you have intercourse with her?

8   A.  Yes.

9   Q.  Did you have intercourse with her multiple times?

10  A.  No, just once.

11  Q.  You only had sex with her once?

12  A.  Yes.

13  Q.  And you knew her for several months, right?

14  A.  No, not several months, a couple months.

15  Q.  How many months?

16  A.  Like a month and a half.

17  Q.  You knew her for only one and a half months?

18  A.  Yes, basically.

19  Q.  And during that one and a half months you had sex with her

20  one time; is that right?

21  A.  Yes.

22  Q.  Okay.  You're 26 years old, right?

23  A.  Yes.

24  Q.  And you know a lot of people who are involved in the street

25  life, right?

1   A.   Yes.

2   Q.   You know a little bit about pimping and prostitution?

3   A.   Is that a question?

4   Q.   Yes, that's a question.

5   A.   Yes.

6   Q.   And you know Jaquorey Carter?

7   A.   Yes.

8   Q.   And you used to talk to Mr. Carter about pimping, right?

9   A.   Yes.

10  Q.   Often?  That's a question.  Did you talk to him often about

11  pimping?

12  A.   Not often, just around the time that the phones were

13  tapped.

14  Q.   Okay.  So during the wiretap you talked to Mr. Carter often

15  about pimping?

16  A.   Yes.

17  Q.   Okay.  And you've met pimps?

18  A.   Well, I mean, I met people that sometimes talk like pimps,

19  but I never met -- I don't know -- like when you say a pimp it

20  is like some people talk like pimps and some people are

21  actually pimping and that's a difference.

22  Q.   Okay.  Well, you've met Mr. Carter, right?

23  A.   I've known Mr. Carter since I was a child.

24  Q.   Right.  And you know that Mr. Carter is a pimp?

25  A.   Yes.

1   Q.  All right.  So you've met pimps, right?

2   A.  One pimp.

3   Q.  You've never met any other pimps besides Mr. Carter?

4   A.  I met people who talk like pimps.

5   Q.  So everybody else you know just talks like a pimp, but

6   Mr. Carter is the only pimp that you know?

7   A.  Yes.

8   Q.  Okay.  You know girls that were engaged in prostitution,

9   right?

10   A.  My baby mama, yes.

11   Q.  Right.  Eva Christian was engaged in prostitution, right?

12   A.  Yes.

13   Q.  And Cheyanne was engaged in prostitution?

14   A.  Yes.

15   Q.  So you know girls that were engaged in prostitution?

16   A.  Yes.

17   Q.  Okay.  And you lived with Ms. Christian while she was

18   engaged in prostitution?

19   A.  I lived with her -- she lived with me.

20   Q.  Oh, I'm sorry.  So she lived with you while she was engaged

21   in prostitution?

22   A.  Yes.

23   Q.  Okay.  And you knew Cheyanne when she was engaged in

24   prostitution?

25   A.  I didn't know Cheyanne was prostituting.

1   Q.  You knew Cheyanne when she was engaged in prostitution?

2   A.  Yes.

3   Q.  Okay.  So you know people who are engaged in the life,

4   right?

5   A.  Yes.

6   Q.  The game?  You know people who were engaged in the game,

7   right?

8   A.  What do you mean by "the game"?  The game could mean

9   multiple different reasons -- I mean, multiple different

10  things.

11  Q.  Yes or no, do you understand my question?  Do you know

12  people who were engaged in the life?

13  A.  In prostitution?

14  Q.  Yes.

15  A.  Yes.

16  Q.  Okay, all right.  So girls who are involved in prostitution

17  are called prostitutes, right?

18  A.  Yes.

19  Q.  Okay.  And tricks are sex buyers?  Tricks are sex buyers?

20  A.  Yes.

21  Q.  Okay.  And tricks -- prostitutes do dates with tricks?

22  A.  Are you asking me these questions or are you telling me?

23  Q.  Everything I'm saying is a question, Mr. Duncan.

24  A.  Oh, okay.

25              THE COURT:  Do you want to pose another question so

1   it's clear?

2   Q.  BY MR. FOGERTY:  Dates can happen in a car?  That's a

3   question.

4   A.  Yes.

5   Q.  Dates can happen in a motel, right?

6           MR. ORTIZ:  I'm going to object it calls for

7   speculation.

8           MR. FOGERTY:  He's testified that he knows about the

9   prostitution life.

10          THE COURT:  Well, yeah.

11          THE DEFENDANT:  No, I never said --

12          THE COURT:  You're not testifying.  Can you just for

13  the record so that it's clear, pose your questions as

14  questions.

15  Q.  BY MR. FOGERTY:  Mr. Duncan, pimps manage prostitutes,

16  right?

17  A.  Yes.  That's what we learned during this trial.

18  Q.  And sometimes pimps are called Ps, right?

19  A.  Yes.

20  Q.  Pimps can drive their girls to dates?

21  A.  Yes.

22  Q.  And pimps can provide money for motel rooms, right?

23          MR. ORTIZ:  I'm going to object this all calls for

24  speculation.

25          THE COURT:  Sustained.

1   Q.  BY MR. FOGERTY:  Do you know pimps to run pimping

2   operations?

3   A.  Yes, I know Jaquorey, he was a pimp.

4   Q.  Okay.  So I'm going to ask you questions about what you

5   know about pimps that run pimping operations.  Pimps can post

6   prostitution ads, right?

7           MR. ORTIZ:  Again, same objection.  Calls for

8   speculation.

9           THE COURT:  He's identified one pimp.

10  Q.  BY MR. FOGERTY:  He said he's familiar with pimps that run

11  pimping operations, so I'm asking his understanding of what

12  pimps do during the course of their running those operations?

13  A.  I don't really have an understanding, like, I'm just

14  talking about stuff I learned during this trial.  I don't

15  really have an understanding of what pimps do or where pimps

16  go.  Like, all I know is what I have learned during this trial.

17      Jaquorey was a pimp, yeah, I talked to -- I know he talks

18  about it, you know.  I haven't actually seen him pimp with

19  nobody.  I haven't seen him actually do anything like that, you

20  know, so you asking me these questions and I'm basing it off of

21  this trial.

22  Q.  Can we pull up Exhibit 106, line two.

23      Mr. Duncan, that's your telephone number, right?

24  (916) 370-1486, right?

25  A.  Yes, this is my telephone number, sir.

1    Q.   And the contact next to your telephone number is the term

2    "Daddy," right?

3    A.   Yes.

4    Q.   And Daddy means pimp in the pimp/prostitute world, right?

5              MR. ORTIZ:  Objection.  Calls for speculation.

6    Q.   BY MR. FOGERTY:  Do you know whether Daddy means pimp in

7    the pimp/prostitute world?

8    A.   Daddy is a slang word.

9    Q.   Yes or no.

10   A.   It can be, yes.

11   Q.   Okay, thank you.  We can take that down.

12        Can we pull up Exhibit 708, lines 6 through 10.  Do you

13   know whether pimps ask their prostitutes how much money the

14   prostitutes make?

