1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF CALIFORNIA
2

3    UNITED STATES,
              Plaintiff,
4                                  Sacramento, California
     vs.                           No. 2:19-cr-00090-KJM
5                                  Tuesday, March 8, 2022
     ROBERT PIERRE DUNCAN,         8:39 a.m.
6          Defendant.
     _____/
7

8

9                    TRANSCRIPT OF PROCEEDINGS
                          TRIAL DAY 7
10        BEFORE THE HONORABLE KIMBERLY J. MUELLER, CHIEF JUDGE

                         ---oOo---
11

12   APPEARANCES:

13     For the Government:         UNITED STATES ATTORNEY'S
                                   OFFICE
14                                 501 I Street, Suite 10-100
                                   Sacramento, CA  95814
15                                 By:  BRIAN ALEXANDER FOGERTY
                                        SAMUEL E. STEFANKI
16                                 Assistant U.S. Attorneys

17
       For the Defendant:         ORTIZ LAW GROUP, PC
18                                 1510 J Street, Suite 100
                                   Sacramento, CA  95814
19                                 By:  JESSE ORTIZ, III
                                   Attorney at Law
20

21     Official Court Reporter:   Thresha Spencer,
                                   CSR, RPR
22                                 501 I Street
                                   Sacramento, CA 95814
23

24
       *Proceedings recorded by mechanical stenography, transcript*
25     *produced by computer-aided transcription*

1        SACRAMENTO, CALIFORNIA, Tuesday, March 8, 2022, 8:39 a.m.

2                                  --o0o--

3        (In open court.)

4                THE CLERK:  Calling criminal case 19-90; United

5    States versus Robert Pierre Duncan.  This is on for jury trial,

6    and today is day seven.

7                THE COURT:  All right.  Good morning.  All counsel

8    are present, Mr. Duncan is present.  Just for the record, 6-A I

9    show as admitted on March 2nd.

10               MR. FOGERTY:  Thank you, your Honor.

11               THE COURT:  I think -- there was at one point we had

12   a discussion after it first was read and clarified those stips

13   themselves were coming in as exhibits.

14               MR. FOGERTY:  That's my recollection as well.  Thank

15   you, your Honor.

16               THE COURT:  Cleanup notes at that point.

17          Any other housekeeping, Mr. Fogerty?

18               MR. FOGERTY:  No, your Honor.  Thank you.

19               THE COURT:  Mr. Ortiz?

20               MR. ORTIZ:  Just my request, your Honor, is once

21   Mr. Stefanki is done, that we take a break so I can switch out

22   my computer and then I begin my closing.

23               THE COURT:  I think that is fine.  Is the government

24   asking to reserve time and have the Court notify it when it

25   hits a certain point in closing?

1          MR. FOGERTY:  Yes.  We'd like to reserve the balance

2     of the hour and a half for rebuttal.

3          THE COURT:  Well, I guess what I'm asking is, do you

4     want a sign at an hour?

5          MR. FOGERTY:  Yes, that's fine.  That would be

6     helpful, your Honor.  Thank you.  If you could just -- if the

7     Court is just offering to let Mr. Stefanki know when we've hit

8     that point, that would be helpful.

9          THE COURT:  That's what I'm suggesting.  Are you

10     trying to reserve a certain amount of time?

11          MR. FOGERTY:  We'd like to -- it doesn't matter

12     exactly how much time we have for rebuttal.  So if the Court

13     would like to give us a heads-up that we're at the one-hour

14     mark, that would be helpful.  If not, that's fine.

15          THE COURT:  All right.  I'll do that.  All right.

16        Anything else, Mr. Fogerty, Mr. Stefanki?

17          MR. FOGERTY:  No, your Honor.  Thank you.

18          THE COURT:  Mr. Ortiz?

19          MR. ORTIZ:  No, your Honor.  Thank you.

20          THE COURT:  All right.  Let's bring the jury in.

21        (Jury present 8:41 a.m.)

22          THE COURT:  Welcome back, members of the jury.  The

23     audience may be seated and counsel as well.  We hope you had a

24     good evening.  We are ready now, as I told you, for closing

25     argument, and then I will instruct you providing the

1    instructions that will guide your deliberations.

2        Just so you have a sense of the schedule this morning, the

3    government will go first and is reserving some time for

4    rebuttal, so I'm going to let the government know when it hits

5    an hour.

6        Whenever the government is done with its initial portion of

7    closing, we'll then take a break to allow Mr. Ortiz to get set

8    up.  He'll then provide the defense closing argument, and then

9    there will be some government rebuttal, and then I will

10   instruct you.  So that will play out over the morning, and then

11   the case will go to you.  So I'm going to recognize the

12   government now for the first portion of its closing argument.

13           MR. STEFANKI:  Thank you, your Honor.

14   Ladies and gentlemen, Robert Duncan put 17-year-old

15   Cheyanne A. to work having sex with strangers.  He did this to

16   make money for himself.  He knew she was 17 years old when he

17   did this to her.  He worked with Eva Christian to do this to

18   her.  When he was caught, he escaped from custody and went

19   running through the streets of Sacramento.

20       You have now heard and seen all of the evidence, and that

21   evidence proved that Mr. Duncan used a number of different

22   tools to send 17-year-old Cheyanne on a miserable journey

23   performing sex acts with strangers.  He used phone calls which

24   you heard.  He used text messages which you read.  He used

25   location tracking apps which you saw on Cheyanne's phone.  He

1   used motels and apartments, and you saw the receipts.  And he

2   used his partner, his co-conspirator, Eva Christian, to move

3   Cheyanne from place to place.  He used Ms. Christian to teach

4   Cheyanne the rules of the game.

5       And he used Ms. Christian to ensure that Cheyanne's body

6   made as much money for him as she possibly could.  There are

7   three counts in this case that you will decide.  Conspiracy to

8   sex traffic Cheyanne, sex trafficking of Cheyanne, and escape

9   from custody.

10      We will start with the sex trafficking count.  Every crime

11  is composed of elements.  An element is just something that the

12  government has to prove to you.  So once you find that the

13  government has proved an element, you can check the box and

14  move on to the next element.  Once you find that all the

15  elements are proven, then you can and must find the defendant

16  guilty and move on to the next count.

17      There are three elements to the trafficking count:  First,

18  Mr. Duncan knowingly recruited, enticed, harbored, transported,

19  provided, obtained, or maintained Cheyanne to engage in a

20  commercial sex act.  We will talk about what each one of those

21  words means, but you only need to find that Mr. Duncan did one

22  of these things in order to find this first element satisfied,

23  check the box, and move on to the next element.

24      The second element is that Mr. Duncan knew or recklessly

25  disregarded that Cheyanne was not 18 and that she would be

1   caused to engage in a commercial sex act, or that Mr. Duncan

2   had a reasonable opportunity to observe Cheyanne and knew that

3   she would be caused to engage in a commercial sex act.

4        If you find any of these three things to be true, this

5   element is satisfied, and you can check the box and move on to

6   the next element.

7        And, third, the conduct was in or affecting interstate

8   commerce.  That's a lot of words.  So let's break it down a

9   little bit, and I'm just going to talk about the first element

10  for a moment.

11       The first element, again, is that Mr. Duncan recruited,

12  enticed, harbored, transported, provided, obtained, or

13  maintained Cheyanne so that she could engage in a commercial

14  sex act.

15       Those are different ways to commit the crime, and they are

16  all listed in the yellow box that you see on the screen.  The

17  evidence we will walk through together over the next few

18  minutes shows that Mr. Duncan did each one of these things in

19  the yellow box.  But again, it's important for you to keep in

20  mind that you only need to decide that he did a single one of

21  them in order to find this element satisfied.

22       So let's start with the term "provide."  To provide means

23  to make something available for someone to use.  That's exactly

24  what Mr. Duncan's pimping operation was all about.  It was

25  about providing Cheyanne to any paying customer.

1          Mr. Duncan did this by posting ads of Cheyanne on the

2     internet.  These ads were available for anyone with an internet

3     connection to see.  They were available for any sex buyer with

4     money to respond to.  You saw Mr. Duncan's post, ladies and

5     gentlemen.  They have 17-year-old Cheyanne's picture on them

6     because she is the product being provided.

7          But they also have Mr. Duncan's phone number.  This makes

8     sense because he is the one providing Cheyanne; he is the one

9     who gets all the benefits.

10         A sex buyer could find this ad when it was on

11     adultsearch.com in the fall of 2018.  If the sex buyer liked

12     what he saw, he could set a date with Cheyanne.  But to do so,

13     the sex buyer had to go through the person providing her, the

14     defendant, Robert Duncan.

15         And make no mistake about what is being provided here,

16     ladies and gentlemen, it's commercial sex acts with Cheyanne.

17     You will be instructed that a commercial sex act means a sex

18     act performed in exchange for anything of value.  And you can

19     see the exchange right here.  Special Agent Hardie told you at

20     the beginning of the trial about what prostitution

21     advertisements look like.  And these ads of Cheyanne include

22     all those hallmarks that he talked about:  Type of date, price,

23     description of the product.  This is your typical internet

24     prostitution advertisement, ladies and gentlemen.

25         This evidence is proof that Mr. Duncan provided Cheyanne to

1    sex buyers; therefore, the first element is met.  But, as you

2    will be instructed, there is more than one way to satisfy this

3    first element.  So even though he only needs to have done one

4    of these things in the yellow box in order to be guilty,

5    Mr. Duncan actually did every single one of them.

6        For example, Mr. Duncan transported Cheyanne so that she

7    could engage in prostitution.  To transport someone just means

8    that Mr. Duncan drove Cheyanne places or that he had

9    Ms. Christian do it.  And you know this happened because of the

10   evidence you heard about Mr. Duncan's activities in September

11   of 2018.

12       During that month Mr. Duncan drove Cheyanne from Sacramento

13   to the Oakland blade and back again numerous times.  He did

14   this so that she could pick up tricks; that is, customers

15   willing to pay for sex with her.

16       The cell phone location information that you've seen and

17   heard about during the trial backs up this fact.  Mr. Duncan

18   was lurking by Cheyanne's father's apartment along Stockton

19   Boulevard in the early afternoon of September 12th.  You know

20   this because his phone was using cell towers there while

21   Mr. Duncan communicated with Ms. Christian.

22       And FBI Special Agent Bryant testified about how cell

23   towers worked, so you know Mr. Duncan's phone was here and was

24   using nearby towers to call Ms. Christian.

25       And, ladies and gentlemen, you know why Mr. Duncan was

1    there because you know where they went next, to the Oakland

2    blade, an area along International Boulevard in Oakland, a

3    strip notorious for high volumes of prostitution.

4        Now, you know that Mr. Duncan, Ms. Christian, and Cheyanne

5    weren't on the blade in the late night hours of September 12th

6    to shop at the Dollar Tree you see or to sell cars.  They were

7    there so that Cheyanne and Ms. Christian could make money for

8    Mr. Duncan by performing sex acts, which is why Mr. Duncan was

9    calling Cheyanne and Ms. Christian all night long, which you

10   know he was doing because you saw his phone records.

11       Those phone records prove that Cheyanne is the 7433 number

12   you see here.  That's the same number that "Daddy" called on

13   September 24th, 2018, when Sacramento County Sheriff Deputy

14   Kendal Chaplin answered the phone and spoke to Mr. Duncan

15   outside Cheyanne's father's apartment.  And you know the 2020

16   number on your screen is Ms. Christian because you saw it on

17   the Miramonte and Trovas Apartment Rental Application that she

18   submitted for Mr. Duncan.

19       These phone records that Special Agent Bryant analyzed and

20   that she explained to you contain electronic data collected by

21   a phone company.  But these everyday routine business records

22   are powerful.  They're powerful because they show you where

23   Mr. Duncan was and who he was talking to.  He was in Oakland,

24   which is where he said yesterday he went to meet Ms. Christian

25   in person because she lived in San Jose at the time, but these

1   phone records also show you that Mr. Duncan called

2   Ms. Christian and Cheyanne 33 times in a single seven-hour

3   period on this one day alone.

4       If Mr. Duncan was just visiting Ms. Christian in Oakland,

5   as he testified yesterday, there would have been no need for

6   him to call her 19 times, and there can be only one reason why

7   an adult like Mr. Duncan was on the Oakland blade calling

8   Cheyanne dozens of times herself in the late evening hours on

9   September 12th.

10      You heard from Special Agent Hardie about how pimps need to

11  stay in constant contact with their prostitutes.  That's so

12  they can manage their prostitute's activities.  That's what

13  Mr. Duncan was doing in the late night hours of September 12th

14  on the Oakland blade, he was pimping Cheyanne.

15      And these phone records also tell you about the end of this

16  episode, ladies and gentlemen.  They tell you that after she

17  worked for a night on the blade, Mr. Duncan brought Cheyanne

18  back to her father's apartment on Stockton Boulevard in

19  Sacramento, and this wasn't just a one-time event.  You saw the

20  maps tracking Mr. Duncan's location on September 12th,

21  September 13th, September 14th, and September 15th.

22      His phones, they followed the same general pattern every

23  time, and that's what you would expect from an organized

24  pimping operation like Mr. Duncan's.  His phone was there when

25  Mr. Duncan collected Cheyanne at her father's apartment on

1   Stockton Boulevard during the day.  It was there when he drove

2   her to Oakland.  It was there while she walked the Oakland

3   blade on International Boulevard at night.  And you know this

4   because Mr. Duncan called her and Ms. Christian dozens of times

5   a night.  The phone company recorded his location as he did so.

6      He did so to relay instructions and details about dates,

7   and he did so to receive updates on how much money they were

8   making for him.

9      Mr. Duncan's phone was also there when he returned Cheyanne

10   to her South Sacramento home each following morning.  This

11   pattern that you saw from Mr. Duncan's phone location, it lines

12   up with what Special Agent Hardie told you at the beginning of

13   the trial.

14      He testified about how important it is for pimps to stay in

15   contact with their prostitutes while those girls are walking

16   the streets.  These phone records and these maps show you what

17   that looks like in real life.

18      This evidence, ladies and gentlemen, is proof that

19   Mr. Duncan transported Cheyanne.  He did this so that she could

20   engage in sex acts for money.  This is another way that you

21   know the first element is met.  And this pattern, this routine,

22   it worked well for Mr. Duncan.  That's why he kept repeating it

23   by transporting Cheyanne to Oakland and back during September.

24      At least it worked well until his close call on September

25   24th with a Sacramento County Sheriff Deputy and Cheyanne's

1    parents outside her father's apartment.

2        You heard about that encounter with Deputy Chaplin, ladies

3    and gentlemen, and, more important, you know what happened

4    next.  Cheyanne was recovered by law enforcement and taken to a

5    children's home in Woodland.

6        And when that happened, Mr. Duncan did precisely what you

7    would expect a pimp who loses his most valuable product to do.

8    He began to recruit, entice, and obtain that valuable product

9    so that it could be his again.  In other words, he got Cheyanne

10   back.  And as soon as he did that, he made her work the streets

11   again for his benefit.

12       And you heard how Mr. Duncan got Cheyanne back, ladies and

13   gentlemen.  First, he sent Ms. Christian to Cheyanne's school

14   to deliver a new cell phone.  Mr. Duncan couldn't go himself,

15   he didn't blend in, and the handoff took place in the girls'

16   bathroom.  But Mr. Duncan needed to reestablish contact with

17   Cheyanne, so he sent Ms. Christian to do the dirty work.

18       And once Mr. Duncan had that cell phone, that electronic

19   leash back in Cheyanne's hand, that's when the recruiting and

20   the enticing began.

21       He used video chatting applications like what you see here

22   to lure Cheyanne back to him.  He did this on a day in early

23   October when you know Cheyanne was still at the Woodland

24   children's home.  And just a few days later, Mr. Duncan sent

25   Ms. Christian to obtain Cheyanne from the children's home.

1          And the phone records line up with Ms. Christian's

2     testimony on this point.  Those records put Cheyanne in

3     Woodland after midnight on October 10th.  She was in constant

4     contact with Mr. Duncan and Ms. Christian at this time.  The

5     phone records also put Mr. Duncan in Natomas at this time.  And

6     Woodland is about a 20-minute drive from Mr. Duncan's apartment

7     in Natomas.

8          So about 35 minutes after Mr. Duncan called Cheyanne a

9     little bit after midnight, she was back in Natomas with him for

10    the first time since that close call with Deputy Chaplin two

11    weeks prior.

12         The phone records show you that Ms. Christian sprung

13    Cheyanne from the children's home, and they show you that she

14    returned Cheyanne to Mr. Duncan.

15         Here's what those phone records look like plotted on

16    Special Agent Bryant's map.  You can see how Mr. Duncan,

17    Ms. Christian, and Cheyanne were communicating with each other.

18    Look at the number of calls Mr. Duncan made to Ms. Christian

19    and to Cheyanne during the very brief period when you know that

20    Ms. Christian drove to Woodland, collected Cheyanne, and

21    returned her to Mr. Duncan in Natomas.  This is Mr. Duncan's

22    springing Cheyanne from her children's home and bringing her

23    back to him.