15   A.   I don't know that.  I've never -- no, I don't know that.

16   Q.   So you don't know that ever to be the case?

17   A.   No.

18   Q.   Okay.  Pimp's goals are to make money, right?

19             MR. ORTIZ:  Objection.  Calls for speculation.

20   Q.   BY MR. FOGERTY:  Do you know?

21   A.   I don't know what a pimp's goal is.

22   Q.   Okay.  So when you were talking to Mr. Carter, you were

23   talking about pimp/prostitute stuff, right?

24   A.   Yes, I was trying to fit in with Mr. Carter, yes.

25   Q.   Right.  So you were trying to fit into the pimp world when

1   you were talking to Mr. Carter, right?

2   A.   Yes.  I was trying to fit in with Mr. Carter, yes.

3   Q.   So when you were trying to fit in as a pimp, you knew that

4   pimps give directions to prostitutes about how to approach

5   prostitution customers, right?

6   A.   No, Carter never told me that.

7   Q.   Did you know that?

8   A.   That's what I was talking about.

9        No.

10  Q.   Okay.  So when you said, "I tell that bitch to walk up to

11  the car and press bitch, push her issue, you feel me," you

12  don't know anything about prostitution?

13  A.   No.  I was telling him something that I overheard somebody

14  else saying.  I was trying to fit in with him.

15  Q.   In October of 2018 you had two phones, right?

16  A.   No, I had one phone.  I had the 370 phone number, but I

17  wasn't using it no more.  But I had the 2096 number, that was

18  my phone.

19  Q.   But at times you've had two phones, right?

20  A.   No.  I was never using two phones at one time.

21  Q.   You've never used two phones at one time?

22  A.   No.

23  Q.   Never?

24  A.   I wasn't using -- I wasn't using the 370 number.  I still

25  had it but I wasn't using it.  I had one phone.  In October of

1  2018 I had one phone.  It was the 745-2096 number.  That was

2  the only phone I was using in October.

3  Q.  My question to you, sir, is have you ever had two phones at

4  one time?

5  A.  Yes, the 370 number and the 2096, but I wasn't using the

6  370 number, but I still had it.  It wasn't off.

7  Q.  So you've had two phones at one time?

8  A.  Yes, I was using -- no -- yes, I had both of the phones,

9  but I was using one.

10  Q.  You've used two phones at the same time, right, Mr. Duncan?

11  A.  I keep explaining the same thing to you, and I don't think

12  I can explain it any further to you.  I had the 370 number but

13  I wasn't using it.  No, I was using the 2096 number, sir.

14  Q.  So you were arrested on May 31st, 2019, right?

15  A.  Yes.

16  Q.  You were called to Mike McCowan's office in Sacramento?

17  A.  Yes.

18  Q.  And when you got there an FBI agent showed you an arrest

19  warrant?

20  A.  I don't think he showed me the warrant; he just showed me a

21  badge.

22  Q.  Okay.  But he told you you were under arrest?

23  A.  Yes.

24  Q.  And you knew you were under arrest?

25  A.  Yes.

1   Q.  You were handcuffed?

2   A.  Yes.

3   Q.  You weren't given the keys to the handcuffs, were you?

4   A.  No, absolutely not.

5   Q.  But you asked one of the officers there to loosen your

6   handcuffs?

7   A.  Yes, I did.

8   Q.  You did that so you could slip out of your handcuffs,

9   right?

10  A.  No.  Actually, I didn't know I would be able to run until

11  he left the door open for me.  So at that point my handcuffs

12  were just too tight, so I asked him to loosen it.  When the

13  officer cuffed me, he cuffed me so tight that he wasn't aware

14  of the cuffs being on, you know, he just snapped them on me,

15  you know.

16  Q.  So at first you weren't going to escape, but then later you

17  decided you were going to escape?

18  A.  When he opened the door, I seen the opportunity to escape.

19  Q.  You saw the opportunity and then you escaped?

20  A.  Yes, I did escape.

21  Q.  Okay.  And when you escaped you ran through midtown

22  Sacramento?

23  A.  Yes.

24  Q.  Right?  You ran through yards?

25  A.  Yes.

1   Q.  Yeah.  And the officers found you near Highway 50, and they

2   asked you to stop, right?

3   A.  Yes.

4   Q.  But you didn't stop?

5   A.  No, I didn't stop.  I kept running until I got tackled.

6   Q.  Right.  So they tried to tackle you, and you fought back?

7   A.  No, I never fought back.  He tackled me, and that's when I

8   stopped.

9   Q.  Okay.  You call girls hoes, right?

10  A.  Yes.

11  Q.  And to you hoes aren't special, right?

12  A.  No, listen.  No, you've got it wrong.  I'm like --

13  Q.  That's a question, yes or no.  Are hoes special to you?

14  A.  Are females special to me?  Yes.

15  Q.  That's not the question, sir.  Are hoes special to you?

16  A.  Yes.

17  Q.  Hoes are special?

18  A.  I think every female is special.

19  Q.  To you none of your hoes are different or special, right?

20  A.  I think every female is different and special.

21  Q.  Okay.  Can we play Exhibit 171, please.

22      (Audio played.)

23  Q.  BY MR. FOGERTY:  And the reason you call them hoes is

24  because they're your property, right?

25  A.  No.  Actually this was a Tee Grizzley song that I was

1    singing.  And I look up to rappers, so I want to be a rapper,

2    that's my dream to be a rapper, and this was a Tee Grizzley

3    song I was singing.  It's one of my favorite rappers and that

4    was a song and that's what he said.  "Ain't none of these hoes

5    special, ain't none of these hoes different."  It was just a

6    song.

7    Q.  Sir, I haven't asked you a question.  You'll have an

8    opportunity to talk again.  I'm going to ask you a question,

9    and I'd ask that you just respond to the questions that I ask

10   you.

11   A.  Yes, sir.

12   Q.  And your lawyer will be able to come up and ask you more

13   questions.

14   A.  Yes, sir.

15   Q.  Okay?

16   A.  Yes.

17   Q.  Thank you.  You know it's unusual for a boyfriend to send

18   his 17-year-old girlfriend to Oakland every night, right?

19   A.  I never did that, sir.

20   Q.  You've been to International Boulevard, right?

21   A.  Absolutely, yes.

22   Q.  And you know that that's the area of Oakland that's known

23   for prostitution activity?

24   A.  Yes, everybody knows that that's around there.

25   Q.  Oh, everyone knows that, okay.

1    A.  That lives around there, yeah, that goes around there, yes,

2    everybody knows that.  It's obvious.

3    Q.  But you didn't live around there?

4    A.  No, I didn't live around there, but I went around there.

5    Q.  Right.  So you lived in Sacramento, right?

6    A.  Yes.

7    Q.  So you would travel 85 -- it's about 85 miles from

8    Sacramento to Oakland?

9    A.  Yes, roughly.

10   Q.  Okay.  So you would travel 85 miles.  How would you get

11   there?