24         And where Cheyanne went just a few hours later tells you

25    exactly why Mr. Duncan went to such great lengths to entice

1    Cheyanne out of the children's home.  He sent 17-year-old

2    Cheyanne back to where she could make him money.  Back to work,

3    back to the blade.

4        This map shows you how he did this.  Barely seven hours

5    after Mr. Duncan and Ms. Christian took her away from the

6    Woodland children's home, Cheyanne was back in Oakland, and she

7    was in constant contact again with Mr. Duncan and

8    Ms. Christian.

9        Mr. Duncan had to keep Cheyanne's electronic leash tighter

10   this time.  He couldn't afford to lose his most valuable

11   product again.  He couldn't afford any more close calls like

12   the one with Deputy Chaplin.  And that's why as soon as she got

13   to Oakland in the evening of October 10th, the same day she was

14   sprung from the children's home, Cheyanne was constantly on the

15   phone with Mr. Duncan.

16       Mr. Duncan recruited, enticed, and obtained Cheyanne from

17   her Woodland children's home.  And then he put her right back

18   to work for him.  These are three more ways that you know this

19   first element is satisfied.

20       And that's not all he did, ladies and gentlemen.

21   Mr. Duncan also maintained Cheyanne.  He did this so that she

22   could make as much money as possible for his pimping operation.

23   To "maintain" means to make it possible for something to

24   continue as it has been.  Robert Duncan was an expert at doing

25   everything he could to maintain Cheyanne.  In doing so, he

1    ensured that she could continue performing commercial sex acts

2    for his benefit.

3        You saw how this played out.  First, Mr. Duncan made sure

4    that Cheyanne and Ms. Christian had cell phones that only he

5    knew about.  These were just like those tracfones that Special

6    Agent Hardie explained to you at the beginning of the trial.

7        You know this because when Cheyanne and Ms. Christian were

8    arrested on the Oakland blade during an antiprostitution sting

9    on October 25th, they each had only their tracfones with them.

10   Both phones were registered in the false name of Marcus Smith.

11   Both phones were registered on the same day, October 15th.

12   October 15th was just five days after Mr. Duncan enticed

13   Cheyanne to return to him from the Woodland children's home.

14   And both phones were registered to the same road in the Bay

15   Area.  This just happened to be where one of Ms. Christian's

16   former boyfriends used to live.

17       This is exactly how you would expect a pimp like Mr. Duncan

18   to set up his electronic leashes, especially when his most

19   valuable product was on the run from a children's home,

20   especially when he had merely been caught by law enforcement

21   outside Cheyanne's father's apartment just a few weeks before,

22   and especially when he had a lieutenant and Ms. Christian who

23   would help him register the phone.

24       And you saw how he used these electronic leashes, ladies

25   and gentlemen.  You saw the message that Mr. Duncan sent to the

1    phone that he assigned Cheyanne.  Messages in which he

2    controlled her every move.  Messages in which he told her to

3    stop laughing in front of other pimps and to behave herself

4    like these ones.  Messages reminding Cheyanne that he always

5    had his eyes on her while she was on the blade working for him.

6        You saw messages in which he monitored how much money

7    Cheyanne was making for him like these ones.  Because remember,

8    ladies and gentlemen, this was all about money for Mr. Duncan.

9    That's why he used the Life360 application to track every move

10   Cheyanne made while she was being put to work.

11       You saw how Cheyanne's Life360 account was "Ashley" on her

12   Tracfone.  Knowing where his most valuable product was at all

13   times allowed Mr. Duncan to maximize the amount of money she

14   made for him.  She had nowhere to hide so all she could do was

15   work.  And you know who got the benefit?  It was Mr. Duncan.

16       So you know why Mr. Duncan tracked Ashley on his own phone,

17   and you also saw how Mr. Duncan tracked Ashley on his own

18   phone.

19       This is a screenshot from the phone that Michael McCowan

20   took off Mr. Duncan when he arrested Mr. Duncan in October.  It

21   proves that Mr. Duncan used Life360 to track Cheyanne.  Life360

22   turned Cheyanne's cell phone into an electronic leash.  Life360

23   allowed Mr. Duncan to keep constant surveillance on her.  And

24   Mr. Duncan used this leash to maintain Cheyanne so that she

25   could make him money.

1    You know this because you also saw the messages that line

2  up with the Life360 on Mr. Duncan's, Cheyanne's, and

3  Ms. Christian's phones.  Messages demonstrating to you that

4  Mr. Duncan's control over Cheyanne was so total and so complete

5  that he knew her exact physical location.  This is yet another

6  example of how it always came back to the money Cheyanne could

7  make for Mr. Duncan.  That's why he watched her every move from

8  afar.

9    Life360 told Mr. Duncan where and when Cheyanne was turning

10  tricks for his benefit.  Because remember, ladies and

11  gentlemen, every time 17-year-old Cheyanne had sex with a

12  stranger in Oakland, Robert Duncan made money.  And it makes

13  sense that Mr. Duncan used Life360 to maintain and monitor

14  Cheyanne.  It makes sense because she was his most valuable

15  asset; she was his most priced commodity.

16    And this is especially true because Mr. Duncan had nearly

17  lost this valuable product back in September.  Think of all the

18  effort that it took for him to get Cheyanne back after she went

19  to the Woodland children's home.  Mr. Duncan couldn't let that

20  investment get away again.  He used his electronic leash to

21  make sure she never would.

22    And Mr. Duncan used his cell phone to keep tabs on more

23  than just where Cheyanne was, he also used it to maintain

24  Cheyanne's ability to work for him on the blade.  He used it to

25  ensure that she could produce for him as efficiently as

1   possible.

2       And you know what the product was -- it was Cheyanne

3   herself.  Except she wasn't actually a product, she was a girl.

4   She was a girl who developed an abscess in her mouth while he

5   was pimping her.  Mr. Duncan maintained her by giving her some

6   of his own abscess pills to stop it from oozing.

7       This was no act of charity, ladies and gentlemen, this was

8   Mr. Duncan maintaining his most productive asset so that

9   potential customers wouldn't be scared off from doing business

10  with her.  Because if men didn't want to have sex with Cheyanne

11  due to the oozing abscess in her mouth, then Robert Duncan

12  didn't get paid.  And as his words and the other evidence

13  you've seen throughout this trial has shown you, getting paid

14  was all that mattered to Mr. Duncan.

15      The evidence shows you how Mr. Duncan maintained Cheyanne

16  and the evidence shows you why Mr. Duncan maintained Cheyanne.

17  So you have another way to find that Mr. Duncan's conduct met

18  this first element of the trafficking count.

19      It's clear that Mr. Duncan maintained Cheyanne so that she

20  could perform commercial sex acts for him, but Mr. Duncan also

21  had to make sure that he had a place to keep Cheyanne after

22  each night of performing sex acts with strangers, especially

23  after his close call in front of Cheyanne's father's apartment

24  on September 24th.

25      He couldn't rest letting her stay out of his reach, and so

1    he harbored Cheyanne himself.  To harbor someone just means to

2    keep them somewhere, and Mr. Duncan kept Cheyanne someplace, in

3    an apartment in Natomas.

4        This is the front door of the Miramonte and Trovas

5    apartment in Natomas where Mr. Duncan harbored Cheyanne.  You

6    know she was here because this was the first place that her

7    phone connected to a cell tower after Mr. Duncan and

8    Ms. Christian obtained Cheyanne from the Woodland children's

9    home.  That same day Cheyanne was back in Oakland again working

10   for Mr. Duncan.

11       You have another way of knowing that Mr. Duncan harbored

12   Cheyanne in the apartment.  That's because he and Ms. Christian

13   talked about Cheyanne and the mundane kind of things that

14   roommates talk about, like locking the door when someone

15   leaves.

16       You also know that Mr. Duncan harbored Cheyanne in the

17   Natomas apartment because you saw him get mad at her when she

18   slammed the apartment doors.  Because even when she wasn't

19   being put to work on the Oakland streets, Cheyanne still had to

20   follow Mr. Duncan's rules.  She was in his house, after all.

21       And the apartment in Natomas is not the only place where

22   Mr. Duncan harbored Cheyanne.  You saw the receipts from the

23   Motel 6 in Oakland where Cheyanne and Ms. Christian performed

24   sex acts for money.  You saw how the Motel 6 was near

25   everything they did when Cheyanne, Ms. Christian, and

1    Mr. Duncan were in Oakland.

2        The Motel 6 was home base because it was conveniently

3    located, but remember it wouldn't rent rooms to children.

4    That's why all the rentals had to be in Ms. Christian's name.

5        The Motel 6 in Oakland was another place where Mr. Duncan

6    harbored Cheyanne.  The Motel 6 and the Natomas apartment were

7    two of the many ways that Mr. Duncan's actions satisfied the

8    first element of the trafficking count.

9        And there is no question about what Cheyanne was supposed

10   to do for Mr. Duncan when she was in Oakland at the Motel 6 and

11   on the blade.  She was supposed to perform sex acts with

12   strangers for money, and Mr. Duncan knew it.  There's only one

13   reason for Mr. Duncan to send a 17 year old to the blade night

14   after night after night.  You saw what that reason was in

15   Mr. Duncan's own words.

16       There's only one possible explanation for why a 17-year-old

17   girl is out on International Boulevard provocatively dressed at

18   5:00 in the morning, ladies and gentlemen.  You know what that

19   reason is and Robert Duncan knew what that reason was.  You

20   heard him tell you what that reason was in his own words.

21       (Audio played.)

22           MR. STEFANKI:  So based on all the evidence you've

23   heard in this case, ladies and gentlemen, evidence which we've

24   only just summarized over the last few minutes, you know that

25   Mr. Duncan recruited, enticed, harbored, transported, provided,

1   obtained, and maintained Cheyanne to engage in a commercial sex

2   act.

3       You only need to find that he did one of these things in

4   order to decide that this element is satisfied.  But as we just

5   explored, Mr. Duncan did every single one of them.  And so you

6   can check this first element off because it's been met by the

7   evidence you've seen over this trial.

8       Let's talk now about the third element of the crime.  I'm

9   not going to linger too long on this element, but here's what

10  you need to know about it.  This element is met where a conduct

11  in the case was in or affecting interstate commerce.  You'll be

12  instructed that acts or transactions that are economic in

13  nature and affect the flow of money in the stream of commerce

14  to any degree affect interstate commerce.

15      And you've seen plenty of evidence over the course of this

16  trial showing that the way Mr. Duncan pimped Cheyanne affected

17  the flow of money.  You'll also be instructed that in

18  determining whether this element is met, you may consider

19  whether Mr. Duncan used the internet or motels that serviced

20  interstate travelers.

21      You know he did so because you saw the evidence that

22  Mr. Duncan and Ms. Christian harbored Cheyanne at a Motel 6 in

23  Oakland.  You heard from the Motel 6 representative that this

24  location was part of a national chain renting motel rooms to

25  customers.  That same witness testified that this Motel 6

1  location served out-of-state guests.  You also can know,

2  because you can see it here, that Ms. Christian used the

3  internet to make these motel reservations.  And you heard

4  testimony that the internet is a global network of computers

5  and servers.  That's enough to prove the interstate element of

6  Mr. Duncan's crime.

7       But you also heard testimony that Life360 is an application

8  that uses the internet.  You've learned that Mr. Duncan told

9  Cheyanne and Ms. Christian to keep the WiFi on their phones

10  turned on so that he could track them using Life360.  And you

11  saw the ads that Mr. Duncan posted on the internet providing

12  Cheyanne to sex buyers.

13      The use of the internet and the use of Life360 also satisfy

14  the interstate commerce element of Mr. Duncan's crime.  So you

15  can check off the interstate commerce element because it has

16  also been met.

17      And now for the last element of the sex trafficking charge

18  against Mr. Duncan.  This element has a lot of words, so we're

19  going to take it piece by piece.

20      There are three ways you may find this element satisfied.

21  First, with evidence that Mr. Duncan knew Cheyanne was 17 when

22  he trafficked her.

23      Second, with evidence that Mr. Duncan recklessly

24  disregarded the fact that Cheyanne was not 18 when he

25  trafficked her.

1        Or, third, that Mr. Duncan had a reasonable opportunity to

2   observe Cheyanne when he was trafficking her.  You only need to

3   find that one of these things is true to check the box for the

4   second element and to move on.  But as the evidence in this

5   case shows, all three of these on your screen are true.

6        Now, it's important to remember one undisputed fact that

7   Cheyanne was actually 17 when Mr. Duncan trafficked her in the

8   fall of 2018.  You saw her birth certificate.  And you know

9   that Mr. Duncan knew she was underage because he told you so.

10  You heard the wiretap call in which Mr. Duncan talked about how

11  he was pimping Cheyanne.  Mr. Duncan didn't think anyone else

12  except for his friend, Jaquorey Carter, would ever hear what he

13  had to say on the call at Government Exhibit 64.  That's why he

14  was so honest when he said that "his white bitch looked hella

15  young."  That's why he said that "his white bitch looked like

16  she was 13 years old."

17       (Audio played.)

18        MR. STEFANKI:  You know who Mr. Duncan was talking

19  about there, it was Cheyanne.  He told you himself on

20  Exhibit 65 that his girl's name was Shy.

21       Another way you can be sure Mr. Duncan knew Cheyanne was

22  underage is because of what he did after he dropped Cheyanne

23  off at her father's apartment on September 24th.  That's when

24  Deputy Chaplin picked up Mr. Duncan's phone call to Cheyanne's

25  phone which had Mr. Duncan's number programmed in it as

1   "Daddy."

2       Mr. Duncan lied about his own age.  He told Deputy Chaplin

3   that he was 16.  If Mr. Duncan thought that Cheyanne was an

4   adult, there was no need for him to lie about being an adult

5   himself.  But Mr. Duncan knew that Cheyanne was just a kid, so

6   he had to make up a story about how he was a kid too.  But he

7   wasn't.  He was a grown man who was pimping a child.

8       And what he did next makes it even clearer to you that

9   Mr. Duncan knew Cheyanne was 17.  For after this close call

10  with law enforcement on September 24th after the police

11  recovered his 17-year-old prostitute and sent her to a

12  children's home for her protection, what did Mr. Duncan do?  He

13  tried to cover his tracks.  He cancelled the cell phone that

14  law enforcement could now trace to him.  And then he got two

15  new phones to use.  Both of these phones had the same account

16  number, the same false name, and the same false address.

17      Mr. Duncan did this on the same day he had his close call

18  with Deputy Chaplin.  These are two of the numbers you've seen

19  repeatedly throughout this trial.  These are the numbers that

20  Mr. Duncan used to manage Cheyanne's prostitution.

21      Now, you know the 2096 number belonged to him because

22  Michael McCowan took a phone with that number off Mr. Duncan

23  himself when he arrested him in October.  And you also heard

24  Mr. Duncan using that 2096 number on wiretap phone calls, and

25  you know that the 2322 number also belonged to Mr. Duncan.

 1   Because it was registered on the same day, with the same

 2   information, and even the same account number as the 2096

 3   phone.

 4        And when Mr. Duncan was arrested in May of 2019 for

 5   trafficking Cheyanne, he did exactly what you would expect of

 6   someone who knew that he had broken the law by prostituting a

 7   child -- he tried to cover his tracks again.  He sent

 8   Ms. Christian a letter telling her to lie.  "Don't say I knew

 9   she was 17."  "Say we never talked about it together."  "Then

10   say it was so long ago you forgot what you said."  "Don't never

11   admit to me ever text your phone."

12        These things that Mr. Duncan wrote, this entire letter, in

13   fact, it doesn't need any explanation from me or from anyone

14   else.  You can use your common sense to see what this letter is

15   all about.

16        It's about Mr. Duncan trying every trick he knows to get

17   Ms. Christian to lie about how he knew Cheyanne was a child.

18   And even if Mr. Duncan didn't know that Cheyanne was 17, which

19   he certainly did, then he was reckless in disregarding her true

20   age.

21        Reckless disregard means you do something you know you

22   shouldn't even after you're put on notice that it might be

23   wrong.  And Mr. Duncan had all kinds of things happen to him

24   that put him on notice that Cheyanne was not 18.

25        There was the close call in front of Cheyanne's father's

1    apartment when the police took her to a children's home.

2    Mr. Duncan should have known she was a child from that day

3    forward, at least because he knew at that point that she had

4    been taken from her parents and sent to a children's home.

5        But there's more.  Cheyanne told Mr. Duncan herself that

6    law enforcement and sex buyers suspected that she might be

7    underage.  If police and tricks on the blade could see that

8    Cheyanne was too young, then Mr. Duncan surely should have seen

9    the same thing.  But look at his reaction to Cheyanne telling

10   him that her youthful appearance was drawing unwanted attention

11   on the blade.

12       Mr. Duncan's reaction shows him to be a pimp.  He certainly

13   didn't react like someone who just learned that the person he

14   had been pimping for months was a child.  He just told her to

15   stop giggling and laughing in front of other pimps.  And his

16   response makes sense when you remember that he knew Cheyanne

17   was underage long before he sent these texts, and his reaction

18   also makes sense when you remember Mr. Duncan's situation at

19   the time.

20       For when Cheyanne behaved like a child out on the blade,

21   that raised the risk that Mr. Duncan would get caught.  There

22   was also the time Ms. Christian told Mr. Duncan that she was

23   frustrated because Cheyanne was acting like a child.