12   A.  By my car.

13   Q.  Okay.  So when you're driving to Oakland, how long does it

14   take to get to Oakland from Sacramento?

15   A.  About like an hour and a half, two hours depending on how

16   you drive.

17   Q.  Right.  Because it's a pretty far distance, right?

18   A.  Yeah.  I like driving.

19   Q.  You like driving.  Sometimes there's a lot of traffic on

20   I-80?

21   A.  Yeah.

22   Q.  So sometimes it's more than an hour and a half, right?

23   A.  Yeah, you've got to drive slow like grandma.

24   Q.  So that's a lot of time in the car, right?

25   A.  Yeah, absolutely.

1    Q.   It is a lot of gas money, right?

2    A.   Absolutely.

3    Q.   It is a lot of time with the people in your car, right?

4    A.   Absolutely.  If you're driving with people, but if you're

5    driving by yourself it gets even more boring.

6    Q.   Right.  So it is a big investment to go to Oakland over and

7    over and over again, right?

8    A.   Not really an investment, no.  It don't cost that much for

9    gas.

10   Q.   A lot of time?

11   A.   Time.

12   Q.   Can we pull up Exhibit 715, page nine, line 53.

13        So Ps are pimps, right?

14   A.   This is not my phone, sir.

15   Q.   That's not the question.  Ps are pimps, right?

16   A.   In the course of this trial, yes, that's what we have

17   learned.

18   Q.   So you've learned that Ps are pimps during this trial?

19   A.   Yes, sir.  Ps are pimps.

20   Q.   You didn't know Ps were pimps before this trial?

21   A.   Yes, I did.

22   Q.   So you did know Ps were pimps?

23   A.   Yes.  Yes.

24   Q.   Okay, all right.  So Ps are pimps, right?

25   A.   Yes.

1    Q.  So if someone said, "You still giggling and laughing in

2    front of Ps," that person is referring to pimps, right?

3                    MR. ORTIZ:  Objection.  Calls for speculation.

4                    THE COURT:  Sustained.

5    Q.  BY MR. FOGERTY:  Can we turn to the next page, please.  The

6    term "in pocket" means being compliant, right?

7                    MR. ORTIZ:  Objection.  Calls for speculation.

8    Q.  BY MR. FOGERTY:  Do you know whether the term "in pocket"

9    means being compliant?

10   A.  No.

11   Q.  You don't know what "in pocket" means?

12   A.  No, I know what "out of pocket" means, but I don't know

13   what "in pocket" means.

14   Q.  Okay.  So what does "out of pocket" mean?

15   A.  Out of pocket is just like you're not right.  Like if I was

16   to tell you right now, you know, your pants are too high, you

17   know, you shouldn't have worn them to court today, you out of

18   pocket.  I basically saying, like, you're not right, you know,

19   like, you're not right.

20   Q.  Oh, okay.  Okay.

21       But you know that -- you know, right, that pimps use the

22   term out of pocket to mean noncompliant prostitutes, right?

23   A.  No.  I think everybody use the word out of pocket.

24   Q.  Oh.

25   A.  My mom use the word out of pocket, and I don't think my mom

1    is a pimp, I would hope not.

2    Q.  So you had sex with Cheyanne, right?

3    A.  Yes, I -- yes, I said that a couple times, I did have sex

4    with Cheyanne, and I'm not denying it.

5    Q.  So you were in a relationship with Cheyanne, right?

6    A.  Sir, a certain type of relationship, yes.  Was it serious,

7    no.

8    Q.  So having sex with a 17-year-old once is not serious?

9    A.  17?  She told me she was 18, sir.

10   Q.  So your 17-year-old girlfriend, Cheyanne, had an abscess in

11   her mouth, right?

12   A.  No, I didn't know about her having an abscess in her mouth.

13   Q.  And an abscess is a big sore in someone's mouth?

14   A.  I know what an abscess is.

15   Q.  Okay.  So you know that an abscess is a big sore in

16   someone's mouth?

17   A.  Yes, I know that an abscess is a big sore in somebody's

18   mouth.

19   Q.  And an abscess can ooze pus or blood?

20   A.  Yes, I've had an abscess before.

21   Q.  You've had an abscess before?

22   A.  Yes.

23   Q.  Oh, so you and Cheyanne had abscesses, huh?

24   A.  I don't know if Cheyanne had an abscess or not.

25   Q.  You used cell phones, we've already talked about that,

1  right?

2  A.  Yes.

3  Q.  And at times you used more than one cell phone?

4  A.  I think I answered this question a couple times too.  I was

5  using the cell phone number 2096.  I was never using two cell

6  phones at one time.  Did I have a cell phone, the 370 number

7  while I had the 2096 number, yes.  But was I using the 370

8  number?  No.  If I was using the 370 number, I wouldn't have

9  been using the 2096 number.

10  Q.  You used a cell phone to call people, right?

11  A.  Yes, I used a cell phone to call people.  That's the only

12  way you can call people, sir.

13  Q.  And you used the cell phone to text people?

14  A.  I used a cell phone to text people.  Yes, I do.

15  Q.  And you use it to save photos?

16  A.  Yes, I use a cell phone to save photos.

17  Q.  And your cell phone contained a lot of personal information

18  about you?

19  A.  Yes.  Yes, the cell phone that my PO took from me contained

20  a lot of information about me, yes, it did.

21          THE COURT:  We are at the point where we should take

22  a midafternoon break.

23          MR. FOGERTY:  This is fine.

24          THE DEFENDANT:  Yeah, no.  We don't need a break.

25          THE COURT:  That's what I'm saying.  We're going to

 1   take our break now, so 20-minute break.  During the break keep

 2   in mind all my admonitions, be back here ready to go at 3:20.

 3   Thank you.

 4        (Jury not present.)

 5             THE COURT:  All right.  You may be seated.  How much

 6   longer do you think you have, Mr. Fogerty?

 7             MR. FOGERTY:  I've got a ways to go.  Especially if

 8   the witness isn't answering the questions, it's going to be a

 9   while.

10             THE COURT:  All right.  Well, I'm just trying to get

11   a sense.  We'll go until 4:30 today, and then if we need to

12   continue with evidence tomorrow, we will.

13        All right.  A 20-minute break.

14        (Recess.)

15             THE CLERK:  Court is back in session.

16             THE COURT:  Are we ready to proceed?

17             MR. ORTIZ:  Yes, your Honor.

18             MR. FOGERTY:  We are, your Honor.

19             THE COURT:  All right.  Let's bring the jury back in.

20        (Jury present.)

21             THE COURT:  All right.  Welcome back, members of the

22   jury.  The audience may be seated.