24   Mr. Duncan simply stayed the course.

25       Ms. Christian also complained to Mr. Duncan that the police

1    were all over her because she was associating with an underage

2    prostitute.  And again, Mr. Duncan's response showed that he

3    just didn't care about Cheyanne's age.

4        He disregarded what everyone else could see about Cheyanne.

5    He disregarded all these warning signs that she was a child

6    because she was too valuable for him to give up.

7        And after he obtained her from the children's home in

8    Woodland, which was another huge warning sign in and of itself

9    about her age, Mr. Duncan spent weeks with Cheyanne in his

10   Natomas apartment.

11       Cheyanne's guard was down during these stretches of time

12   when she wasn't in Oakland working.  This means that Mr. Duncan

13   had hours and hours to observe her during those unguarded

14   moments.  He told you himself that he had sex with Cheyanne.

15   So he could see then what you can see now.  He could see that

16   Cheyanne was a young girl who still had her braces on.  He

17   could see that she still looked incredibly young.  Which means

18   that you can check off the last element because it's been

19   satisfied.

20       So based on the evidence you've seen throughout this trial,

21   evidence which I've only just summarized for you over the last

22   few minutes, all of the elements of Count Two are met, ladies

23   and gentlemen.  This means that Robert Duncan is guilty of sex

24   trafficking a child.

25       Now I want to take a brief moment to talk about an

1   alternative way that Mr. Duncan is guilty of Count Two.  As the

2   Court will instruct you, Mr. Duncan is guilty of sex

3   trafficking Cheyanne even if you think that all he did was help

4   Eva Christian do it.

5        Now all of the evidence we've just seen makes it clear that

6   Mr. Duncan was the one in charge.  But even if Ms. Christian

7   was somehow the mastermind behind the scenes, Mr. Duncan would

8   still be guilty because of what you see on the screen,

9   something called aiding and abetting.  Aiding and abetting is

10  just a different way of saying that Mr. Duncan intentionally

11  helped Ms. Christian traffic Cheyanne.  It's just an

12  alternative way that you can find Mr. Duncan guilty.

13       Because even if Ms. Christian was the driving force here,

14  Mr. Duncan still intentionally helped her.  They bought

15  Cheyanne a phone together.  He drove Cheyanne to Oakland, he

16  gave her pills for her abscess, he told her where and when to

17  sell her body to sex buyers, he told Ms. Christian to go get

18  Cheyanne at the children's home.

19       This evidence of Mr. Duncan's direct guilt also makes him

20  guilty as an aider and abetter.  You don't need to find that

21  he's directly guilty and guilty under aiding and abetting,

22  either one of these is sufficient to find Mr. Duncan guilty of

23  Count Two.

24       So let's move on to the conspiracy count.  The conspiracy

25  count has two elements.  And again, an element is just

1    something that the government must prove to you.

2        So once you find that the government has proved an element,

3    you check that box and you move on.  Once both elements are

4    satisfied, you can and you must find Mr. Duncan guilty of

5    conspiracy to commit sex trafficking.

6        The first element is that there was an agreement between

7    Mr. Duncan and at least one other person to commit the crime of

8    sex trafficking Cheyanne.  The other person here, of course, is

9    Ms. Christian.

10       The second element is that Mr. Duncan became a member of

11   the conspiracy knowing of at least one of its objects and

12   intending to help accomplish it.

13       Now, please keep one thing in mind as we look at the

14   evidence of this conspiracy, ladies and gentlemen.  For the

15   conspiracy count, you can and you should consider all of the

16   evidence that we just looked at for the trafficking count.

17   There is no need for you to keep the evidence for both of these

18   counts in separate buckets.  Much of the evidence that proves

19   the trafficking count, the evidence we just looked at, also

20   proves the conspiracy count.

21       For example, all the text messages between Mr. Duncan and

22   Ms. Christian about Cheyanne, those show that Mr. Duncan is

23   guilty both of trafficking Cheyanne and of conspiring with

24   Ms. Christian to traffic Cheyanne.

25       So let's start with the first element of the conspiracy

1   count.  To find Mr. Duncan guilty of conspiracy, all you must

2   decide is that he and Ms. Christian agreed to commit the crime

3   of sex trafficking Cheyanne.  You don't need to find that he

4   and Ms. Christian were equal partners; it doesn't matter if

5   they had different roles.  There also doesn't need to be any

6   formal or written agreement between the two of them.

7       A conspiracy can be shown by words and actions that prove

8   there was an established relationship and coordinated activity

9   between Mr. Duncan and Ms. Christian.

10      And you've seen significant evidence establishing the

11  partnership between Mr. Duncan and Ms. Christian.  You saw them

12  working together to bring back Cheyanne from the Woodland

13  children's home.  You heard Mr. Duncan telling Jaquorey Carter

14  on Exhibit 62 that his San Jose bitch, that's Ms. Christian,

15  was going to get a room so that she and Cheyanne could perform

16  commercial sex acts inside of it.  And you saw the motel

17  receipts proving that this is, in fact, what happened.

18      Most important, you saw in Mr. Duncan's and Ms. Christian's

19  own words that they made a plan together.  By teaching and

20  managing Cheyanne while they were on the blade, Ms. Christian

21  kept her end of the bargain.  By harboring and maintaining

22  Cheyanne, Mr. Duncan kept his end of the bargain.  That's why

23  he said he had been a man of his word.

24      You saw in their own words that they were a shared team

25  with a shared goal, and you saw that they had a plan for how to

1    reach that shared goal.

2        The plan was for Ms. Christian and Mr. Duncan -- I'm

3    sorry -- Ms. Christian and Cheyanne to walk the streets

4    together for Mr. Duncan's benefit, and for Ms. Christian to

5    teach Cheyanne about the game along the way.

6        Because, as Mr. Duncan himself put it, this was not an "I"

7    situation, this was an "us" situation.

8        In other words, ladies and gentlemen, when it came time to

9    using Cheyanne's body to make Mr. Duncan money, he and

10   Ms. Christian were in it together.  This evidence satisfies the

11   first conspiracy element; you can check that box.

12       And now to prove the second conspiracy element, there needs

13   to be evidence that Mr. Duncan joined up with Ms. Christian to

14   accomplish their shared goal of making money off Cheyanne.  And

15   you've seen the evidence in this case that shows Mr. Duncan to

16   be not just an equal partner, but the driving force behind

17   this.

18       He was the one in control, but he was also the one who took

19   the least amount of risk because he wasn't out on the blade

20   having sex with strangers.  And you know that Mr. Duncan was in

21   control of the partnership because this was all about money for

22   him and nobody else.

23       Mr. Duncan's own words show you that he was driving this

24   partnership with Ms. Christian, and he took steps to help the

25   partnership succeed because that meant more money in his own

1   pocket.

2        These text messages show that if Cheyanne didn't produce,

3   well, then Cheyanne was in trouble and Ms. Christian was also

4   in trouble.  Because Cheyanne not producing meant that the

5   Duncan/Christian partnership was not working.  This evidence

6   satisfies the second conspiracy element, you can check that box

7   too.

8        Which means based on the evidence you've seen throughout

9   this trial, both of the elements of the conspiracy count have

10  been met.  This means that Robert Duncan is guilty of

11  conspiracy to commit sex trafficking of a child.

12       And now let's move on to the escape count.  There are three

13  elements of the escape count.  The first is that Mr. Duncan was

14  in the custody of an officer of the United States, which in

15  this case was an FBI special agent.

16       The second element is that he was in custody following a

17  lawful arrest for the felony of sex trafficking a child.

18       And the third element is that Mr. Duncan knowingly and

19  voluntarily left that custody without permission.

20       You heard testimony during trial that Mr. Duncan was

21  arrested on May 31st, 2015, by FBI agents.  And you also heard

22  testimony that Mr. Duncan was handcuffed and placed in the back

23  of an FBI vehicle.

24       You heard testimony as well that FBI agents are officers of

25  the United States.  This satisfies the first element; you can

1    check that box.

2        And you saw the warrant issued for Mr. Duncan's arrest.

3    You heard testimony that this is the warrant that law

4    enforcement agents used to arrest Mr. Duncan.

5        So you know that the second element of the escape count is

6    satisfied; you can check that box.  And you heard how

7    Mr. Duncan broke out of the FBI agent's vehicle and went

8    sprinting through midtown Sacramento.  You heard about how

9    multiple law enforcement officers had to chase him down as he

10   ran full speed away from them.

11       And you heard about how when he was finally rearrested,

12   Robert Duncan had fled several city blocks from where he was

13   first placed in handcuffs.  So you know that the final element

14   of the escape count is satisfied, and you can check that box.

15       Based on the evidence you've seen throughout this trial,

16   ladies and gentlemen, all of the elements of the escape count

17   have also been met.  This means that Robert Duncan is guilty of

18   the crime of escape from custody.

19       And it's no wonder that he tried to escape, because Robert

20   Duncan was guilty of sex trafficking 17-year-old Cheyanne.  He

21   ran because he knew he was caught.  He knew then what you know

22   now -- he provided 17-year-old Cheyanne to sex buyers on the

23   internet and on the streets of Oakland.  He transported her to

24   the blade and back to her father's apartment.

25       When he couldn't do that any longer, he enticed her out of

1    her children's home, then he harbored her in a Natomas

2    apartment with his co-conspirator.  From there, he maintained

3    Cheyanne for sex buyers.

4        He made her make money for him by having sex with

5    strangers.  He worked her until she developed an oozing abscess

6    in her mouth.  He knew she was 17 when he did these things to

7    her, ladies and gentlemen.  He told you that he knew it on

8    wiretapped phone calls.

9        He tried to get Eva Christian to lie about whether he knew

10   it.  Robert Duncan did all of these things for one simple

11   reason, to make money for himself.

12       For these reasons, when you go back to deliberate, we ask

13   that you return the only verdict that is consistent with the

14   evidence you've seen and heard over this trial, and that is

15   guilty on all three counts.

16       This in front of you is the verdict form that you will have

17   with you during your deliberations.  Remember the evidence

18   you've seen and the evidence you've heard during the trial.

19   Mark the lines underneath where the verdict form says "guilty"

20   for each of the three counts in this case.

21       Thank you, ladies and gentlemen.

22            THE COURT:  All right.  That concludes the beginning

23   portion of the government's closing.  As I told you at the

24   beginning, argument and statements are not evidence.  They tell

25   you what counsel thinks the evidence has shown at this stage of

1    the case, and you'll hear the same kind of argument from the

2    defense in just a bit.  That used just about 56 minutes of your

3    time, just so you know.

4        We'll go ahead and take a break to allow Mr. Ortiz now to

5    get set up.  Let's say a 15-minute break, and then we'll come

6    back during the break, bearing in mind all my admonitions.

7    They're more important than ever.  Thank you.

8        (Jury not present.)

9            THE COURT:  All right.  You may be seated.  15-minute

10   break.  Do you have an estimate of how long you're going to

11   take, Mr. Ortiz?

12           MR. ORTIZ:  My hope, your Honor, is no more than

13   45 minutes.

14           THE COURT:  All right.  In any event, I'll let you

15   know when you approach an hour and hour and a half max.

16           MR. ORTIZ:  Thank you.

17           THE COURT:  All right.  And then the government would

18   have about half an hour for rebuttal if it wishes.

19           MR. FOGERTY:  Thank you, your Honor.

20           THE COURT:  And then we'll instruct.  So it may well

21   be that we can do all of that before another break.  All right.

22       (Recess.)

23           THE CLERK:  Come to order.  Court is back in session.

24   Are you ready, Mr. Ortiz?

25           MR. ORTIZ:  Yes, your Honor.

 1          THE COURT:  All right.  Let's bring the jury in.

 2      (Jury present.)

 3          THE COURT:  All right.  You may be seated.  Welcome

 4  back, once again, members of the jury.  We're ready now for the

 5  defense closing argument.

 6      Mr. Ortiz.

 7          MR. ORTIZ:  Thank you, your Honor.  The government

 8  versus Robert Duncan.  This case is about whether or not the

 9  government can prove to you what they allege against

10  Mr. Duncan.

11      The Court has told you over and over again that you're not

12  to talk about this case with anybody until you've heard all the

13  evidence, until you've heard the arguments of the attorneys,

14  until you've heard the law that applies to this case, and after

15  you reach a verdict, if you can.

16      Once that happens, once this case is over, then you'll be

17  able to talk about everything that you saw, everything that you

18  heard during the course of this case.

19      And, when you do that, I'm certain that you're going to

20  talk to your friends, your family about this whole experience,

21  about this whole jury experience.  And you're going to tell

22  them that when this trial began, the government told us that

23  Mr. Duncan was guilty.  The government told us that it was

24  going to present evidence to you beyond a reasonable doubt that

25  Mr. Duncan was guilty.

1    But you're also going to say, "But we sat here, we sat

2  through this trial for three weeks listening to the evidence,

3  listening to special agent after special agent coming in here

4  from all parts of this country to try and prove what the

5  government alleges."

6    And you're going to say, "We heard a lot of stuff, but

7  there was nothing there," at least as to Mr. Duncan.

8    Because one thing that I'm sure that everyone is firmly

9  certain/fairly certain about is that one person, that

10 Ms. Christian, her guilt was proved beyond a reasonable doubt.

11    We heard that Ms. Christian, and she told you this herself,

12 took Cheyanne, took herself out to Oakland/San Francisco to do

13 what she had been doing for years before she even met

14 Mr. Duncan.  She did those things.  She decided to do those

15 things.  And she took Cheyanne along with her.

16    We heard during the course of this case that at one point

17 she went to a group home -- and we'll talk more about this in

18 detail as my argument goes on -- but then took her right back

19 out.

20    We know that Cheyanne was taken to Oakland in late October,

21 they were being watched by undercovers from Oakland PD, and

22 they were arrested for strolling up and down International

23 Boulevard.  We know all of those things.  We also know that

24 when Ms. Christian was talked to by Oakland PD, she did what

25 she does, and that is lie.  She told you that herself.  "I said

1    what I had to say so I wouldn't go to jail."

2        She told you that at some point she was arrested in this

3    case, and she was arrested because she is guilty of trafficking

4    Cheyanne.  But she met with her lawyers, she met with the

5    government, Special Agent Penna and told another version of

6    what she says happened.

7        And when she testified in this courtroom, she admitted to

8    you again that she lied in that interview, that she hid things

9    in that interview because she wanted to get out of custody.  So

10   she said what she said, and low and behold a month later, she's

11   out of custody.

12       She came into this case, she testified, and admitted to you

13   again that even while she was on that stand, even though while

14   she's under oath telling you her various stories, she

15   acknowledged and admitted that even when she's testifying her

16   number one priority is getting home, and she will say what she

17   has to say to not go back to jail.

18       And that's what she did.  And even though all of the

19   uncontroverted evidence points directly at her, even though she

20   was the one who was arrested with Cheyanne, even though she was

21   the one who took Cheyanne out previously to prostitute just

22   like she did.  Even though all of those things, Mr. Duncan was

23   also charged.  He was charged with conspiracy to traffic a

24   minor and sex trafficking of a child.

25       Also escape, but Mr. Duncan doesn't dispute that he tried

1    to escape.  He doesn't dispute or deny that he's guilty of that

2    charge.  But as to these two charges, he shouldn't be sitting

3    here.  He shouldn't be sitting here accused of these two

4    charges in the indictment.

5         But he sits here accused, and for the last hour you have

6    been told by the government that you need to find him guilty,

7    even though there's a complete lack of evidence much less

8    evidence beyond a reasonable doubt that he's guilty.

9         But he's charged.  But the Court will tell you, as soon as

10   I'm done, that Mr. Duncan is presumed to be innocent, and the

11   fact that an indictment was filed is not evidence of anything.

12   It just basically tells you what the accusations are.

13        But you are also told that Mr. Duncan has pled not guilty

14   to these charges.  And because he has done that at all stages

15   of this proceeding when you began jury selection, when you

16   heard the evidence, and even now Mr. Duncan is presumed to be

17   innocent because that's, in fact, what he is.

18        Because the government has failed to prove his case beyond

19   a reasonable doubt.  And what does that mean, beyond a

20   reasonable doubt?  Well, the Court will tell you that proof

21   beyond a reasonable doubt is proof that leaves you firmly

22   convinced that he's guilty.  A reasonable doubt is a doubt

23   based upon reason, your common sense, because we aren't asking

24   you to leave that at the door.  You use that along with the

25   evidence and the law, and if based on all of those things you

1   have a doubt as to whether or not the government has proved

2   their case, if after listening to all the case you decide,

3   "Well, where's the evidence that you're saying exists?"  That

4   is reasonable doubt.

5       And if you have a reasonable doubt, which you absolutely

6   should have in this case, you must find Mr. Duncan not guilty

7   of these charges.

8       The Court is going to read to you another instruction, and

9   it's important to keep this other instruction in mind.  Your

10  role here in this case is to decide whether Mr. Duncan is

11  guilty of the three charges -- the three specific charges that

12  have been filed against him, that's it.  That's your only role

13  here.