23        We'll continue with the cross-examination.  I'm remembering

24   that I asked you if you could stay until 5:00 today.  We're

25   going to play it by ear.  We'll continue until 4:30 assuming we

1   need that amount of time.  If we're close, maybe we'll ask if

2   you can stay until 5:00.  I think at this point closing

3   arguments and instructions will be at some point tomorrow, I

4   think that's right.  It depends on how long the evidence takes,

5   and we don't rush that.

6        All right, Mr. Fogerty.

7             MR. FOGERTY:  Thank you, your Honor.

8   Q.  BY MR. FOGERTY:  Mr. Duncan, before the break you testified

9   that you believe every woman is unique, right?

10  A.  Yes, sir.

11  Q.  And if every woman is unique, you wouldn't use violence

12  against a woman, would you?

13  A.  I never used violence against a woman in my life, sir.

14  Q.  Can we play Exhibit 167 from 7:47 to 7:56?

15       (Audio played.)

16  Q.  BY MR. FOGERTY:  Mr. Duncan, that's your voice, right?  Yes

17  or no?

18  A.  Yes, sir.

19  Q.  And that's a recording of a telephone call that you're

20  participating in, right?

21  A.  Yes, sir.

22  Q.  So it's a video recording of a call -- audio call that

23  you're having with Ms. Christian and Cheyanne?

24  A.  Yes, I recorded this video.

25  Q.  Right.  So you recorded the video of yourself talking on

1  the phone with Cheyanne and Ms. Christian?

2  A.  It was Ms. Christian and it was exaggerated.  It wasn't

3  Cheyanne, sir.

4  Q.  Oh, Cheyanne wasn't on that call?

5  A.  No, that wasn't Cheyanne.

6  Q.  So -- so at least Mr. Carter is not the only person you

7  talk about pimping with, right?  You talk about pimping with

8  other people besides Mr. Carter, right?

9  A.  I never talk -- no, I never talk about pimping with nobody,

10  no.

11  Q.  So during that eight-minute call you never said the word

12  "pimp"?

13  A.  Yes, I did.

14  Q.  Okay.  So you talked with other people besides Mr. Carter

15  about pimping, right?

16  A.  In that call I said "pimp," yes, but I don't feel like --

17  yeah, yeah, in that call I did, yes.

18  Q.  Okay.

19  A.  But earlier you said other pimps, and I was saying, you

20  know, the video.

21  Q.  So during your calls with Mr. Carter, you were talking

22  about pimping, right?

23  A.  Yes.

24  Q.  And you were able to understand what Mr. Carter was saying?

25  A.  Yes, I understand what he was saying.

1    Q.   You understood what he was saying?

2    A.   Yeah.

3    Q.   And did you think he understood what you were saying?

4    A.   Well, I don't know what he thinks in his head.  I don't

5    know.  I was talking about --

6    Q.   From his responses, did you think he understood what you

7    were saying?

8    A.   Yes.

9    Q.   Okay.  So you were able to communicate with another pimp,

10   right?

11   A.   Yes.

12   Q.   Okay.  So you were able to convince Mr. Carter that you

13   were a pimp, right?

14   A.   No, I'm not a pimp.  He's the pimp.  I was trying to fit in

15   with him.  I'm not a pimp, he's the pimp.

16   Q.   And you were effectively able to fit in, right?

17              MR. ORTIZ:  Objection.  Calls for speculation.

18              THE COURT:  Overruled.

19        Did you hear the question?

20              THE DEFENDANT:  No, can you repeat it again, please.

21   Q.  BY MR. FOGERTY:  You did a good job of fitting in as a

22   pimp, right?

23   A.   I don't know.  I don't know if I did a good job, honestly,

24   I don't know.  I don't know how to answer -- I don't think so,

25   no.  I don't know.

1    Q.  Can you not remember or you don't know?

2    A.  I don't know if I did a good job or not.

3    Q.  Okay.  Can we pull up Exhibit 2.  That's Cheyanne in

4    Exhibit 2, right?

5    A.  Yes, sir.

6    Q.  And that's how she looked back in September and October of

7    2018?

8    A.  Is that a question?

9    Q.  Yes.

10   A.  No -- I don't remember her looking like this.

11   Q.  Oh, she looked different?

12   A.  She looked -- yeah, a little different.  When I see

13   Cheyanne, I see her with makeup on, you know, she looked

14   different.

15   Q.  Okay.  So let's pull up Exhibit 159.  That's you and

16   Ms. Christian on the bottom?

17   A.  Yes.

18   Q.  And that's Cheyanne on the top?

19   A.  Yes.

20   Q.  And that's you talking to Cheyanne using a video calling

21   application, right?

22   A.  Yes.

23   Q.  Okay.  And if we can go to Exhibit 160, please.  Again,

24   that's you smiling on the bottom, right?

25   A.  Yes, this looks like the same picture.

1    Q.  And on the left is Ms. Christian?

2    A.  Yes.

3    Q.  And on the top is Cheyanne?

4    A.  Yes.

5    Q.  And she's got braces on her teeth?

6    A.  It's kind of blurry.

7    Q.  But you had sex with Cheyanne, right?  You knew she had

8    braces on her teeth, right?

9    A.  Honestly, I did not know that Cheyanne had braces on her

10   teeth.

11   Q.  But you can see braces on her teeth, right?  You can see

12   that in that photo?

13   A.  I do see something on her teeth.  It is kind of blurry.  I

14   don't know if it is braces or not, but I do see something on

15   her teeth.

16   Q.  Okay.  So you dropped Cheyanne off at her parent's house on

17   Stockton Boulevard on September 24th of 2018, right?

18   A.  Yes, sir.

19   Q.  And you dropped her off because you were driving the car,

20   right?

21   A.  Yes, I was driving the car.

22   Q.  Okay.  You were driving that BMW?

23   A.  Yes, sir.

24   Q.  Okay.  And after you dropped her off you sped away, right?

25   A.  Yes, that's how I drive.  I drive fast.  I always speed.

1   Q.  Oh, okay.  So it wasn't unusual for you to speed away from

2   your 17-year-old girlfriend's house --

3                MR. ORTIZ:  Objection.  Argumentative.

4                THE COURT:  Sustained.

5                THE DEFENDANT:  I always drive fast.

6                THE COURT:  Wait for the next question.

7                THE DEFENDANT:  Oh, okay.

8                THE COURT:  I sustained the objection.

9   Q.  BY MR. FOGERTY:  So after the close call with Cheyanne's

10  parents, you called Cheyanne with the (916) 370-1486 number,

11  right?

12  A.  No, I didn't call her.  No.  I was talking to her mom, and

13  after that I didn't call that -- no, I didn't call her.

14  Q.  But you called Cheyanne's phone, right?

15  A.  I don't remember.  No, I don't remember.

16  Q.  You don't remember?

17  A.  No, I don't remember.

18  Q.  Huh.

19  A.  I remember arguing with the mom.

20  Q.  And that was over the phone?

21  A.  Yes.

22  Q.  But you don't remember.  It's true that memory loss is your

23  biggest excuse, right?