14      And as you keep that in mind as jurors -- and we talked

15  about this some in voir dire and a little bit in the

16  pre-instructions from the Court -- but you are the jurors, you

17  decide what happens in this case.  You decide what the law is.

18  And then once the Court reads you the law, you apply the facts

19  as you determine them to be with the law in this case.

20      One thing that you cannot do is let in any kind of emotion

21  or sympathy, like or dislike for anybody.  You've heard during

22  the course of this trial some recordings of Mr. Duncan where

23  he's rapping to some songs that he likes.  Some of those words

24  could be offensive, I get that.

25      But your role here is not to determine whether you agree or

1   disagree with that music, you like or dislike the lyrics.  You

2   can't let those feelings influence how you view everything else

3   in this case, and that is simply the testimony of the

4   witnesses, the exhibits, and the stipulations that Mr. Fogerty

5   read to you over the course of this trial.

6       As the Court mentioned at the close of the government's

7   opening argument, nothing that the attorneys say, nothing that

8   the government has said, nothing that I have said or will say

9   is evidence of anything.  It's as the Court indicated.  It's

10  our argument to you as to how we see the evidence.

11      But ultimately you decide.  Count One is the conspiracy

12  count.  And for the government to prove this count against

13  Mr. Duncan, they have to prove two things:

14      First, that between in or around September of 2018 and

15  continuing through in or around October 2018 there was an

16  agreement between Mr. Duncan and Ms. Christian, who we know is

17  guilty of sex trafficking, to commit the crime of sex

18  trafficking of a child.

19      And, second, that Mr. Duncan became a member of that

20  conspiracy knowing of at least one of its objects and intending

21  to help and accomplish it.

22      Well, Count One and Count Two are essentially the same.

23  They both involve the trafficking of a minor charge.  The

24  conspiracy just adds there's an agreement with two people to do

25  that.

1        And I'm not going to go over the elements with you, the

2   government did that with you, and the Court is going to read it

3   to you.

4        But as you go through the evidence, ask yourself, did the

5   evidence really establish that Mr. Duncan recruited Cheyanne?

6   Did the evidence really establish that Mr. Duncan enticed her,

7   transported her, provided, obtained, or maintained Cheyanne as

8   the government claims?

9        And as you go through each of the pieces of evidence that

10   you heard during the course of this trial, as you evaluate what

11   the government argued to you as to how each of those things

12   have been established, ask yourself, first, was there even any

13   evidence of that?  And, second, if there was some evidence of

14   it, did it rise to the level of beyond a reasonable doubt?

15        And as you go through that, you're going to see that it's

16   not as the government said, no matter how many times it's

17   argued to you over and over again.  No matter how many times

18   it's told to you that Mr. Duncan is a pimp.  That he did these

19   things for money, that he forced Cheyanne to sell her body.

20   Because that's what the constant theme of the opening argument

21   was.

22        But again, nothing that Mr. Stefanki said is evidence of

23   anything.  What's the evidence of that?  Where is the evidence

24   of any of those things?  You're being asked to speculate,

25   you're being asked to assume, but, as the Court will tell you,

1    that's not evidence.

2        You can't speculate.  You have to be convinced beyond a

3    reasonable doubt that it's been proven.  And what did that

4    evidence establish?  Well, first, did the government prove that

5    Mr. Duncan trafficked Cheyanne?

6        Let's go through what the evidence is in this case.  And

7    this trial lasted three weeks, and it feels like it lasted

8    three weeks, but really there was not much evidence presented

9    in this case.  This trial, evidence wise, was relatively short.

10   And that's because there isn't any evidence in this case.  What

11   did we hear?

12       Well, we know from Mr. Duncan that back in the summer of

13   2018 he was working for his mom, working for a temp agency, and

14   he came across Ms. Christian and Cheyanne, we know that.

15   There's no dispute about that.  And we know that over the

16   course of time Mr. Duncan became friends with Cheyanne.

17       We know Mr. Duncan had a sexual encounter with Cheyanne, we

18   know all of those things.  But remember when you're evaluating

19   that aspect of this, the fact that Mr. Duncan had sex with

20   Cheyanne.  Think back to the instruction I cautioned you

21   earlier about.

22       Mr. Duncan is not charged here with having sex with

23   Cheyanne.  That's not one of the charges before you.  It

24   happened, but that's not one of the charges in front of you.

25       But you heard from Mr. Duncan, you could see in the various

1    phones, his phone, Cheyanne's phone that they had a

2    relationship.  You see photographs, you see different pictures

3    that were on the various phones.  But the FaceTime picture

4    doesn't show anything other than Mr. Duncan had a three-way

5    call with Ms. Christian and Cheyanne.  The picture in

6    Mr. Duncan's phone of him talking to Cheyanne again, how does

7    that prove anything?  It doesn't other than Mr. Duncan had a

8    relationship with her, a friendship with her.

9        The picture in Cheyanne's phone that shows Mr. Duncan with

10   the flowers around his head, again, that doesn't establish

11   anything that the government is arguing to you.  And in the

12   bottom left corner of the slide, it's very small, but it's the

13   contact that Mr. Duncan had for Cheyanne, "little one."

14       Again, nothing to be drawn from that other than, as

15   Mr. Duncan testified, she's younger than him and she's little.

16   So nothing as far as the pictures, the contacts in the phones

17   establish anything that the government is alleging.

18       But then we go into some of the other evidence that the

19   government is relying on.  Now we're going to go

20   chronologically in order.

21       The first one is a wiretap that was referenced in argument

22   between Mr. Duncan and Mr. Carter.  And Mr. Duncan was asked

23   about it, it was read to you several times during the course of

24   this trial, but what about this wiretap proves that Mr. Duncan

25   was trafficking Cheyanne?

 1        Nothing.  There's a reference to "San Jose bitch" in the

 2   wiretap, and the government argues that piecing that together

 3   with the Motel 6 receipt somehow ties this all back to

 4   Cheyanne.  Where's the evidence of that?  This wiretap happened

 5   six days before the Motel 6.

 6        We saw in Mr. Duncan's phone he referred to Ms. Christian

 7   as "Oak Eva," Eva from Oakland, not his San Jose bitch, even

 8   though she did come from San Jose.

 9        And certainly there is no reference to Cheyanne anywhere in

10   this wiretap.  And to the extent that Mr. Duncan is saying

11   things about trying to impress Mr. Carter about pimping and

12   pressing "his bitches," that doesn't establish anything.  He's

13   not charged with talking the way he's talking.  But it's

14   evidence that you heard, and you must consider it.

15        But this, by no stretch of the imagination, supports any

16   sort of inference that Mr. Duncan is guilty of trafficking

17   Cheyanne, because he never did that.

18        You heard about the Motel 6 receipt, and Ms. Christian told

19   you that she rented that room.  And at one point during her

20   testimony she indicated that she did that at the instruction of

21   Mr. Duncan.  Well, of course she said that on the stand because

22   she wants to go home.  But as she was asked more questions

23   about the Motel 6, she admitted to you, "Well, I have been

24   prostituting for many years -- for many years before I even met

25   Mr. Duncan.  And that Motel 6, that was my spot.  That was my

1  spot before I even met Mr. Duncan or knew who Mr. Duncan was."

2      I asked her to estimate for me how many times she had

3  rented that room before she even met Mr. Duncan.  She couldn't

4  remember because it was so many.

5      The most she could say was over 20 times.  Ms. Christian

6  rented that room at her own doing.  She rented that room so she

7  can prostitute out of it.  There is no evidence that Mr. Duncan

8  in any way directed her to do that.

9      We've seen a lot of text messages, we've seen a lot of cell

10  phone dumps, we've seen all of those things, and there is

11  absolutely nothing in any of the evidence that supports what

12  Ms. Christian is saying.  There's nothing there because

13  Mr. Duncan never directed her to do that.  She did that on her

14  own, of her own volition, because that's what she needed to do

15  to make money for herself.

16      She indicated that on this day -- or on these days, the

17  12th, 13th, checking out on the 14th, she told you that on

18  these days she remembered that Cheyanne was with her.  Well,

19  ask yourself, is there any evidence of that?  Is there any

20  evidence that Cheyanne was with Ms. Christian on these days?

21      Well, there is no evidence of it.  And how do we know that?

22  Well, the government had an expert come in to court and talk to

23  you at length about cell phone towers, about the amount of work

24  that can be done to find out where somebody's phone is.

25      And we heard that on these days, the 12th and the 13th,

 1   that Mr. Duncan's phone was in the Oakland area.  We heard

 2   that, and Mr. Duncan himself told you he had been to Oakland

 3   lots of times.  He couldn't say specifically what day, but his

 4   phone was there on these days.

 5        And the argument earlier to you was this proves -- this

 6   proves that Mr. Duncan was in Oakland with Cheyanne so he could

 7   watch her.  The argument was even Mr. Duncan picked up

 8   Cheyanne, took her to Oakland, and dropped her off back home.

 9        That's what the argument was to you.  But where is the

10   evidence of that?  Because certainly if, in fact, Mr. Duncan

11   did those things, which he didn't, the same expert who did

12   analyze Cheyanne's phone on different days, who was able to

13   ascertain where Cheyanne's phone was on other days, who had the

14   records for Cheyanne's phone for these days, she didn't come in

15   here and say, "Not only did I see Mr. Duncan's phone there but

16   Cheyanne's phone was also there."

17        She didn't say that.  Because there's no evidence of that

18   because Cheyanne wasn't there.  Mr. Duncan may have called her

19   phone multiple times, but the allegation is that he took her to

20   Oakland specifically to prostitute her.

21        Well, if she wasn't there, there's no evidence that she was

22   there, what is available to them.  And if it was there, you

23   would have heard it.  It's reasonable to conclude that she

24   wasn't there, because she wasn't.

25        So the cell phone information for those days doesn't

1    support anything.  You're being asked to speculate.  In fact,

2    you're being asked to create evidence that's not there.  That's

3    not your role as jurors.  You decide what you hear from the

4    four walls of this courtroom, and that's it.  And there's no

5    evidence at all that Cheyanne was there.  No matter how many

6    times you've been told, and I'm assuming that when the

7    government gets back up here they're going to tell you it

8    again.  Yeah, even though there's no cell phone information for

9    her for these days in particular, she was there.  Well, they

10   can say it, they can argue it, it doesn't make it a fact.

11       You heard about a close call that occurred at the apartment

12   complex where Mr. Duncan, as he described to you, was dropping

13   off Cheyanne from another location.  And he didn't deny that.

14   He told you, "I got there, I got a call -- I either called in

15   or called out, heard a tussle," and who he presumed to be

16   Cheyanne's mom got on the phone, and there was a very heated

17   conversation.  Nothing about that establishes anything.

18       Mr. Duncan told you by that point he had had sex with

19   Cheyanne.  That would certainly make her parents angry.  A cop

20   does call him, Deputy Chaplin; Mr. Duncan told you he had no

21   idea who it was.  He assumed it was dad who mom had just told

22   Mr. Duncan had a gun, and if he came back they were going to

23   kill him.

24       That was Mr. Duncan's thought process, so he didn't give

25   his name, and he gave a fake date of birth or a fake age, and

1  then he left.

2      So there's nothing about that close call as it was

3  described by the government that points to guilt, not even by

4  any stretch of the imagination.

5      It was argued to you that the opening of some accounts on

6  September 24th is proof of guilt.  Well, first, Mr. Duncan

7  didn't open these accounts, we know that.  We know that it was

8  Ms. Christian who opened these accounts, and Mr. Duncan didn't

9  even go with her.  Because as you heard and Ms. Christian

10  acknowledged, that when Mr. Duncan called her about this

11  incident she wasn't even in Sacramento, she was in San Jose.

12      And these accounts were created there.  Mr. Duncan wasn't

13  there, he was in Sacramento.  She came back and gave him a new

14  phone.  There was a lot of questioning on cross-examination of

15  Mr. Duncan about terminating service for his old phone, and he

16  told you, "I just stopped using it, I never terminated

17  service," because he never did.  Whatever action was taken on

18  these phones and this service was done by Ms. Christian, she

19  told you that.

20      But we know that his old phone number, the 370 number, was

21  even being used after the 24th.  The very last question I asked

22  the T-Mobile representative was to identify dates on the

23  billing for that account.  And it shows, at least for the

24  documents that were subpoenaed, the last text message that was

25  sent from that account wasn't September 24th, it was October

1   25th.

2       So this termination date is being blown way out of

3   proportion, it's not evidence of anything, but the argument

4   itself is wrong, it's flawed.

5       And Exhibit 301, you're going to have the exhibits with

6   you, go to the very last page of it.  And it shows you, at

7   least in that billing cycle, messages were being sent all the

8   way until October 25th of 2018.

9       So these accounts, the creation of them, doesn't establish

10  anything.  It's argued to you that the harbored element of

11  trafficking was established by the renting of this apartment

12  complex.  And once Cheyanne left her parent's house on the

13  24th, went into the group home thereafter, that he harbored

14  her, he got an apartment so that they could harbor Cheyanne.

15      Well, there's obvious arguments with that argument as well.

16  First, the incident, the close call that the government argued

17  remember happened on September 24th.  So to follow their logic,

18  to follow their argument, the need for an apartment to harbor

19  her once she was in a group home would have been after

20  September 24th.

21      But we know that this apartment and the applications for it

22  and all of the groundwork for it, everything happened before

23  the 24th.  We know that the initial application was on the

24  18th, deposits were paid and background checks were run on the

25  23rd.  So you're being asked to make an inference/assumption

1  when the evidence contradicts what's being argued to you.

2      This apartment was not being used to harbor anybody much

3  less Cheyanne.  But the argument, nonetheless, is that the

4  point of the apartment was to get Cheyanne from the group home

5  and bring her back here.  Again, there's absolutely no evidence

6  of that -- well, Ms. Christian said that Mr. Duncan told her to

7  go get her and get the phone.  But again, when called on to

8  show us any evidence of that, because the government argues

9  that everything that they do with each other is all in text

10  message, there's nothing there about that at all.

11      Ms. Christian is the one who got the apartment, she's the

12  one who lied about Cheyanne being her niece, she's the one

13  responsible for the apartment, not Mr. Duncan.

14      But going on in the argument it's she was harbored there.

15  Well, what's the evidence of that?  There were phone -- cell

16  phone records evaluated in October for Cheyanne's phone.  So we

17  know, according to the cell detail records and the cell tower

18  information, that Cheyanne was in the area of the apartment

19  complex in Natomas on one day, on October 10th.  That is the

20  only day that her phone is shown in the area of that apartment

21  complex.

22      That's important for two reasons.  If the apartment was

23  meant to harbor her, then the cell phone records would show

24  that she was there often, that she basically lived there.  And

25  that's the argument that's being made.  You were shown text

1    messages from a phone that doesn't even belong to Mr. Duncan

2    where there is -- there's conversation about slamming doors,

3    locking the door, things like that.  The argument is that's

4    proof of the harboring in this apartment.

5         Again, there's no evidence to support that.  And if that

6    were true, the special agent who came in here would have said,

7    "Not only on this day, not only on October 10th was she there,

8    but she was there the 11th, 12th, 13th, 14th, 15th, all the way

9    to the day of her arrest."  But you heard no evidence of that

10   sort because she was never there but for maybe that one day.

11   And for that one day she was there after midnight and in the

12   very, very early hours of the 10th.

13        The argument is that Mr. Duncan was there to receive her.

14   Well, we know that's not true because we know by October, we

15   know it from both Ms. Christian and Mr. Duncan, that he was on

16   house arrest.  He couldn't be in that apartment.  He was in the

17   apartment complex where he was living with his sister, but he

18   couldn't have been in the apartment rented by Ms. Christian.

19   He could only go there during the day.

20        So even if Cheyanne was there in the early morning hours of

21   the 10th, Mr. Duncan certainly wasn't there.  Because, as he

22   told you, as Ms. Christian told you if he was, his ankle

23   monitor would have gone off, and he would have been thrown in

24   jail.

25        But that never happened because he wasn't over there in

1     those early morning hours.  There was no harboring no matter

2     how many times it's being said to you.

3          Life360.  Well, what's the evidence of this?  Well, we know

4     that there was a screenshot on Mr. Duncan's phone.  He told

5     you -- Mr. Duncan told you that the Ashley being referred to in

6     the Life360 is not Cheyanne, it was one of Ms. Christian's

7     aliases.

8          But even beyond that, where is the evidence that Mr. Duncan

9     ever asked Ms. Christian?  Where is the evidence that

10    Mr. Duncan ever asked Cheyanne to join Life360?  There is none.

11    We don't dispute that the app was downloaded on her phone, but

12    just because it's on her phone doesn't mean she's doing it in

13    his direction.

14         He told you why he had Life360 on his phone, because

15    Ms. Christian asked him to, and you can see that in the text

16    messages.  She's telling/asking him to join her Life360.  She's

17    also the one who is texting Cheyanne to join her Life360.

18    Again, the common theme here.  Ms. Christian is the one

19    responsible for all of this.  She's going to come in here, and

20    she did, to now try and save herself.  But, frankly, she's a

21    liar, and she told you that.

22         The videos from Mr. Duncan's phone, I talked a little bit

23    about it.  There were some very short clips where he's saying

24    some offensive things about women, but he's not being charged

25    with that.  As he told you, he was mimicking rap music that he

 1   was very interested in.  Those videos aren't proof of anything.