24                MR. ORTIZ:  Objection.  Argumentative.

25                THE COURT:  Overruled.

1   Q.  BY MR. FOGERTY:  Memory loss is your biggest excuse, right?

2   A.  No, that's not my biggest excuse.

3   Q.  Can we pull up Exhibit 800, page two.  You remember writing

4   this letter to Ms. Christian, right?

5   A.  Yes, sir.

6   Q.  Do you remember telling her to just go out there and bring

7   you home?

8   A.  Yes, sir.

9   Q.  Can we pull up right there, those two lines, further down.

10  Yeah, all the way across.  Yeah, just all the way across.  See

11  where it says "memory loss is your biggest excuse," right?

12  A.  Yes, sir.

13  Q.  So you told Ms. Christian to go out there and bring you

14  home, and that memory loss was her biggest excuse, right?

15  A.  Yes, sir.

16  Q.  And you can't remember whether you called 17-year-old

17  Cheyanne's mother or 17-year-old Cheyanne, right?

18  A.  I don't think I would call her mother.

19  Q.  So you called her, right?

20  A.  No, her mother had her phone.

21  Q.  And you called Cheyanne's phone, correct?

22  A.  I don't know.

23  Q.  You don't remember?

24  A.  I don't know.

25  Q.  So you just called a random number and you got Cheyanne's

1   mom; is that right?

2   A.  I don't know.  Honestly, I really don't know.

3   Q.  Okay.  Okay.  So you -- when you talked to whoever you

4   talked to, you didn't identify yourself as Robert Duncan, did

5   you?

6   A.  No.  No.

7   Q.  In fact, you told the deputy sheriff you were 16 years old,

8   right?

9   A.  Yes.

10  Q.  Because you didn't want the deputy sheriff to know that you

11  were an adult?

12  A.  Yeah, I got it with the dad.  I didn't want him to know who

13  I was because they were threatening they was going to kill me.

14  Q.  You didn't want the person you were talking to to know that

15  you were an adult, correct?

16  A.  Not correct.  I didn't want the person I was talking to to

17  know who I was.

18  Q.  So you told that person that you were 16 years old?

19  A.  Yes, I did.

20  Q.  And you weren't 16 years old?

21  A.  No, I wasn't.

22  Q.  You were a grownup?

23  A.  Yes.

24  Q.  Okay.  And right up after that incident you cancelled your

25  cell phone service for the 1486 number, correct?

1    A.   No.  I just didn't use the phone no more.

2    Q.   Oh, you didn't terminate the service?

3    A.   No, I never turned the phone off, no.

4    Q.   Okay.  Can we pull up Exhibit 51, please.

5         Will you pull in there.  September 24th, 2018, termination

6    date, do you see that?

7    A.   Yes.

8    Q.   And your name is right under that, right?

9    A.   Yes.

10   Q.   And that's for the number (916) 370-1486, right?

11   A.   Yes.

12   Q.   Okay.  So that phone was terminated on the day you had the

13   close call with Cheyanne's parents, right?

14   A.   No.  I never turned this phone off.  I just stopped using

15   it.  I never went to the service and said "I don't want this

16   phone no more, turn it off."  No, I just stopped using this

17   phone.  This phone was still on after this date.

18   Q.   So it is a coincidence that T-Mobile thinks that that phone

19   was terminated on the same day you had the run-in with

20   Cheyanne's parents?

21             MR. ORTIZ:  Objection.  Argumentative and it calls

22   for speculation.

23             THE COURT:  Overruled.

24   Q.   BY MR. FOGERTY:  Is it a coincidence?

25   A.   This is the honest God's truth.  I never turned that phone

1  off on that day.

2  Q.  Okay.  But the phone was turned off, right?

3  A.  That's what it says right here.

4  Q.  Okay.  Thanks.  We can take that down.

5      In September of 2018, you would go to Oakland, right?

6  A.  Yes.

7  Q.  And if we can pull up Exhibit 21, please.  And that's at a

8  Jack in the Box and El Pollo Loco on International Boulevard in

9  Oakland, right?

10  A.  On 25th Avenue.  25th Avenue.

11  Q.  Do you know if that's the corner of 25th and International

12  Boulevard?

13  A.  Yes, that's what it says right here on the sign.

14  Q.  Have you been to that place before?

15  A.  Yes.

16  Q.  Okay.  And you've been to that Jack in the Box parking lot,

17  right?

18  A.  No.  I ate at this Jack in the Box.  I believe if it is the

19  same one on International.  I ate at this Jack in the Box

20  before, yes, I have.

21  Q.  Okay.  So your answer is yes, you've been to that Jack in

22  the Box?

23  A.  Yes, I ate at this Jack in the Box before.

24  Q.  Okay.  And you know that this is the International blade in

25  Oakland, right?

1   A.   Yes.

2   Q.   And blade means an area known for prostitution activity?

3   A.   Yes.

4   Q.   Okay.  And you've hung out there?

5   A.   No, I didn't hang out there.  I went there to eat some Jack

6   in the Box.

7   Q.   You went all the way to Sacramento to 25th and

8   International Boulevard to go to Jack in the Box?

9   A.   No.  I went all the way from Sacramento to International

10  Boulevard to hang out.  But when I was driving by I stopped and

11  ate Jack in the Box.

12  Q.   So you were hanging out on International Boulevard and

13  decided to eat at the Jack in the Box that was right in the

14  neighborhood?

15  A.   No, I wasn't hanging out on International Boulevard, I was

16  hanging out in Oakland.

17  Q.   Okay.  So of all of the Jack in the Box's in Oakland, this

18  is the one you ate at in Oakland?

19  A.   This is the one I drove by, sir, yes.

20  Q.   And you've been to this area more than once, right?

21  A.   Yes.

22  Q.   You've been there often, right?

23  A.   I wouldn't say often, but I have been driving by

24  International, yes, I have, and I'm not denying that.

25  Q.   And you know that there are people who are walking up and

1   down that street who are engaged in prostitution?

2   A.  Yes.

3   Q.  And you know that pimps hang out in that parking lot?

4   A.  Yes.

5   Q.  So your phone was seized by Mike McCowan in October of

6   2018, right?

7   A.  Yes.

8   Q.  And in that phone you have Cheyanne saved as Lil One,

9   right?

10  A.  Yes.

11  Q.  You called her little one because she's young?

12  A.  Yeah, little one means littler than me.  You know, younger

13  than me.  I'm going to call someone I consider my little homie

14  or my little brother little one, you know, because they're

15  younger than me.

16  Q.  Okay.  But that's Cheyanne's number saved in your phone as

17  little one, right?

18  A.  Yes, I put her number and saved in my phone as little one,

19  yes.

20  Q.  Okay.  So can we pull up Exhibit 152 at page 3.

21      So that 1375 number, that's 17-year-old Cheyanne's number?

22  A.  This is Cheyanne's number.

23  Q.  Okay.  So that's the number that Cheyanne was using when

24  she was at the Woodland Youth Services group home, right?