 2       And then Exhibit 167.  This is the recording where we hear

 3   Mr. Duncan talking to Ms. Christian and a female named Xavia

 4   (phonetic) in the background.

 5       Ms. Christian came in here and said, "Oh, that was

 6   Cheyanne."  But of course she's going to say that.  But no one

 7   else came in here and said "I know that voice and that's my

 8   daughter.  That's Cheyanne."  Nothing.  Because it wasn't

 9   Cheyanne, it was some other person that now Ms. Christian

10   claims it is because it supports her being able to stay out of

11   custody.

12       But the video itself, listen to it.  He's obnoxious.  He

13   clearly is under the influence.  He's slurring his words.  And

14   he told you why he had been drinking.  He told you why he

15   lashed out and how it was very out of character for him.  But

16   not only did he say that, Ms. Christian herself said it.  That

17   the way he was talking in that recording wasn't how he talks to

18   her, and she was laughing and giggling with the other girl in

19   the car because Mr. Duncan, using her words, sounded so stupid.

20   It was hilarious to them, it was a joke to them, and that's why

21   they're laughing at him.

22       He talks about "You like being a pimp," or something along

23   those lines, he talks about head butting, but he described it

24   to you.  He was upset at the moment.  He was drunk at the

25   moment.  And given Ms. Christian's history, he was kind of

1    taking digs at her, which she didn't take seriously.  She

2    laughed it off because it was just that, something to laugh

3    off.

4         There were some wiretaps, two of them that related to

5    Mr. Duncan talking about Cheyanne's mom, that she was going on

6    his Facebook, his social media, that she knew a lot of

7    information about him, where his mom went to church, so he's

8    talking to Mr. Carter about that.  But that's all it shows is

9    that she's basically social media stalking him, and he wants to

10   figure out why.

11        But one of the wiretaps that the government focuses on is

12   where Mr. Duncan is referring to his white bitch.  And look at

13   the words that Mr. Duncan uses in the wiretap.  He says that

14   the white one, she looks young, like she could be 13 years old.

15   Nowhere is he saying he knows that she's under 18, just that

16   she looks young.

17        But the most important aspect of this wiretap is what he

18   says at the beginning, when he's trying to figure out why is

19   her mom so mad at me?  Why is she stalking me the way she's

20   stalking me?  And you can hear it in his voice, he's trying to

21   figure out what's going on.

22        He says, "I don't know, but, you know, she looks like, kind

23   of like she could be a hoe."  He wasn't saying that she was

24   one, he wasn't saying that she was his prostitute, he was just

25   trying to piece together what mom was saying to him, her belief

1    that she was prostituting.  And his thought was, "Well, I guess

2    now that I think about it, the makeup that she wears, the

3    clothes that she wears, I guess she could be."  But he didn't

4    know.

5        As he told you, he didn't find out that Cheyanne was

6    prostituting until he was arrested for this in May of 2019.  So

7    these wiretaps don't establish anything that the government

8    alleges.

9        And then the text messages.  We saw the text messages from

10   Mr. Duncan's phone and we know what phones are his.  We know

11   that there are three phones that are his.  We know the 370

12   number, the 2096 number, and not 2322, but the phone that was

13   taken from him in May when he was arrested.  And we saw nothing

14   from that phone, I believe it ended in 4097.

15       But all the text messages the government showed you in

16   their arguments, none of those come from his phone.  And I'll

17   go over those in a second.  But the ones that do come from his

18   phone he explained to you that the various things that he's

19   saying in the text messages are simply him being insecure about

20   Eva, not even referencing Cheyanne in any way, not asking about

21   Cheyanne in any way in these text messages.

22       But he's saying he doesn't want her staying in certain

23   places, Eva, saying that she's never showed him anything he

24   should be concerned about.  And look at them, there's only four

25   pages.  As you go through them, there's nothing about

1    prostitution and, more specifically, nothing about prostitution

2    of Cheyanne.

3         You heard about and you saw these websites.  Well, one of

4    the websites -- or one of the exhibits, 401, has a name of

5    Stephanie on it, a number not even associated with Mr. Duncan

6    on it.  So that one there's no even arguable ties to

7    Mr. Duncan, so that one could go away, even though it's an

8    identical app.

9         But the other one, the argument is that Mr. Duncan created

10   this app for the purpose of providing Cheyanne for sex.  Step

11   back a second.  We acknowledge that on the app there's a phone

12   number on it that's tied to Mr. Duncan, but the issue is not

13   that his number is on it, the issue is did he create this?  Was

14   he aware of it?  What was the evidence about that?

15        Well, we heard from Ms. Christian who had been posting ads

16   for at least three or four years, she told you the kind of

17   information that's on those apps.  That the person who posts

18   those ads is not her pimp because the pimps don't interact with

19   customers, that the numbers on the ads are for the prostitutes

20   themselves.  That's what she told you.

21        And, in fact, that's what Special Agent Hardie told you as

22   well.  He said in posting these ads, according to Special Agent

23   Hardie, that pimps are very careful about what they put in

24   these ads because they don't want to get caught.  And so they

25   put fake names.  The numbers are in the names of the

1    prostitutes, not the pimps, because they would never -- they

2    would never want to be found out by law enforcement.

3        And he acknowledged on cross-examination that certainly if

4    a pimp was going to put out one of these ads, he would never

5    put his own cell phone number on it, especially if the cell

6    phone is in the pimp's name.

7        Well, this ad is contrary to everything that Ms. Christian

8    told you and completely inconsistent with what the government's

9    own expert told you.  But, more importantly than that, there

10   are ways -- there are very specific ways that the special

11   agents, if they were asked, could find out who posted this ad.

12   They could find the phone, the specific cell phone that was

13   used, they could tell you what computer was used, they could

14   subpoena records from the companies to show you who's paying

15   for these ads.  And he's used all of those techniques in prior

16   testimony to show who, in fact, posted these ads.  Except in

17   this one.  In this one there were no subpoenas issued.  In this

18   one, the ads weren't traced back to anybody.  They weren't

19   traced back to Mr. Duncan, that's for sure.

20       But now you're being asked to make that leap even though

21   there could have been a way to get to a point to prove a point,

22   we don't have any of that evidence because there is no such

23   evidence.  Because clearly had there been, had there been

24   evidence, actual evidence that Mr. Duncan posted this ad, you

25   would have heard it.  But you heard nothing other than the

1  exact special agent who does those things for a living doing a

2  quick Google search, taking a screenshot, and then testifying,

3  that's it.

4      This is the government.  You've seen during the course of

5  this trial multiple attorneys, multiple support staff, all the

6  resources available to it.  Prove it.  Don't just say over and

7  over again, prove it to me, that's your job.

8      Ms. Christian -- your Honor, how much time am I at?

9          THE COURT:  You're at about 55 minutes.

10          MR. ORTIZ:  -- she is basically the star witness, the

11  star witness for the government.  A witness who engages in this

12  kind of conduct, a witness who lies over and over again,

13  including when she claimed that Mr. Duncan has hit her.

14     She said it so nonchalantly on direct examination, but

15  press on it, it was very clear she was making it up.  It was

16  very clear when she was asked a simple question, "Where's the

17  evidence of it?"  You could see she was thinking, looking back

18  into the audience trying to find the answer because she was

19  caught.

20     So what did she do?  She got emotional -- or at least

21  pretended to -- because she was asked about that exactly as

22  well, her reaction, that she's good at it.  She's good at

23  crying on cue.  Because I asked her, I said, "You're good at

24  that, right?"  Just like in your Oakland PD interview, you were

25  claiming innocence, you were blaming Marcus for all of this

1    stuff, you were crying and crying and crying.  But the second

2    the officer left the room, tears stopped, crying stopped, and

3    she left.

4        She admitted that to you; she didn't try to lie on that

5    because she was caught.  She's trying her best to convince

6    people that she's the victim here.  But she lied to OPD, she

7    lied to Special Agent Penna twice, and she did exactly what she

8    told you she was going to do.  She was going to say what she

9    had to say to avoid going back to jail.

10       Because that is and has always been her primary concern.

11   Clearly it cannot be that you're being asked to convince

12   Mr. Duncan of these charges based primarily on what you heard

13   from Ms. Christian.  But, shockingly, that's exactly what

14   you're being asked to do.

15       Every time the government says "Mr. Duncan is a pimp, that

16   he used her body for cash," that he did all these things, every

17   time he says that it's not based on any of the physical

18   evidence you saw because the physical evidence contradicts that

19   argument.  The only way that you can even in any way follow the

20   argument is if you somehow put any credibility in

21   Ms. Christian.  And clearly, based on what you saw from that

22   witness stand, what you heard from her, her reactions, it

23   simply can't be the case that she's believable.

24       The bulk of the argument for the government was, again,

25   these text messages that were extracted from Ms. Christian's

1    phone where he's asking about money, things of that nature.

2    But again, that extraction is for a phone not tied to

3    Mr. Duncan in any way.  The phone 2322, that's not his phone.

4    His parole officer told you what phones he had, you have

5    evidence of the phone he was arrested with, 4097, not this.  So

6    no matter how many times these text messages are shown to you,

7    because even in the slides you saw, the phone number is taken

8    out because they don't want you seeing that, but the phone

9    number is not Mr. Duncan's.

10    Even the extraction from Cheyanne's phone, all of those

11    messages have nothing to do with Mr. Duncan.  Those also are

12    the 2322 number, not Mr. Duncan's.

13    And the only evidence that's argued to you that ties

14    Mr. Duncan to these phones is because Ms. Christian opened the

15    account with the same account number and the same address.

16    That's the only tie that's relied upon by the government.

17    But she opened those accounts in San Jose, she gave

18    Mr. Duncan one phone, and gave someone else, probably Marcus,

19    as she said, the other phone.  Nothing to do with Mr. Duncan.

20    And again, we've heard from special agent after special

21    agent giving expert opinions, giving lay opinions about their

22    years and years and years in the FBI.  If that phone, the 2322

23    number was, in fact, Mr. Duncan's phone, which it is not, you

24    would have heard testimony from an expert in that regard

25    evaluating the call histories, evaluating who is calling who,

1  what numbers are being called.  But again, no evidence of that,

2  because any kind of inquiry along that line would have come up

3  empty-handed.

4     So, instead, we don't rely on the FBI to establish our

5  case, we don't bring in a special agent to establish our case,

6  we'll just rely on Ms. Christian who says she opened this

7  account and these texts are from Rob.

8     Absolutely no evidence to support any of that.  But she's

9  saying what she has to say to stay out of custody.  I'm

10  assuming -- or I expect the government will come up here and

11  say, "Well, she couldn't lie because she was subject to a

12  cooperation agreement.  And under the cooperation agreement she

13  has to tell the truth."  Well, who decides that?  Who decides

14  that?  Think about that as you listen to the argument on their

15  final closing.  Ms. Christian is not credible.

16     Finally, the letter that Mr. Duncan sent to Ms. Christian.

17  There was a lot of cross-examination, Mr. Duncan was trying to

18  explain why he said what he said, and he told you why he wrote

19  the letter.  It was at the request of Ms. Christian, why?  Not

20  because he wanted her to lie for him to cover for him, he

21  wanted her to say certain things to protect herself.  Because,

22  as she told him, "I lied to get out of jail.  When I take the

23  stand, I'm going to lie again."

24     She asked him, "What does perjury mean?"  And he indicates,

25  "Well, if you don't remember things, they can't get you for

1    perjury.  So just say you don't remember things."

2         If you follow the letter through, it's clear what he's

3    saying to her -- it is cryptic and there are vulgar things in

4    that letter, personal things between the two of them -- but

5    this, by no way, proves anything.

6         As to the issue of Cheyanne being 17.  Well, now he

7    knows -- now he knows that when all this was happening she was

8    a prostitute, now he knows when this was all happening in 2018

9    that she was 17, but he told you why he was concerned about

10   that.  She was a minor, he was 26, and he had sex with her.

11   And that's why he's telling her to say, "We didn't talk about

12   it."

13        There's no reference in this letter to him pimping out

14   Cheyanne or anybody.  But you have the letter, you'll read it,

15   you can make whatever determinations you think are necessary.

16   But certainly it doesn't lead to a convicting Mr. Duncan of

17   something that he's not guilty of.

18        And, most importantly, this case is about Cheyanne being

19   pimped.  She was forced to do all of these things.  She was

20   enticed, she was transported, she was harbored, she was

21   maintained, she was obtained, all of those things.  That's the

22   argument to you.  She didn't come in here and say that.  She

23   never told you any of those things.  You heard about her

24   parents, they didn't come in here either.

25        So where is the proof that all of these things even

1   happened?  Ms. Christian?  Did the government prove beyond a

2   reasonable doubt that Mr. Duncan knowingly recruited, enticed,

3   harbored, transported, provided, obtained, or maintained

4   Cheyanne A. to engage in a commercial sex act?

5        Based on the actual facts, based on the evidence in this

6   case, the answer to that question is absolute no.

7        There are some other elements; we don't even get there

8   because the first question is, answer no.  Was this interstate

9   commerce?  I'll touch on it briefly.  The ads.  We've already

10  talked about the fact that there is no evidence that Mr. Duncan

11  created them.  And, as the Court read to you, a lack of

12  evidence like using the subpoena power, like tracing back to a

13  cell phone, like tracing back to a computer.  The lack of all

14  that stuff when it's available to you is a doubt based on

15  reason.

16       The Motel 6.  Ms. Christian rented that room like she had

17  over 20 times before.  There is no evidence to support that

18  Mr. Duncan directed that in any way whatsoever.  There's no

19  interstate commerce here.  Even the Life360 app, there is no

20  evidence other than this one screenshot that it was used to

21  recruit, maintain, harbor anybody.

22       And then finally did the government prove that Mr. Duncan

23  knew that Cheyanne was a minor?  Well, the evidence is he did

24  not, not until he was arrested on this case.  And there's no

25  evidence to the contrary because Ms. Christian's testimony is

 1   not evidence that should be considered.

 2        You are here to decide whether or not Mr. Duncan is guilty

 3   of trafficking of Cheyanne and conspiring with Eva who, in

 4   fact, is guilty of this, to traffic Cheyanne.

 5        And to the extent that you have this emotion, you feel bad

 6   for Cheyanne and her family, as you should, if Ms. Christian

 7   was doing as she said she was doing, as the government claims

 8   was going on even though we have no evidence of it, you have to

 9   set those emotions aside.

10        You came in here, and the Court instructed you on a very

11   crucial concept of our criminal justice system, and that is you

12   can't just point the finger at somebody.  You can't just accuse

13   somebody.  As the government, you can't just say all these

14   things happened.  It doesn't work that way, at least not

15   anymore.

16        This courthouse is sacred.  It's meant to put the burden on

17   the government.  When they're going to say these things about

18   you, when they're going to charge you with these offenses or

19   any offense, they have to prove it.  And it's not enough just

20   to say it over and over and over again.  You have to prove it.

21        And if you can't, there shouldn't have been a charge in the

22   first place.  And certainly if you can't and a jury sees the

23   evidence and the jury sees that you can't, don't come up here

24   and tell that jury over and over again facts that weren't

25   proved.

1    But that's exactly what you heard over the course of these

2    last three weeks.  That's exactly what you heard in the opening

3    argument.  That's exactly what you're going to hear in their

4    closing argument.  Absolutely listen to what the government is

5    saying.  But as you're listening to every word, ask yourself,

6    "Where's the evidence of that?"

7        And when you ask yourself that and you hold the government

8    to their obligation, there is only one verdict you can reach on

9    Counts One and Two, and that is that Mr. Duncan is not guilty

10   of those.

11       Again as to Count Three, no issue there.  Mr. Duncan was

12   arrested, he was handcuffed, he freaked out, and he ran.  Not

13   an excuse, so he's guilty of that.  But not of trafficking

14   Cheyanne, not of trafficking anybody.

15       Thank you, your Honor.

16           THE COURT:  All right.  That concludes the defense

17   closing argument.  Again, argument telling you what the defense

18   believes the evidence has shown.

19       How long does the government estimate for rebuttal?

20           MR. FOGERTY:  I'll probably use the balance of the

21   time, your Honor.

22           THE COURT:  All right.  So that would be just over

23   half an hour.  I think we can go forward with that.  Let's do

24   that, and then we'll take another break before I read the

25   instructions to you.

1          All right, Mr. Fogerty.

2                MR. FOGERTY:  Thank you, your Honor.

3          Good morning, ladies and gentlemen.  We'll work through

4     this quickly.  The first thing I want to talk about is that

5     2322 phone number.

6          Mr. Duncan has made the argument that that's not his phone,

7     it's someone else's phone.  And he makes that argument because

8     whoever is using the 2322 number is definitely pimping

9     Cheyanne.  Think about what you saw in the text messages on the

10    2322 number.  They show a person micromanaging a 17 year old as

11    she has sex for money.  Checking in on how much she earned.

12         Can we pull up 708, page 1, line 6 through 10.  All right.

13    We'll just use the Elmo.

14         Your Honor, before we start, can we take a short break so

15    that we can fix our technical difficulty here?