25  A.  I didn't know that then, but now I know that now, yes.

1   Q.  Right.  So when you sent Eva Christian to pick her up,

2   that's what you guys were using to communicate with her?

3   A.  No, I never sent Eva to pick nobody up.

4   Q.  But you called, you used the 2096 number to call 1375 when

5   Cheyanne was at the Woodland Youth Services group home, right?

6   A.  No.  My baby mama used that phone to call her.

7   Q.  Oh, you never called?

8   A.  No.

9   Q.  So your baby mama is Ms. Christian, right?

10  A.  Yes.

11  Q.  And she's using the 2020 number, right?

12  A.  Yes.

13  Q.  Because it says "Oak Eva," right, because that's where you

14  guys met, right?

15  A.  No.  Because that's where she told me she was from.

16  Q.  But she's not from Oakland, right?

17  A.  No.  She's from San Jose, but she told me Oakland was her

18  second home.

19  Q.  You can take that down.

20      So, Mr. Duncan, your testimony today is carefully tailored

21  to paint a picture that you're not guilty, right?

22          MR. ORTIZ:  Objection.  Argumentative.

23          THE COURT:  Sustained.

24  Q.  BY MR. FOGERTY:  You wouldn't say something today that --

25  you wouldn't intentionally say something today that would hurt

1    you, right?

2    A.  I'm going to tell the truth.  What I say today was the

3    truth.  I'm going to tell the truth.  Even if the truth does

4    hurt me, it's the truth.

5    Q.  And you tried to explain your constant contact with

6    Cheyanne by saying that you were just having sex with a 17 year

7    old, right?

8    A.  She told me she was 18.

9    Q.  Right.  But you tried to explain all of the contact you had

10   with her as just a sexual relationship with somebody who was

11   then 17, right?

12   A.  Yeah.  She told me she was 18, so that's why I had sex with

13   her one time.

14   Q.  You're interested in the outcome of this case, right?

15   A.  Yes.  It's my life.

16   Q.  Because the case involves you, right?

17   A.  It involves my life and me not seeing my children.

18   Q.  And you tried to affect the outcome of this case even

19   before it even came to trial, right?

20   A.  No.

21   Q.  You reached out to Ms. Christian when you two were at the

22   Sacramento County Jail, right?

23   A.  We reached out to each other.

24   Q.  All right.

25   A.  It was my baby mama.  It was my job as a man to take care

1  of my baby mama and help my baby mom.

2  Q.  So you two talked to Ms. Christian about this case while

3  you were at the Sacramento County Jail, right?

4  A.  Yes, we talked together about this case.

5  Q.  And you have a brother named Rashad, right?

6  A.  Yes.

7  Q.  And Rashad helped you communicate with Ms. Christian while

8  you were in custody?

9  A.  Yes, he helped me support my baby mama while she was in

10  custody.

11  Q.  You reached out to Ms. Christian and told her to just go

12  out there and bring you home?

13  A.  Yes.

14  Q.  And by that you meant say the things that you needed her to

15  say?

16  A.  No.  That letter was because of the things she said.  I was

17  replying to the things that she said, the things she was

18  telling me.

19  Q.  You reached out to Ms. Christian to provide your own legal

20  advice, right?

21  A.  I wrote that letter.

22  Q.  Is that a yes or a no, Mr. Duncan?

23  A.  No, I didn't reach out to her, she reached out to me, sir.

24  Q.  You sent Ms. Christian a handwritten letter to provide your

25  own legal advice, right?

1  A.  She asked me.  She reached out to me.

2  Q.  It is a yes-or-no question, sir.

3  A.  No.

4  Q.  Did you send Ms. Christian a letter in which you were

5  providing legal advice?

6  A.  Sir, you asked me two different questions.

7  Q.  Did you send Ms. Christian a letter?

8  A.  Yes.

9  Q.  Did you send her a letter in which you talked about -- you

10  used the word perjury?

11  A.  Yes.

12  Q.  Okay.  You're not a lawyer, right?

13  A.  No.

14  Q.  All right.  Will you pull up Exhibit 800, page two, just

15  the bottom half.

16      That handwritten letter says, "The only thing they can get

17  you for is perjury if they catch you lying on the stand, but

18  that ain't shit.  They probably won't even press charges for

19  that," right?

20  A.  Yeah, this is the letter I wrote.

21  Q.  Right.  "Perjury ain't shit," right?

22  A.  Yeah, she was asking me what was perjury.

23  Q.  Right.  And you said "perjury ain't shit"?

24  A.  Yes, I told my baby mama "perjury ain't shit."

25  Q.  Right.  Because you're not afraid of perjury?

1  A.  No, I wasn't worried about being perjury, she was worried

2  about being perjury.

3  Q.  But you told her "perjury ain't shit," which means you

4  don't care about perjury, right?

5  A.  No, I was telling that for her.

6  Q.  You said perjury ain't shit, right?

7  A.  Yeah, that's what I told her.

8  Q.  Okay.  And then the letter also said, "Don't say I knew she

9  was 17.  Say we never talked about it together," right?

10  A.  Yes.

11  Q.  Okay.  And you have a child with Ms. Christian?

12  A.  Yes.

13  Q.  And this is the handwritten letter to the mother of your

14  child?

15  A.  Yes.  My baby mom.

16  Q.  And then if we go to the last page, you told her to call

17  your lawyer, Mr. Ortiz?

18  A.  Yes, these are the things she was asking me for, so this is

19  what I gave her.

20  Q.  All right.  We can take that down.

21          MR. FOGERTY:  No further questions at this time, your

22  Honor.

23          THE COURT:  All right.  Mr. Ortiz, any further

24  questions?

25          MR. ORTIZ:  Yes, your Honor.

REDIRECT EXAMINATION

1

2   Q.  BY MR. ORTIZ:  Mr. Duncan, remind me who is Tee Grizzley.

3   A.  One of my favorite rappers.

4   Q.  And back in 2018, was it common for you to record yourself

5   rapping?

6   A.  Absolutely.  I love music.

7   Q.  During the course of this trial we've seen about three or

8   four video clips that were taken from your phone.  Do you

9   remember seeing and hearing those?

10  A.  Yes.

11  Q.  Were those examples of you rapping some songs?

12  A.  Yes, this is stuff that I would put on the internet.

13  Q.  The recording that we heard, and we've heard a portion of

14  it on cross-examination, Exhibit 167.  Do you recall hearing

15  the entirety of that recording during the trial?

16  A.  Yes.

17  Q.  And if you can remember, Mr. Duncan, why was it that you

18  sent that recording?  Or why did you make that recording, I

19  should say?

20  A.  Well -- well, you know how like -- I was telling my baby

21  mama these things, you know, and like she was giggling and

22  laughing like everything was all funny.  You know, that's

23  because she's used -- she's used to that.  You know, she's used

24  to that type of stuff.  You know, and --

25  Q.  Let me stop you for a second.  When you say "she's used to

1    that kind of stuff," what do you mean?