16               THE COURT:  You should be able to display it on the

17    Elmo.

18               MR. FOGERTY:  I'm going to have a lot more documents

19    to show on the Elmo, your Honor.  It may be efficient to take a

20    short break.

21               THE COURT:  Why don't you start on the Elmo and see

22    if you can get the technical difficulties worked out in the

23    meantime.

24               MR. FOGERTY:  All right.  Exhibit 708, line 6, the

25    2322 number.  "How much you got?"

1          "$730."

2          "How much she got?"

3          "$1,000."

4               THE COURT:  I don't think that's displaying on the

5     screen, just so you're clear.

6               MR. FOGERTY:  Thank you, your Honor.

7               THE COURT:  Now it is.

8               MR. FOGERTY:  All right.  Thank you, your Honor.

9               THE COURT:  Uh-huh.

10              MR. FOGERTY:  Line 6, 2322 number.  "How much she

11    got?"

12         "$730."

13         Or "how much you got?"

14         "$730."

15         "How much she got?"

16         "$1,000."

17         "She's in trouble."

18         You saw these texts over and over again of the person using

19    the 2322 number managing 17-year-old Cheyanne's prostitution

20    activity, exactly the types of things a pimp would say who is

21    benefiting from and providing a person for commercial sex.  And

22    you know, ladies and gentlemen, that these are Mr. Duncan's

23    text messages.

24         First, think about Exhibit 51.  Exhibit 51 is the

25    subscriber information on the 1486 number.  Can we pull up

1   Exhibit 51, please.

2        Exhibit 51, you've seen it over and over again, it is the

3   1486 number.  You know that that's subscribed to by Robert

4   Duncan, it's his phone number, he told you it was.

5        You know that he terminated that account on the very same

6   day that he got the two new phones, the 2096 number and the

7   2322 number.  You also saw, and you will see later, if you look

8   in exhibits that go back a few.  That in Exhibits 52 and 53,

9   numbers -- can we go to 52 and 53?  We've seen 51 over and over

10  again, that's Mr. Duncan's 1486.

11       Exhibit 52 and Exhibit 53 both have the same account

12  number.  It's the same account, two numbers.  Those are the two

13  numbers that Mr. Duncan got the day he terminated his account

14  for 1486.

15       Second, think about what the person using the 2322 number

16  is saying in those text messages.  Can we pull up Exhibit 703

17  at page 13, lines 262 through 263?  708, please, page 13, line

18  262 through 263.

19       All right, ladies and gentlemen, this is the 2322 texting

20  with Ms. Christian.  When Ms. Christian says "Cheyanne's

21  abscess is oozing out of control," the 2322 number says "I'm

22  give her some of my pills."

23       You heard that the only two people in this case that have

24  had abscesses are Cheyanne and Mr. Duncan.  So the person

25  saying "I'm going to give Cheyanne some of my abscess pills" is

1    Mr. Duncan.  That tells you that Mr. Duncan is using 2322.

2         Can we go to page 11, please.  Go to lines 225 through 227.

3    All right.  When Ms. Christian in her text is venting her

4    frustration about having to help Cheyanne, the person using

5    2322 number says, "I'm on ankle, so, yes, you need to help her.

6    If I wasn't, then no.  I'm on ankle."

7         You know from the evidence that the only person in this

8    case who was on some sort of restriction, who couldn't go

9    places, had restrictions on his movement because he had a

10   curfew was Mr. Duncan.  So the person telling Ms. Christian to

11   help Cheyanne because he's on ankle or restriction is

12   Mr. Duncan.

13        That's, again, how you know how Mr. Duncan is using the

14   2322 number that is over and over again managing Cheyanne's

15   prostitution activity.

16        But there's more.  Can we go to page 13 at line 253.  Here

17   Ms. Christian tells the person using the 2322 number, "You said

18   I am done being hard-headed.  I was never being hard-headed."

19        Ladies and gentlemen, you know who was calling

20   Ms. Christian hard-headed.  You heard those very words out of

21   Mr. Duncan's mouth yesterday.

22        Can we play Exhibit 167 at 747, please.

23        (Audio played.)

24        MR. FOGERTY:  That's Mr. Duncan using the 2322 number.

25   Let's also take a step back and think about what you just saw

1  there.  Mr. Duncan has denied over and over again that he had

2  two phones.  He denies it because it's really bad for him that

3  there are these two phones that he's using.  But you saw in

4  this video him using two phones.  He's talking to Ms. Christian

5  and Cheyanne on one phone, and he's recording it with another

6  phone, two phones.  2096 and 2322.

7       But there's more.  Can we pull up Exhibit 800 at page 2,

8  please -- oops, sorry.  You've seen this -- there you go.

9  "Don't never admit to ever to text your phone -- don't never

10  admit to me ever texting your phone."

11      You know Mr. Duncan was using the 2322 number because of

12  what he told Ms. Christian in this letter.  Because when he was

13  trying to cover his tracks, he wrote this letter to

14  Ms. Christian.

15      Ladies and gentlemen, you know that Mr. Duncan sent text

16  messages to Ms. Christian.  You've seen them.  So when he says

17  "Don't admit to it," he's telling Ms. Christian to lie.  It's

18  that simple.  Now, why was he telling Ms. Christian to lie

19  about that specific fact of whether he's ever texted her phone?

20  Well, he told her to lie because the texts reveal what he was

21  doing to 17-year-old Cheyanne.

22      Ladies and gentlemen, it's not a mystery who was using

23  2322.  Mr. Duncan revealed himself on those texts over and over

24  again.  All right.  We can take that down.

25      So Mr. Ortiz talked a little bit about those prostitution

1  ads and he put up Exhibit 401.  Can we put that up, please.

2  All right.  Exhibit 401.  See that phone number next to

3  Stephanie, (916) 758-7904.  Mr. Ortiz told you to put that

4  aside because there's no evidence connecting that to

5  Mr. Duncan.  Well, that's not true.

6      Let's go to Exhibit 57, please.  Can we zoom in on the row

7  that says "Robert Duncan"?  Do you see that number

8  (916) 758-7904, the number that was on the prostitution ad at

9  Exhibit 401?  That number is assigned to Robert Duncan.

10  Robertd6900@gmail.com.  That's Mr. Duncan's number too.  So

11  don't put that prostitution ad aside because it's Mr. Duncan's

12  prostitution ad, and it is an ad depicting Cheyanne.  You've

13  seen the photos, I'm not going to display them again.  If you

14  want to see them again you'll have them in your deliberation

15  room.

16      But if you need a little more, let's go a little bit

17  deeper.  Let's see whose email address is Robert D.  Let's pull

18  up Exhibit 58, please.

19      Robertduncan6900, no surprise there, that's Mr. Duncan as

20  well.  So again, when Mr. Ortiz told you to disregard

21  Exhibit 401, the prostitution ad depicting Cheyanne, don't do

22  that.  You can see that that's linked directly to Mr. Duncan.

23      Let's talk about the other prostitution ad.  Mr. Duncan

24  really wants to avoid Exhibit 400.  Can we pull up that

25  exhibit, please.  That's the one with his phone number on it.

1   Mr. Duncan really wants to avoid this ad because it's powerful

2   evidence that he was providing a 17 year old to have sex with

3   strangers for money.  This ad in and of itself proves each and

4   every element of Count Two.

5       First, by posting this ad, Mr. Duncan is providing a 17

6   year old to have sex with sex buyers, commercial sex acts.

7       Can we turn to page 2, please.  Second, after looking at

8   the child depicted in that photo and the other photos,

9   Mr. Duncan knew or, at the very least, recklessly disregarded

10  the fact that Cheyanne was under 18.

11      We can take that down.

12      And, third, the advertisement to pay for sex with a 17 year

13  old is economic in nature and it occurred on the internet,

14  which is something that Special Agent Schofield testified it

15  consists of a global network of computers.

16      This ad is a big problem for Mr. Duncan, that's why --

17  that's why he argues that he couldn't have been dumb enough to

18  put his own telephone number on it.

19      But remember, ladies and gentlemen, there are two time

20  periods in this case.  The first time period, that's before the

21  close call on September 24th.  That's when Mr. Duncan was

22  running his pimping operation using the phone subscribed in his

23  own name, that 1486 number.  That's when he was driving

24  Cheyanne to Oakland himself.  That's when he was posting that

25  ad.

1          And remember you heard ads that are posted on the internet

2     can stay up longer than one day, they can stay up for days or

3     weeks.

4          And then there was this second time period after his close

5     call with Deputy Chaplin and Cheyanne's parents on September

6     24th.  That's when Mr. Duncan tried to get savvy.  He got the

7     two phones, the two phones you saw him using together to make

8     that reporting, set up his home base in Natomas, he finally

9     moved in with Ms. Christian and Cheyanne, and he started

10    sending Cheyanne to Oakland with Ms. Christian.

11         Mr. Ortiz has argued that Mr. Duncan was smart the whole

12    time.  He wasn't.  He's just lucky he didn't get caught on

13    September 24th.

14         And let's talk a little bit about what happened on

15    September 24th.  Mr. Duncan told you that he told Deputy

16    Chaplin that he was 16, and he explained why he did that.

17    Mr. Duncan told you that he told Deputy Chaplin he was 16 years

18    old in that call because he didn't want Cheyanne's parents to

19    know who he was.

20         But, ladies and gentlemen, let's think about all the ways

21    Mr. Duncan could have disguised his identity.  He could have

22    given a false name.  He could have disguised his voice.  He

23    could have said he was 50 years old.

24         All of the choices he had about how to conceal his

25    identity, but he chose telling Deputy Chaplin that he's 16.  16

1    is a very specific lie.  He thought no one would question what

2    he was doing if he said he was a kid, because Cheyanne was a

3    kid.

4        The fact that he chose to disguise himself as someone under

5    18 reveals that he knew Cheyanne was under 18.  And you've seen

6    the letter over and over again, he tells Ms. Christian, "Don't

7    say I knew she was 17."

8        Ladies and gentlemen, he knew she was 17, you know that

9    from the evidence.  So again, he's telling her to lie, and the

10   lie is important.

11       You'll see the jury instructions in a few minutes.  It will

12   tell you that one of the things that you need to determine is

13   whether Mr. Duncan knew or recklessly disregarded Cheyanne's

14   age, or whether he had a reasonable opportunity to observe her.

15       So consider the lie he asked Ms. Christian to tell.  It is

16   a lie designed to knock out one of those elements.  That's why

17   he wrote the letter, that's why he lied.

18       You also heard testimony yesterday from Mr. Duncan about

19   the 1486 number.  And I want to talk about one specific aspect

20   of his testimony, the fact that Mr. Duncan repeatedly denied

21   that he terminated the service for the 1486 number on September

22   24th.  That's the date of the close call with Deputy Chaplin.

23       He claimed that he just turned his phone off, he just

24   powered it off, turned it off and put it away.

25       But you saw Exhibit 51.  T-Mobile's records indicate that

1  the cell service was terminated from Mr. Duncan's account.

2  From Mr. Duncan's account, the cell service was terminated.

3  Think about why Mr. Duncan would deny that the service was

4  terminated, why he would deny that the service was cancelled.

5      Typically when someone cancels a phone or terminates it,

6  the date they do that is inconsequential, it doesn't matter.

7  But you know the cancellation date matters in this case, it's

8  September 24th.  You know because September 24th, you know what

9  Mr. Duncan was doing.

10     You know he was confronted by a deputy sheriff, you know

11  the deputy sheriff was with his 17-year-old prostitute,

12  Cheyanne, you know he was using the 1486 number to talk to that

13  deputy sheriff.  You know that that 1486 number was registered

14  in his name, and you know that the 1486 number was saved in the

15  17-year-old Cheyanne's phone as "Daddy."  And that the deputy

16  sheriff could see that that number was assigned to "Daddy."

17     Mr. Duncan, I submit to you, believed that police could

18  trace that number to him.  With that, they could determine that

19  he had posted Exhibit 400, one of the prostitution ads

20  depicting Cheyanne.

21     This was a huge problem for Mr. Duncan's pimping operation.

22  A deputy sheriff, his 17-year-old prostitute, and his number

23  linked to it.  So, of course, he got rid of the phone.  Of

24  course he needed to get rid of the phone.  But admitting

25  cancelling the phone, well, that shows you that he knew he had

1   a big problem, so that's different.  So that's why he told you

2   that he just turned it off even though you saw Exhibit 51.

3       Because saying that he cancelled it revealed what was going

4   through his head that day, September 24th.

5       Mr. Ortiz talked a little bit about Life360 and an account

6   assigned to Ashley.  He said, Mr. Ortiz argued, that the Ashley

7   account belonged to Eva Christian.  But you know from the

8   evidence that that's not true.  Look at Exhibit 163.

9       Ladies and gentlemen, you know, and you're the judges of

10  the facts of this case.  You know and you heard that this

11  exhibit, 163, is from Mr. Duncan's phone that was seized by

12  Mr. McCowan.  It's a screenshot showing Ashley on Life360.

13      Now can we pull up Exhibit 714.  Can we zoom in on the top

14  part, please.  You know from your review of the evidence in

15  this case that Exhibit 714 was from the phone that the Oakland

16  Police Department took from Cheyanne on October 25th.  In

17  Cheyanne's phone there's a Life360 account for Ashley.  The

18  evidence shows you that that's not Ms. Christian's.  Mr. Duncan

19  was following Cheyanne who was Ashley, not Ms. Christian.

20      We can take that down.  Mr. Ortiz has also argued that

21  Mr. Duncan couldn't have known or didn't know that Cheyanne was

22  17 years old.  His argument just doesn't account for all the

23  times that it was clear that Cheyanne was underage and

24  Mr. Duncan decided to traffic her anyway.

25      First, Ms. Christian told you that she and Mr. Duncan

1    talked about the fact that Cheyanne was a kid, and Mr. Duncan

2    just told her don't worry about it.

3        But even putting that aside, think about the rest of the

4    evidence.  You saw Cheyanne's appearance and the fact that she

5    still had braces.  Stop and think about why Mr. Duncan again

6    repeatedly denies that he knew Cheyanne had braces.  Because

7    that fact reveals her youth.

8        Mr. Duncan -- or you heard that Cheyanne couldn't rent

9    rooms at the Motel 6 because she was too young, that Mr. Duncan

10   knew that Cheyanne lived with her father and her little sister.

11   You heard about the close call and how Mr. Duncan lied about

12   his age, and you heard about how Mr. Duncan and Eva Christian

13   worked in concert to bring Cheyanne back to Mr. Duncan's

14   apartment in Natomas in the middle of the night.

15       The evidence is overwhelming that Mr. Duncan knew she was a

16   kid, but he just revealed he didn't care because, ultimately,

17   it was about making money.

18       So Mr. Ortiz spent a lot of time about how Eva Christian

19   was the mastermind of this whole operation, and that's designed

20   to make you think that Mr. Duncan is not responsible for what

21   he did to this 17 year old.

22       First, as my colleague described to you, it doesn't matter

23   whether Mr. Duncan or Eva Christian was in charge or the

24   mastermind of this pimping operation, you can look to the

25   instruction of aiding and abating if you'd like.  But from the

1    evidence, you know that Ms. Christian wasn't running the show.

2    Just compare what each of them got out of it.

3        Ms. Christian got -- she got a whole lot of grief.  You've

4    seen the text messages with Ms. Christian complaining over and

5    over again about having to help Cheyanne.  Can we pull up

6    Exhibit 708, page 10.  Can we go to lines 203 to 205.

7        Ms. Christian complaining over and over again, but when she

8    complains, Mr. Duncan, using that 2322 number, pulls her back

9    in.  And you also know that Ms. Christian got herself arrested

10   as part of this when she was out in Oakland with Cheyanne.

11   Compare that to what you know Mr. Duncan got out of it.  What

12   you saw from the text messages, what you heard from the

13   recordings.  It's one word, money.  He got money.  That's how

14   you know Mr. Duncan was in charge of this conspiracy and

15   pimping operation.  Look who got the money, it was Mr. Duncan.

16       So Mr. Duncan has argued that he was only going to Oakland

17   in September and October of 2018 for two reasons:  To sell cars

18   and to hang out with his girlfriend -- his then girlfriend, Eva

19   Christian, who he claims he didn't know was engaged in

20   prostitution.

21       The problem is the phone records and the location

22   information for his phone, that 1486 number -- one of his

23   phones -- just don't back that up.

24       Can we pull up Exhibit 302 at page 8.

25              THE COURT:  You have just over four minutes left.

 1          MR. FOGERTY:  You can take that down.

 2      At the end of the day what Mr. Duncan wants you to believe

 3  is that he was in a sexual relationship with Ms. Christian and

 4  17-year-old Cheyanne and they were tricking him.  They were

 5  engaged in prostitution behind his back, and he was this

 6  insecure guy sitting at home hoping that his lady friends

 7  wouldn't leave him.  That claim is designed to think Mr. Duncan

 8  is the victim here.  But none of the evidence you've seen so

 9  far is considered -- in this trial is consistent with that.

10      You didn't hear anything like that when Mr. Duncan was on

11  calls with Jaquorey Carter saying "I tell my bitch to walk up

12  to cars and press them."  You definitely hear that in that

13  eight-minute call with Ms. Christian and Cheyanne.  What you

14  heard was him talking about, was his pimping strong enough.