2    A.   She's used to prostituting, she's used to being talked to

3    like that, that's why she was laughing and giggling.

4    Q.   Do you normally, or back then, did you normally talk to

5    Ms. Christian in the way we heard you talking in that

6    recording?

7    A.   No.  When I first met her, like, she didn't tell me she was

8    prostituting.  And then when I found out that she was

9    prostituting, I felt lied to, I felt betrayed, you know, I felt

10   backstabbed, and I felt heart broke.  And in that video I was

11   drinking, and I got drunk, and my animosity started to, you

12   know, display itself.  And that's the reason why I was talking

13   like that to her, you know, out of animosity.

14   Q.   You could hear yourself in the recording?

15   A.   Yes.

16   Q.   Did it sound to you that you were under the influence?

17   A.   Yes, I was drunk for sure.

18   Q.   You had mentioned that the individuals that were -- the

19   female voices that we could hear in the car, one of them was

20   Ms. Christian?

21   A.   Yes, it was my baby mama.

22   Q.   And the other one was Xavia (phonetic)?

23   A.   Yes.

24   Q.   You heard Ms. Christian testify that the other voice that

25   we can hear in the video was Cheyanne?

1  A.  Yes.

2  Q.  Was that true?

3  A.  No.

4  Q.  You were shown various pictures of Cheyanne, the first one

5  was Exhibit 2.  Do you remember that picture?

6  A.  Yes.

7  Q.  Where Cheyanne appears to be sitting down with her arms

8  across her knees?

9  A.  Yes.

10  Q.  Is that how she normally looked when you saw her?

11  A.  Honestly, no.  That picture -- she looks different in that

12  picture.  She looks paler, she looks different in that picture.

13  That's not how she looked when I seen her in person.

14  Q.  And when you'd seen her in person, I think you described it

15  as she wore makeup or different kind of clothes --

16  A.  Yes.

17  Q.  -- that made her look older?

18  A.  Yes.

19  Q.  You saw some FaceTime screenshots both in my questioning of

20  you and just now by Mr. Fogerty?

21  A.  Yes.

22  Q.  And do you recall Ms. -- do you recall Cheyanne having

23  braces?

24  A.  No.  Honestly, I didn't even know she had braces until now.

25  Q.  Do you even know she has braces?

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

1    A.  Can you repeat that?

2    Q.  Do you know, as you sit now, whether she does or doesn't

3    have braces?

4    A.  No.  Even in the picture I didn't even see -- it's not even

5    that clear.

6    Q.  You were asked some questions about the phone call

7    regarding the September 24th incident.  Do you remember that

8    line of questioning?

9    A.  Yes.

10   Q.  Do you remember having a conversation with who you thought

11   was Cheyanne's mom?

12   A.  Yes.

13   Q.  Do you remember whether you called her or that number

14   called you?

15   A.  I remember talking to Cheyanne on the phone.  I had called

16   Cheyanne, and I was trying to see if she had made it in the

17   house safe.

18   Q.  And was it during the course of that phone call that the

19   mom got on the phone?

20   A.  Yes, I believe so.  Yes, yes, it is because I heard

21   tussling, and then she picked up the phone.

22   Q.  You were asked some questions about terminating service of

23   that 370 number.  Do you remember that line of questioning?

24   A.  Yes.

25   Q.  Did you personally ever terminate that phone?

1   A.   No, I never turned that phone off.  I just powered it off,

2   like that phone was still on.  I never turned it off, I just

3   powered it off.  I stopped using it.

4   Q.   You were asked some questions about the letter that you

5   sent to Ms. Christian, right?

6   A.   Yes.

7   Q.   And the word "perjury" is referenced in the letter?

8   A.   Yes.

9   Q.   Why are you referencing perjury in that letter?

10  A.   She asked me what perjury was.  She told me she was going

11  to lie to get a deal, and when she got out she was going to

12  tell the truth.  And the worse she was going to get was a

13  perjury.  And when she got out she realized she wasn't going to

14  be sentenced until after I got sentenced, and that's when she

15  realized she was locked in.

16  Q.   And was that what gave rise to this letter?

17  A.   Yes.

18  Q.   In the letter there's a reference to not discussing with

19  Ms. Christian Cheyanne or something being 17, right?

20  A.   Yes.

21  Q.   At any point prior to you getting arrested in this case in

22  May of 2019, did you know that Cheyanne was under the age of

23  18?

24  A.   No.  I believe she was 18, the age she told me she was when

25  I met her.

1    Q.  A lot of the questions that you were asked by Mr. Fogerty

2    were phrased in -- along the lines of you having sex with

3    17-year-old Cheyanne.

4         Do you remember that line of questioning?

5    A.  Yes.

6    Q.  At the time that you had sex with Cheyanne, how old did you

7    think she was?

8    A.  The age she told me she was.  She told me she was 18.

9              MR. ORTIZ:  Right.  Thank you.  That's all I have,

10   your Honor.

11             THE COURT:  Anything further, Mr. Fogerty?

12             MR. FOGERTY:  Yes, your Honor.

13                          RECROSS-EXAMINATION

14   Q.  BY MR. FOGERTY:  So, Mr. Duncan, you said that Eva

15   Christian was used to being talked to like she was a

16   prostitute, right?

17   A.  Yes, she's been prostituting way before she met me.

18   Q.  So she was accustomed to kind of the pimp/prostitute words,

19   right?

20   A.  Yes.

21   Q.  So if there are messages with Ms. Christian at times with

22   someone who sounds like a pimp, you may have been the one

23   sending those messages, right?

24   A.  No.

25   Q.  Because you talked to Ms. Christian like she was used to

1    being talked to, right?

2    A.   No.  That's not correct, sir.

3    Q.   Oh, so --

4    A.   No, just because -- just because somebody is talking to her

5    like a pimp doesn't mean it's me.

6    Q.   But it's possible since you talked to Ms. Christian like a

7    pimp, right?

8    A.   No.  Prostitutes, they talk to a lot of guys.

9    Q.   Well, you said you talked to Ms. Christian like she was

10   used to being talked to, right?

11   A.   Yes, and I said she --

12   Q.   Right?

13   A.   I never said I talked to her like she was -- I said she was

14   used to being talked to like that.

15   Q.   Okay.

16   A.   That's why she was giggling and laughing, and she wasn't

17   mad about me talking to her like that.

18   Q.   Right.  So you were talking to Ms. Christian like a pimp,

19   right?

20   A.   Yes.

21   Q.   Okay.  So if there are messages with Ms. Christian talking

22   to someone who is talking to her like a pimp, they could be

23   from you, right?

24   A.   No.  I was talking to her like that because I was drunk.

25   And, like I said, I had animosity.  I was talking like that

 1  because I was in my emotions, I was in my feelings.  I don't

 2  normally talk to her like that.