15      Can we play 167 at 516.

16      (Audio played.)

17          MR. FOGERTY:  That's not consistent with what

18  Mr. Duncan portrayed when he was on the stand, with him being a

19  victim and being tricked by Ms. Christian and 17-year-old

20  Cheyanne.  His text messages don't reveal that either.  His

21  text messages aren't consistent with him being tricked by

22  Ms. Christian and a 17 year old.

23      Can we pull up Exhibit 715 at line 1?

24      Mr. Duncan's text messages to 17-year-old Cheyanne reveal

25  that he's no victim here.  The language is crude but it's

1   revealing, "Bitch, you need to stop slamming doors and fix your

2   mother fucking attitude.  You're mad because you've been on

3   some faggot shit and you got put out on blast, you should have.

4   Something shit gets exposed when you deal with real people."

5       Mr. Duncan knows what's going on even seemingly when people

6   try to do things behind his back.  And notice Mr. Duncan's word

7   choice.  He uses that slur over and over and over again in

8   recordings, in his text messages, in Exhibit 715, in

9   Exhibit 708.  That's another hallmark of Mr. Duncan's

10  communication, how he talks to Ms. Christian and how he talked

11  to 17-year-old Cheyanne.

12      In the end, Mr. Duncan's testimony doesn't match up with

13  the evidence that you've seen in this trial.  And, therefore, I

14  ask that you return verdicts of guilty on all counts.  Thank

15  you.

16      THE COURT:  All right.  Members of the jury, that concludes

17  the closing arguments.  It is my duty to read the final jury

18  instructions to you.  That's going to take a good, 20,

19  25 minutes, and so I have the unenviable position of standing

20  between you and lunch.  I need to finish the instructions

21  before you can break for that.

22      Normally we would take a break now, and I can understand

23  that you might want a break.  So just let me know by a show of

24  hands, are there any of you who would like a break now of at

25  least 10 to 15 minutes before we take another 20 to 25 minutes

1  for you to hear my jury instructions?  You're all okay sitting

2  there for another 20, 25 minutes?  All right.  I'm not seeing

3  any raised hands so I'm going to accept that.

4      Ms. Schultz is going to bring you -- each of you will have

5  a copy of your own instructions.  You're not required to follow

6  along with me.  This is to assure you that you will have your

7  own copy with you when you retire to deliberate.

8      All right.  This is very serious stuff.  It's not a

9  dramatic reading.  These are important words.  I am required to

10 read them to you.

11     Members of the jury, now that you have heard all the

12 evidence, it is my duty to instruct you on the law that applies

13 to this case.  You have the instructions with you.  You do not

14 need to follow along, it's entirely up to you, whatever works

15 for you to best understand these instructions.

16     It is your duty to weigh and to evaluate all of the

17 evidence received in the case and in that process to decide the

18 facts.  It is also your duty to apply the law as I give it to

19 you to the facts as you find them, whether you agree with the

20 law or not.  You must decide the case solely on the evidence

21 and the law.  You'll recall you took an oath promising to do so

22 at the beginning of the case.

23     You should also not be influenced by any person's race,

24 color, religious beliefs, national ancestry, sexual

25 orientation, gender identity, gender or economic circumstances.

1   Also, do not allow yourself to be influenced by personal likes

2   or dislikes, sympathy, prejudice, peers, public opinion or

3   biases, including to the extent you can unconscious bias.

4       Unconscious biases are stereotypes, attitudes, or

5   preferences that people may consciously reject but may be

6   expressed without conscious awareness, control, or intension.

7       You must follow all these instructions and not single out

8   some and ignore others, they are all important.  Please do not

9   read into these instructions or do anything I may have said or

10   done any suggestion as to what verdict you should return --

11   that is a matter entirely up to you.

12       The superseding indictment, the charging document is not

13   evidence.  Mr. Duncan has pleaded not guilty to the charges.

14   He is presumed innocent unless and until the government proves

15   him guilty beyond a reasonable doubt.

16       In addition, Mr. Duncan did not have to testify or present

17   any evidence.  He does not have to prove innocence.  The

18   government has the burden of proving every element of the

19   charges beyond a reasonable doubt.

20       Here, Mr. Duncan has testified.  You should treat his

21   testimony just as you would the testimony of any other witness.

22       You have heard evidence that Mr. Duncan has previously been

23   convicted of a crime.  You may consider that evidence only as

24   it may affect the defendant's believability as a witness.  You

25   may not consider a prior conviction as evidence of guilt of the

1    crime for which Mr. Duncan is now on trial.

2        You are here only to determine whether Mr. Duncan, the

3    defendant, is guilty or not guilty of the charges in the

4    superseding indictment.  Mr. Duncan is not on trial for any

5    conduct or offense not charged in the superseding indictment.

6        Regarding the presumption of innocence.  Because of the

7    presumption of innocence, a defendant does not have to prove

8    innocence.  The burden of proof again is always on the

9    government to prove every element of the charges beyond a

10   reasonable doubt.  The burden never shifts to the defendant.

11       Proof beyond a reasonable doubt is proof that leaves you

12   firmly convinced the defendant is guilty.  It is not required

13   that the government prove guilt beyond all possible doubt.  A

14   reasonable doubt is a doubt based upon reason and common sense

15   and is not based purely on speculation.  It may arise from a

16   careful and impartial consideration of all the evidence or from

17   lack of evidence.

18       If after a careful and impartial consideration of all the

19   evidence you are not convinced beyond a reasonable doubt that

20   the defendant, Mr. Duncan, is guilty, it is your duty to find

21   him not guilty.  On the other hand, if after a careful and

22   impartial consideration of all the evidence you are convinced

23   beyond a reasonable doubt that the defendant, Mr. Duncan, is

24   guilty, it is your duty to find him guilty.

25       To review, the evidence you're to consider in deciding what

1    the facts are consists of the following:  The sworn testimony

2    of any witness, the exhibits received into evidence, and any

3    facts to which the parties have agreed.

4         In reaching your verdict you may consider only the

5    testimony of exhibits received into evidence.  Again, to

6    review.  The following things are not evidence and you may not

7    consider them in deciding what the facts are.

8         First, questions, statements, objections, and arguments by

9    the lawyers are not evidence.  The lawyers are not witnesses.

10   Although you must consider a lawyer's questions to understand

11   the answers of a witness, the lawyer's questions are not

12   evidence.

13        Similarly, what the lawyers have said in their opening

14   statements, closing arguments, and at other times isn't

15   intended to help you interpret the evidence, but it is not

16   evidence.  If the facts, as you remember them, differ from the

17   way the lawyers state them, your memory of the facts controls.

18        Secondly, any testimony that I have excluded, stricken, or

19   instructed you to disregard is not evidence.  In addition, some

20   evidence may have been received only for a limited purpose.  If

21   I instructed you to consider certain evidence in a limited way,

22   you must do so.

23        Third, anything you may have seen or heard when court was

24   not in session is not evidence.  As I've been telling you

25   throughout, you are to decide the case solely on the evidence

1    received here at trial.

2         Again to review what evidence is or the nature of evidence.

3    Evidence may be direct or circumstantial.  Direct evidence is

4    direct proof of a fact, such as testimony made by a witness

5    about what that witness personally saw or heard or did.

6         Circumstantial evidence is indirect evidence.  That is, it

7    is proof of one or more facts from which you could find another

8    fact.  You are to consider both direct and circumstantial

9    evidence.  Either can be used to prove any fact.  The law makes

10   no distinction between the weight to be given to either direct

11   or circumstantial evidence.  It is for you to decide how much

12   weight to give to any evidence.

13        In deciding the facts in the case, you may have to decide

14   which testimony to believe and which testimony not to believe.

15   You may believe everything a witness says, or part of it, or

16   none of it.

17        In considering the testimony of any witness, again to

18   review, you may take into account the following:

19        First, the witness's opportunity and ability to see or hear

20   or know the things testified to.

21        Second, the witness's memory.

22        Third, the witness's manner while testifying.

23        Fourth, the witness's interest in the outcome of the case,

24   if any.

25        Fifth, the witness's bias or prejudice, if any.

1        Sixth, whether other evidence contradicted the witness's

2  testimony.

3        Seven, the reasonableness of the witness's testimony in

4  light of all the evidence.

5        And, eight, any other factors that bear on believability.

6        Sometimes a witness may say something that is not

7  consistent with something else he or she said.  Sometimes

8  different witnesses will give different versions of what

9  happened.  People often forget things or make mistakes in what

10 they remember.

11       Also, two people may see the same event but remember it

12 differently.  You may consider these differences, but do not

13 decide that testimony is untrue just because it differs from

14 other testimony.

15       However, if you decide that a witness has deliberately

16 testified untruthfully about something important, you may

17 choose not to believe anything that witness said.  On the other

18 hand, if you think the witness testified untruthfully about

19 some things but told the truth about others, you may accept the

20 part you think is true and ignore the rest.

21       The weight of the evidence as to a fact does not

22 necessarily depend on the number of witnesses who testify, but

23 is important at how believable the witnesses were and how much

24 weight you think their testimony deserves.

25       During trial certain charts and summaries have been

1  admitted into evidence.  Charts and summaries are only as good

2  as the underlying supporting material.  You should therefore

3  give them only such weight as you think the underlying material

4  deserves.

5      You have heard testimony from an undercover officer who was

6  involved in the government's investigation in this case.  Law

7  enforcement officials may engage in stealth and deception such

8  as the use of informants and undercover agents to investigate

9  criminal activity.  Undercover agents and informants may use

10  false names and appearances and assume the roles of members in

11  criminal organizations.

12      You have heard testimony that the defendant, Mr. Duncan,

13  made certain statements.  It is for you to decide first whether

14  the defendant made the statements and, second, if so, how much

15  weight to give each of them.  In making those decisions, you

16  should consider all the evidence about the statements including

17  the circumstances under which the defendant may have made each

18  one.

19      You have heard testimony from persons who testified to both

20  facts and opinions and the reasons for his or her opinions.

21  Fact testimony is based on whether what the witness saw, heard,

22  or did.  Opinion testimony is based on the education or

23  experience of the witness.

24      Regarding the testimony about facts, it is your job to

25  decide which testimony to believe and which testimony not to

1   believe.  Again, you may believe everything a witness says or

2   part of it or none of it.

3       Take into account the factors I reviewed with you earlier

4   in these instructions that I provided to assist you in weighing

5   the credibility of witnesses.  Regarding the testimony about

6   witness's opinions, this opinion testimony was allowed because

7   of the education or experience of the witness.  Opinion

8   testimony should be judged just like any other testimony.  You

9   may accept all of it, part of it, or none of it.  You should

10  give it as much weight as you think it deserves considering the

11  witness's education and experience, the reasons for the

12  opinion, and all the other evidence in the case.

13      You have heard testimony from Eva Christian, a witness who

14  pleaded guilty to a crime arising out of the same events for

15  which the defendant, Mr. Duncan, is on trial.  This guilty plea

16  is not evidence against Mr. Duncan, and you may consider it

17  only in determining this witness's believability.

18      You have also heard that Eva Christian entered a plea

19  agreement in which she agreed to cooperate with the government

20  in exchange for a promise from the government to be prosecuted

21  for a less serious offense.  For these reasons in evaluating

22  the testimony of Eva Christian, you should consider the extent

23  to which or whether her testimony may have been influenced by

24  any of these factors.  In addition, you should examine the

25  testimony of Eva Christian with greater caution than that of

1   other witnesses.

2      The superseding indictment charges that the offenses

3   alleged in Counts One through Three were committed in or around

4   or on or about certain dates.  Although it is necessary for the

5   government to prove beyond a reasonable doubt that the offenses

6   were committed on a date reasonably near the dates alleged in

7   the superseding indictment, it is not necessary for the

8   government to prove that the offenses were committed precisely

9   on the dates charged.

10     Regarding knowingly.  An act is done knowingly if the

11  defendant is aware of the act and does not act through

12  ignorance, mistake, or accident.  You may consider evidence of

13  the defendant's words, acts, or omissions, along with all the

14  other evidence, in deciding whether the defendant acted

15  knowingly.

16     A separate crime is charged against the defendant,

17  Mr. Duncan, in each count.  You must decide each count

18  separately.  Your verdict on one count should not control your

19  verdict on any other count.

20     And now to review the counts.  Count One.  The defendant is

21  charged in Count One of the superseding with conspiring to

22  engage in sex trafficking of a child in violation of Section

23  1594(c) of Title 18 of the United States Code.

24     For the defendant, Mr. Duncan, to be found guilty of that

25  charge, the government must prove each of the following

1  elements beyond a reasonable doubt.  First, between in or

2  around September 2018 and continuing through in or around

3  October 2018, there was an agreement between the defendant,

4  Mr. Duncan and Eva Symone Christian to commit the crime of sex

5  trafficking of a child, to wit Cheyanne A.

6      Second, the defendant Mr. Duncan became a member of the

7  conspiracy knowing of at least one of its objects and intending

8  to help accomplish it.

9      A conspiracy is a kind of criminal partnership -- an

10  agreement of two or more persons to commit one or more crimes.

11  The crime of conspiracy is the agreement to do something

12  unlawful.  It does not matter whether the crime agreed upon was

13  committed.  For a conspiracy to have existed, it is not

14  necessary that the conspirators made a formal agreement or that

15  they agreed on every detail of the conspiracy.

16      It is not enough, however, that they simply met, discussed

17  matters of common interest, acted in similar ways, or perhaps

18  helped one another.  You must find that there was a plan to

19  commit the crime of sex trafficking of a child as alleged in

20  Count Two of the superseding indictment as an object of the

21  conspiracy with all of you agreeing as to the particular crime

22  which the conspirators agreed to commit.

23      One becomes a member of a conspiracy by willfully

24  participating in the unlawful plan with the intent to advance

25  or further some object or purpose of the conspiracy even though

1  the person does not have full knowledge of all the details of

2  the conspiracy.

3      Furthermore, one who willfully joins an existing conspiracy

4  is as responsible for it as the originators.  On the other

5  hand, one who has no knowledge of a conspiracy but happens to

6  act in a way which furthers some object or purpose of the

7  conspiracy does not thereby become a conspirator.

8      Similarly, a person does not become a conspirator merely by

9  associating with one or more persons who are conspirators nor

10  merely by knowing that a conspiracy exists.

11     Count Two.  The defendant is charged in Count Two of the

12  superseding indictment with sex trafficking Cheyanne A. in

13  violation of 1591 of Title 18 of the U.S. Code.  For the

14  defendant to be found guilty of that charge, the government

15  must prove each of the following elements beyond a reasonable

16  doubt.

17     First, between in or around September 2018 and continuing

18  through in or around October 2018, the defendant knowingly

19  recruited, enticed, harbored, transported, provided, obtained,

20  or maintained Cheyanne A. to engage in a commercial sex act.

21     Second, the defendant knew or recklessly disregarded the

22  fact that Cheyanne A. had not attained the age of 18 years and

23  would be caused to engage in a commercial sex act or the

24  defendant had a reasonable opportunity to observe Cheyanne A.

25  and knew she would be caused to engage in a commercial sex act.

 1      And, third, the defendant's acts were in or affecting

 2  interstate commerce.

 3      In considering the offense alleged in Count Two of the

 4  superseding indictment, you must consider the following

 5  definitions:  The words recruit, entice, harbor, transport,

 6  provided, obtain, and maintain and have their ordinary

 7  meanings.  The term commercial sex act means any sex act on

 8  account of which anything of value is given to or received by

 9  any person.  The government does not have to prove that any

10  person actually engaged in a commercial sex act to prove Count

11  Two.

12      Also in determining whether the offense alleged in Count

13  Two was in or affecting interstate commerce, you must consider

14  the following additional instruction.  Interstate commerce

15  means trade, transactions, transportation, or communication

16  between any point in a state and anyplace outside that state.

17  Or between two points within a state through a place outside

18  the state.

19      Acts and transactions that are economic in nature and cross

20  state lines are in interstate commerce.  Acts and transactions

21  that are economic in nature and affect the flow of money in the

22  stream of commerce to any degree, however minimal, affect

23  interstate commerce.  The government need not prove that the

24  offense was both in and affecting interstate commerce.  It need

25  only prove one or the other.

1          It is not necessary for the government to prove that the

2     defendant knew or intended that his conduct would affect

3     commerce.  In determining whether the defendant's conduct was

4     in or affecting interstate commerce, you may consider for Count

5     Two whether the defendant used a means or facilities of

6     interstate commerce such as the internet or motels that service

7     interstate travellers.

8          Also regarding sex trafficking of a child.  A defendant may

9     be found guilty of sex trafficking of a child even if the

10     defendant personally did not commit the act or acts

11     constituting the crime but aided and abetted in its commission.

12     To aid and abet means to intentionally help someone else commit

13     a crime.  To prove a defendant guilty of sex trafficking of a

14     child by aiding and abetting, the government must prove each of

15     the following beyond a reasonable doubt.

16          First, someone else committed the crime of sex trafficking

17     of a child as charged in Count Two.