 3  Q.  You only talk to Ms. Christian like a pimp when you were

 4  angry with her then?

 5  A.  I talked to her on that video when I was drunk and I was in

 6  my emotions and in my feelings.  That's the only time I ever

 7  talked to her like that.

 8  Q.  So when you get drunk you're able to talk like a pimp?

 9  A.  Man.

10  Q.  Yes or no, please.

11  A.  That time --

12  Q.  Yes or no, please.

13  A.  No.

14  Q.  You're not able to talk like a pimp when you're drunk?

15  A.  No.

16  Q.  But you were just talking in that recording like a pimp,

17  right?

18  A.  And I told you why, sir.

19  Q.  So you're able to talk like a pimp when you're drunk,

20  right?

21  A.  No.

22  Q.  So when you wrote the letter to Ms. Christian, you weren't

23  telling her to tell the truth, right?

24  A.  No.  She didn't -- she wasn't saying --

25  Q.  I'm not asking you about what Ms. Christian was saying.

1   I'm asking you when you wrote the letter to Ms. Christian, you

2   weren't telling her to tell the truth, were you?

3   A.  No.

4   Q.  You were telling her to lie, right?

5   A.  No, I was helping her.

6   Q.  You were helping her lie?

7   A.  I was answering her questions.

8   Q.  Mr. Duncan, when you were writing the letter to

9   Ms. Christian, you were telling her to lie, correct?

10  A.  I was answering her question.  She already had everything

11  she was going to do in her head.  She was asking me, and I was

12  helping her.  I was answering her question, sir.

13  Q.  By answering her questions you were telling her to lie,

14  correct?

15  A.  No, I don't feel like I was telling her to lie.  I felt

16  like she already made her mind up on what she was going to do.

17  Q.  Perjury means lying under oath, correct?

18  A.  Yes, and she asked me about that.

19  Q.  Right.  And you said "it ain't shit," right?

20  A.  And I replied to her, yes, I did.

21  Q.  So you were telling her to lie, right?

22  A.  No.  She already been lying.  She's a liar.  She already

23  been lying.  I can tell a liar and a lie, sir.  She was asking

24  me these questions and I was answering.  I'm not denying that I

25  was answering, I'm not denying that I wrote that letter.

1  Q.  "Remember, it's not what you tell them or my lawyer, it is

2  about what you say on the stand.  Memory loss is your biggest

3  excuse because it was so long ago" --

4  A.  Uh-huh.

5  Q.  And -- right?

6  A.  Yes, that's about the perjury, sir, which she asked me

7  about.

8  Q.  So you're telling her to lie?

9  A.  No, I never told her to lie.

10 Q.  "Don't never admit to me ever texting your phone.  If they

11 ask say, you were talking to so many N word and you don't

12 remember," right?

13 A.  Yes.

14 Q.  So you're telling her what to say?

15 A.  No, I'm not telling her what to say.  This is what she was

16 asking me, and I was replying to her.

17         MR. FOGERTY:  No further questions.

18         THE COURT:  Anything further, Mr. Ortiz?

19         MR. ORTIZ:  No, your Honor.  Thank you.

20         THE COURT:  All right.  Does the defense have

21 additional evidence to present?

22         MR. ORTIZ:  No, your Honor.  The defense rests.

23         THE COURT:  All right.  Is the government seeking to

24 put on a case in rebuttal?

25         MR. FOGERTY:  No, your Honor.

1                    THE COURT:  All right.  So all the evidence is now

2      in, correct, Mr. Ortiz?

3                    MR. ORTIZ:  Yes, your Honor.

4                    THE COURT:  Mr. Fogerty?

5                    MR. FOGERTY:  Yes, your Honor.

6                    THE COURT:  All right.  With that, because we have a

7      half hour to an hour at most and that is not sufficient time

8      for closing arguments and jury instructions, it is best to give

9      all of that to you at the same time so you can hear each side's

10     closing, the government has a chance for rebuttal, and then I

11     would give you the law for you to apply.

12         So I'm going to excuse you now early for the afternoon.

13     Please be ready to go tomorrow morning at 8:30.  And the

14     parties are saying they may take up to an hour and a half each

15     total for closing, so the case should go to you by noon or so,

16     perhaps a little bit later depending on when we take breaks.

17         So because of that and the time of the case -- the timing

18     of the case, it is essential that you pay very careful

19     attention to all my admonitions.  No research of any kind, no

20     discussing the case with anyone.  If anyone attempts to contact

21     you in any way, please let me know first thing in the morning.

22     It is essential that you hear the closing yet and my

23     instructions and your fellow juror's opinions before you

24     consider how to decide the case.

25         Thank you for your service today.  We'll see you tomorrow

THRESHA SPENCER, OFFICIAL COURT REPORTER, USDC

```
 1   morning.  Have a good evening.
 2        (Jury not present 4:00 p.m.)
 3             THE COURT:  We have a juror coming back.  Did you
 4   leave something, Mr. 100989432?
 5             JUROR 100989432:  Yes.
 6             THE COURT:  All right.  Oh, there you go, your water
 7   bottle.  Have a good evening.
 8             JUROR 100989432:  Thank you.
 9             THE COURT:  All right.  You may be seated.  Let me
10   just ask briefly before Mr. Duncan is escorted back.  Is there
11   any housekeeping?  The main housekeeping I know of is the jury
12   instructions which I believe you have.
13             MR. FOGERTY:  Yes.  Right.
14             THE COURT:  You have what I propose for the final
15   instructions given that Mr. Duncan now has testified, I
16   substituted the instruction for his testifying, and that should
17   be showing as instruction number three, simply saying that you
18   should treat this testimony just as you would the testimony of
19   any other witness.  And then instruction number four is the
20   plain vanilla priors instruction.
21        So is there any objection to those final proposed
22   instructions?
23             MR. FOGERTY:  No, your Honor.
24             MR. ORTIZ:  No, your Honor.
25             THE COURT:  All right.  So you may use those
```

1    instructions in closing, refer to them.  I'll prepare a final

2    version, and we also have the verdict form.

3         Is there anything else we need to discuss tonight yet,

4    Mr. Fogerty, Mr. Stefanki?

5              MR. STEFANKI:  No, your Honor.

6              MR. FOGERTY:  No, your Honor.

7              MR. ORTIZ:  No, your Honor.  Thank you.

8              THE COURT:  All right.  Then we'll recess, and

9    Mr. Duncan can return to counsel table and confer with

10   Mr. Ortiz, and we will see you tomorrow morning.

11             MR. ORTIZ:  Thank you.

12             MR. FOGERTY:  Thank you.

13             (Proceedings adjourned:  4:02 p.m.)

14                       ---o0o---

15   I certify that the foregoing is a correct transcript from the

16   record of proceedings in the above-entitled matter.

17

18                      /s/ Thresha Spencer
                        THRESHA SPENCER
19                      CSR No. 11788, RPR

20

21

22

23

24

25