18          Second, the defendant aided, counseled, commanded, induced,

19     or procured that person with respect to at least one element of

20     the crime of sex trafficking of a child as charged in Count

21     Two.

22          Third, the defendant acted with the intent to facilitate

23     the crime of sex trafficking of a child as charged in Count

24     Two.  And, fourth, the defendant acted before the crime before

25     completed.

1        It is not enough that the defendant merely associated with

2    the person committing the crime or unknowingly or

3    unintentionally did things that were helpful to that person or

4    was present at the scene of the crime.  The evidence must show

5    beyond a reasonable doubt that the defendant acted with the

6    knowledge and intention of helping that person commit the crime

7    of sex trafficking of a child as charged in Count Two of the

8    superseding indictment.

9        A defendant acts with the intent to facilitate the crime

10   when the defendant actively participates in a criminal venture

11   with advance knowledge of the crime and having acquired that

12   knowledge when the defendant still had a realistic opportunity

13   to withdraw from the crime.

14       The government is not required to prove precisely which

15   defendant actually committed the crime and which defendant

16   aided and abetted.

17       A minor's willingness to engage in sexual activity is not a

18   defense to any of the counts in the superseding indictment.

19       Count three.  The defendant is charged in Count Three of

20   the superseding indictment with escape from custody in

21   violation of Section 751(a) of Title 18 of the U.S. Code.

22       Before the defendant, Mr. Duncan, can be found guilty of

23   that charge, the government most prove each of the following

24   elements beyond a reasonable doubt:

25       First, on or about May 31st, 2019, the defendant was in the

1   custody of an officer of the United States, to wit, a special

2   agent of the Federal Bureau of Investigation.

3        Second, the defendant was in custody by virtue of a lawful

4   arrest for an offense, to wit, Title 18, U.S. Code Section

5   1591(a)(1).

6        Third, the defendant knowingly and voluntarily left custody

7   without permission.  I'm noting the second has a typo.  But I

8   think I've read it substantially correctly.  Agree,

9   Mr. Fogerty?

10            MR. FOGERTY:  Agreed, your Honor.  Thank you.

11            THE COURT:  Mr. Ortiz?

12            MR. ORTIZ:  Yes, your Honor.

13            THE COURT:  All right.  Now regarding your

14   deliberations.  When you begin your deliberations, elect one

15   member of the jury as your foreperson who will preside over the

16   deliberations and speak for you here in court.  You will then

17   discuss the case with your fellow jurors to reach agreement if

18   you can do so.  Your verdict, whether guilty or not guilty,

19   must be unanimous.

20        Each of you must decide the case for yourself, but you

21   should do so only after you considered all the evidence,

22   discussed it fully with the other jurors, and listened to the

23   views of your fellow jurors.

24        Do not be afraid to change your opinion if the discussion

25   persuades you that you should, but do not come to a

1   conclusion -- a decision simply because other jurors think it

2   is right.

3         It is important that you attempt to reach a unanimous

4   verdict but, of course, only if each of you can do so after

5   having made your own conscientious decision.  Do not change an

6   honest belief about the weight and effect of the evidence

7   simply to reach a verdict.

8         Perform these duties fairly and impartially.  You should

9   not be influenced by any person's race, color, religious

10  beliefs, national ancestry, sexual orientation, gender

11  identity, gender, or economic circumstances.

12        Also, as a very important reminder, do not allow yourself

13  to be influenced by personal likes or dislikes, sympathy,

14  prejudice, fear, public opinion, or biases including

15  unconscious biases.

16        Again, to review unconscious biases are stereotypes,

17  attitudes, or preferences that people may consciously reject

18  but may be expressed without conscious awareness, control, or

19  intention.

20        It is your duty as jurors to consult with one another and

21  to deliberate with one another with a view towards reaching an

22  agreement if you can do so.  During your deliberations you

23  should not hesitate to re-examine your own views and change

24  your opinion if you become persuaded it is wrong.

25              MR. FOGERTY:  Your Honor, may I interrupt?  I'm

1    sorry.  Going back to the instruction number 25.  The Court

2    needs to insert felony offense in the second element.  I think

3    the Court said an offense as in a-n offense, but it should be

4    "and a felony offense."

5               THE COURT:  Agreed, Mr. Ortiz?

6               MR. ORTIZ:  Yes, your Honor.

7               THE COURT:  All right.

8               MR. FOGERTY:  Sorry, your Honor.

9               THE COURT:  All right.  I'm going back just briefly,

10   it is on page 26, instruction number 25, line eight.  That line

11   on the left-hand side we use to identify the line.  So where it

12   says, "Lawful arrest for a" -- there's a typo there.  It should

13   be "lawful arrest for a felony offense."

14       I'm going now to instruction number 27.  Because you must

15   base your verdict only on the evidence received in the case and

16   on these instructions, I remind you that you must not be

17   exposed to any other information about the case or to the

18   issues it involves.

19       So except for discussing the case now with your fellow

20   jurors during your deliberations, do not communicate with

21   anyone in any way, and do not let anyone else communicate with

22   you in any way about the merits of the case or anything to do

23   with it.

24       This includes discussing the case in person, in writing, by

25   phone or electronic means, by email, text messaging, or any

1   internet chat rooms, blogs, website, or other feature.  This

2   applies to communicating with your family members, your

3   employer, the media or press, and the people involved in the

4   trial.

5       If you are asked or approached in any way about your jury

6   service or anything about this case, you must respond you've

7   been ordered not to discuss the matter and then report that

8   contact to me.

9       Do not read, watch, or listen to any news or media accounts

10  or commentary about the case or anything to do with it.  Do not

11  do any research such as consulting dictionaries, searching the

12  internet, or using other reference materials.  And do not make

13  any investigation or in any other way try to learn about the

14  case on your own.

15      As I've previously reviewed with you, these restrictions

16  are required to ensure the parties have a fair trial based on

17  the same evidence that each party has had an opportunity to

18  address here before you.  A juror who violates these

19  restrictions jeopardizes the fairness of these proceedings, and

20  a mistrial could result that would require the entire trial

21  process to start over.

22      If you learn that any juror is exposed to any outside

23  information, please notify the Court immediately.

24      Some of you have taken notes during trial.  Whether or not

25  you took notes, you should rely on your own memory of what was

1    said.  Notes are only to assist memory.  You should not be

2    overly influenced by your notes or those of your fellow jurors.

3        The punishment provided by law for the crimes charged is

4    for the Court to decide if it needs to.  You may not consider

5    punishment in deciding whether the government has proved the

6    case against the defendant, Mr. Duncan, beyond a reasonable

7    doubt.

8        A verdict form has been prepared for you.  After you have

9    reached unanimous agreement on a verdict, your foreperson

10   should complete the verdict form according to your

11   deliberations, sign and date it, and advise the clerk that you

12   are ready to return to the courtroom.

13       If it becomes necessary during your deliberations to

14   communicate with me, you may send a note through the security

15   officers signed by any one or more of you.  No member of the

16   jury should ever attempt to communicate with me except by a

17   signed writing, and I will respond to the jury concerning the

18   case only by writing or here in open court.

19       If you do send out a question, I will consult with the

20   lawyers before answering it, which may take some time.  You may

21   continue your deliberations while waiting for the answer to any

22   question.  Remember that you are not to tell anyone, including

23   me, how the jury stands numerically or otherwise on any

24   questions submitted to you including the question of whether or

25   not Mr. Duncan is guilty until after you have reached a

1    unanimous verdict or have been discharged.

2        Ladies and gentlemen, those are your instructions.  Before

3    I excuse you, I'm going to have Ms. Schultz swear the security

4    officer who will accompany you and keep you safe during your

5    deliberations.

6        Ms. Schultz.

7            THE CLERK:  Please raise your right hand.

8        (Swear.)

9            COURT SECURITY OFFICER:  So help me God.

10            THE CLERK:  Thank you.

11            THE COURT:  All right.  Members of the jury, you are

12   now excused.  We'll assume that you're deliberating until 1:30.

13   If we don't hear from you before then, you're excused from the

14   deliberation room, and then you would report tomorrow morning

15   at 8:30 and deliberate between 8:30 and 1:30.  So we're on call

16   and at your service.  Thank you again for your service so far,

17   and you may follow the security officer now to deliberations.

18            THE CLERK:  The alternates, you guys can leave your

19   things on there.  You'll be able to retrieve your lunches and

20   then continue down to the assembly room on the fourth floor,

21   and I'll come see you there.

22            THE COURT:  And deliberating jurors you may take your

23   notepads.

24        (Jury not present 12:13 p.m.)

25            THE COURT:  All right.  I just ask that you remain

1    within ten minutes of the courtroom for the hours the jury is

2    deliberating.  And we'll let you know if we do hear something

3    today.  And if we don't then be on call tomorrow between 8:30

4    and 1:30.

5              MR. FOGERTY:  Yes, your Honor.

6              MR. ORTIZ:  Yes, your Honor.

7              THE COURT:  Thank you.

8         (Recess from 12:14 to 2:06 p.m.)

9              THE COURT:  All right.  We're back on the record.

10   Counsel are present, Mr. Duncan is present.  We have a note

11   that the jury has reached a verdict, so I will ask Ms. Schultz

12   to bring the jury back in.  The alternates will be in the

13   audience, and I will ask her to collect the verdict form from

14   the foreperson.  I'll inspect that form.  If it's an order, I

15   will then ask Ms. Schultz to read it into the record asking the

16   jury to listen carefully.  And then I'll confirm if, in fact,

17   Ms. Schultz has read it correctly that that is the verdict as

18   returned.  I will then ask if any party wants the jury polled;

19   that is, each person asked individually if that is the verdict,

20   and if the parties agree based on any polling that that is the

21   verdict, then the verdict will stand.

22        At that point I always give every juror in every case

23   regardless of outcome, regardless of nature of case a basic

24   Certificate of Appreciation just to thank them for their

25   service.  And so while I typically do that after the jury has

 1   adjourned, given the logistics and the fact that they've been

 2   deliberating on a separate floor, I am going to, while you are

 3   still here, just come around through this door, provide the

 4   certificates with my thanks, and then excuse them from this

 5   courtroom.  Then I'll come back on the bench and just discuss

 6   any housekeeping.

 7       Is that acceptable to you, Mr. Fogerty?

 8           MR. FOGERTY:  It is.  Thank you, your Honor.

 9           THE COURT:  Mr. Ortiz?

10           MR. ORTIZ:  It is, your Honor.

11           THE COURT:  All right.  Ms. Schultz, we are ready for

12   the jury.

13           THE CLERK:  Yes, your Honor.

14       (Jury present 2:08 p.m.)

15           THE COURT:  Welcome back, members of the jury, those

16   of you in the audience.  Counsel may be seated.  The Court has

17   received your note indicating you've reached a verdict.  The

18   foreperson has the verdict form?  Ma'am, I'm going to ask

19   Ms. Schultz to retrieve that from you.

20       All right.  The verdict form is in order.  I'm going to ask

21   Ms. Schultz to read the form into the record.  Please listen

22   carefully because you may be asked one by one if this is your

23   verdict.

24       So, Ms. Schultz, could you please read that into the

25   record.

1          THE CLERK:  Yes, your Honor.  Ladies and gentlemen of

2     the jury, listen to your verdict as it will stand recorded.

3          In the United States District Court, Eastern District of

4     California, United States of America, plaintiff, versus Robert

5     Duncan, defendant.  Case number 2:19-cr-90-KJM.  Verdict form.

6          We, the jury, find the defendant, Robert Pierre Duncan, as

7     follows.  As to Count One of the superseding indictment,

8     guilty, 18 U.S.C. Section 1594(c), conspiracy to engage in sex

9     trafficking of a child.

10          As to Count Two of the superseding indictment, guilty, 18

11     U.S.C. Section 1591(a)(1)(b)(2), sex trafficking of a child, to

12     wit Cheyanne A.

13          As to Count Three of the superseding indictment, guilty, 18

14     U.S.C. Section 751(a), escape from custody dated March 8th,

15     2022, signed the foreperson.

16          THE COURT:  All right.  That is the verdict as it's

17     been returned.  Let me ask if either side wishes the jury be

18     polled.

19          Mr. Fogerty?

20          MR. FOGERTY:  No, your Honor.

21          THE COURT:  Mr. Ortiz?

22          MR. ORTIZ:  Yes, please, your Honor.

23          THE COURT:  All right.  Ms. Schultz, could you please

24     poll the jury.

25          THE CLERK:  Yes, your Honor.

1          We can do it loud.  Ladies and gentlemen of the jury, as I

2     call your juror number, please answer yes or no to the

3     following question.  Is the verdict as read your verdict?

4          Juror number one?

5                    JURY MEMBER:  Yes.

6                    THE COURT:  Juror number two?

7                    JURY MEMBER:  Yes.

8                    THE CLERK:  Juror number three?

9                    JURY MEMBER:  Yes.

10                   THE CLERK:  Juror number four?

11                   JURY MEMBER:  Yes.

12                   THE CLERK:  Juror number five?

13                   JURY MEMBER:  Yes.

14                   THE CLERK:  Juror number six?

15                   JURY MEMBER:  Yes.

16                   THE CLERK:  Juror number seven?

17                   JURY MEMBER:  Yes.

18                   THE CLERK:  Juror number eight?

19                   JURY MEMBER:  Yes.

20                   THE CLERK:  Juror number nine?

21                   JURY MEMBER:  Yes.

22                   THE CLERK:  Juror number ten?

23                   JURY MEMBER:  Yes.

24                   THE CLERK:  Juror number eleven?

25                   JURY MEMBER:  Yes.

1           THE CLERK:  Juror number twelve?

2           JURY MEMBER:  Yes.

3           THE COURT:  All right.  Is there anything further

4     before I formally thank the jurors for their service.

5        Mr. Fogerty?

6           MR. FOGERTY:  No, your Honor.

7           THE COURT:  Mr. Ortiz?

8           MR. ORTIZ:  No, your Honor.

9           THE COURT:  All right.  Members of the jury, I'm just

10    going to come around and formally thank you.  I've let the

11    parties know I do this in every case, regardless of the case,

12    the verdict.  But I thank the jurors and the alternates for

13    their service.  If the alternates could come forward and sit

14    where they had been seated.  So I'm just going to come and

15    present that to you here rather than make you wait in the

16    separate room so I'll be around in just a moment.

17        All right.  Each and every one of you has performed, as I

18    told you at the beginning, a very important duty of American

19    citizenship.  You've exercised an incredibly important right,

20    and in a challenging time, but we've been showing that courts

21    can operate during pandemics.  We are here to ensure that the

22    rule of law is followed and applied and you've been a part of

23    that.  You've had a sense of how courts operate as a result of

24    your service.

25        And so, again, regardless of the nature of case, regardless

1   of verdict, I present this kind of thanks as the least we can

2   do to every citizen juror.  So thank you, thank you.

3   Mr. 101003715.  Ms. 101010173, I'm going to take a breath in

4   and step around you here, Mr. 100998772, Mr. 101011285,

5   Mr. 100999236, Ms. 100999943, Ms. 100999943, Ms. 100992528,

6   Ms. 101009376, Mr. 101009271, Mr. 101008877.  Thank you, sir.

7   Mr. 101003836.  I mixed up my order.  Mr. 100989432.  I'm glad

8   we were able to accommodate your schedule.  Ms. 100986759 and

9   Mr. 101008877.  I thought there were two of us.

10      You are now formally excused, your jury service is over.

11  Ms. Schultz will provide you with further instructions.

12          THE CLERK:  You can leave everything on your seat

13  including your notes and your -- take your certificate,

14  attendance sheets, belongings.  Thank you all very much.

15      (Jury not present 2:16 p.m.)

16          THE COURT:  All right.  You may be seated.  Let me

17  ask if there's any housekeeping other than typically we would

18  set a sentencing date at this time.

19      Is there anything else, Mr. Fogerty?

20          MR. FOGERTY:  No, your Honor.

21          THE COURT:  Mr. Ortiz?

22          MR. ORTIZ:  No, thank you.

23          THE COURT:  All right.  What date would we typically

24  suggest, Ms. Schultz?

25          THE CLERK:  June 6th, 2022, at 9 a.m.

1          THE COURT:  Is that day acceptable to you,

2     Mr. Fogerty?

3          MR. FOGERTY:  It is.  Thank you, your Honor.

4          THE COURT:  Mr. Ortiz?

5          MR. ORTIZ:  It is, your Honor.

6          THE COURT:  All right.  The process in advance of

7     sentencing so that it's clear, particularly to Mr. Duncan.  The

8     Court is assisted by the probation office.  The probation

9     office first prepares a draft presentence report.  The parties

10    may file informal objections to that report.  And then the

11    probation office prepares a final report.  Each side made final

12    objections to the final report.  At the time of sentencing I'll

13    rule on objections, I'll consider the briefs of the parties,

14    and I'll give Mr. Duncan a chance to address me.  So that's why

15    we need some time now.

16         All right.  We are adjourned.

17          MR. FOGERTY:  Thank you, your Honor.

18          (Proceedings adjourned:  2:18 p.m.)

19                         ---o0o---

20    I certify that the foregoing is a correct transcript from the

21    record of proceedings in the above-entitled matter.

22

23               /s/ Thresha Spencer
                 THRESHA SPENCER
24               CSR No. 11788, RPR

25