PHILLIP A. TALBERT
United States Attorney
SAM STEFANKI
Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-00090-KJM |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | |
| ROBERT PIERRE DUNCAN, | DATE: September 12, 2022<br>TIME: 9:00 a.m. |
| Defendant. | COURT: Hon. Kimberly J. Mueller |

The Court should sentence defendant Robert Duncan to forty years in prison followed by a lifetime of supervised release.

Duncan repeatedly victimized seventeen-year-old Cheyanne A. over a two-month period in 2018 by making her have sex with strangers in Oakland. He kept the money Cheyanne made by performing these dangerous and degrading acts with sex buyers. Duncan had sex with Cheyanne himself, even while working her so hard and so consistently that she developed an abscess in her mouth. When law enforcement recovered Cheyanne and placed her at a children's home for her safety, Duncan sent his co-conspirator to obtain Cheyanne and then he put her right back to work having sex for money on the streets of Oakland.

Following his arrest for trafficking Cheyanne, Duncan escaped from a law enforcement vehicle, sprinted through the streets of Sacramento with his handcuffs dangling from his wrist, and fought one of the responding officers so violently that the officer tore his biceps from the bone and needed surgery to

1

re-attach it.  Duncan's criminal conduct in this case is egregious, extreme, and shows that he has no regard for the dignity of his child victim or for the law.  He should be sentenced to forty years of imprisonment as a result.

Furthermore, Duncan has no remorse for his crimes.  He tried to persuade his co-conspirator, Eva Christian, to perjure herself for him.  When Christian did not do so, he testified falsely at trial and in the face of overwhelming evidence of his guilt.  Even now, Duncan refuses to accept the jury's verdict that he is guilty of sex trafficking Cheyanne, of conspiring with Christian to do so, and of escaping from custody following his arrest for these crimes.

Duncan's conduct in this case, his criminal history, and his denial of responsibility for what he did to Cheyanne are so serious that the United States Sentencing Commission Guidelines Manual ("U.S.S.G." or the "Guidelines") calls for him to spend the rest of his life in prison.  While a life sentence would be warranted based on Duncan's actions in this case, a forty-year sentence appropriately balances Duncan's crimes with the slightly mitigating circumstances of his upbringing.  Such a sentence will keep Duncan from harming other children and will send a powerful deterrent message to the community that trafficking children for sex is a reprehensible crime that will be punished accordingly.

## I.   FACTUAL BACKGROUND

### A.   Duncan Victimized Seventeen-Year-Old Cheyanne By Making Her Have Sex With Strangers for Money.

Cheyanne repeatedly had sexual intercourse with strangers because of Duncan.  Presentence Investigation Report ¶¶ 15–18 [hereinafter "PSR"], ECF No. 214.  She was a child when he made her do this in the late summer and early fall of 2018, and he nevertheless took for himself the proceeds generated by his underage victim.  PSR ¶ 16.

Duncan knew that Cheyanne was a child when he made her have sex with strangers for money.  *See* PSR ¶ 16; Trial Ex. 64 (containing Duncan's statement that Cheyanne "look like she fuckin' thirteen years old").  Despite this knowledge, he transported Cheyanne from her father's apartment in Sacramento to Oakland so she could walk the streets nightly, after which he returned her to Sacramento each morning.  PSR ¶¶ 6–7, 16.  He micromanaged Cheyanne's prostitution and tracked her every move using a location-monitoring application called Life360.  *See, e.g.*, PSR ¶¶ 12, 14.  Duncan advertised

Cheyanne on the internet to maximize the money he made from her body and to ensure she was having intercourse with enough sex buyers to meet his financial demands:



Trial Ex. 400; *see also* PSR ¶ 9.  He made Cheyanne sell her body on a stretch of street in Oakland known for prostitution and violence.  PSR ¶¶ 16, 18; Trial Exs. 21, 22 (containing photographs of the Oakland blade).  He repeatedly victimized Cheyanne in this way nearly every night in September and October of 2018.  *See* PSR ¶¶ 15–16, 18, 50 (finding that Duncan's conduct qualifies him as a "repeat and dangerous sex offender against minors").

If Cheyanne got out of line, Duncan degraded and demeaned her.  *See, e.g.*, PSR ¶ 17 (describing video recording admitted as Exhibit 167 in which Duncan recounted headbutting Cheyanne and called her "'a hardheaded little bitch'"); Trial Ex. 715 at 10 (containing text message sent by Duncan calling Cheyanne, "Faggot ass bitch"), 13 (containing text messages sent by Duncan calling Cheyanne a "bitch" and referencing her "pussy lips").  When Cheyanne failed to give Duncan the respect he thought he deserved, he punished her and made her work more.  *See, e.g.*, PSR ¶ 17 (describing video recording admitted as Exhibit 167 in which Duncan told Cheyanne to stand in a corner of his apartment for failing to call him "Daddy"); Trial Ex. 708 at 1 (containing Duncan's text message that Cheyanne was "in trouble" because she had only made $1,000 from sex buyers on a particular night), 16 (containing Duncan's command that Cheyanne "aint coming back [home] until she make some more money").

Duncan's methods to get Cheyanne to have sex with paying strangers included physical threats, intimidation, and violence.  PSR ¶ 17; Trial Ex. 167.  He skillfully deployed the older and more experienced Christian to manage Cheyanne's day-to-day victimization on his behalf.  PSR ¶¶ 14, 37 (finding that Duncan "was the leader and managed Christian's involvement in the offense"); Trial Ex. 708 at 6 (containing Duncan's text message to Christian that "last time i checked you stepped up and took the spot as being my bottom bitch").  Duncan used this playbook to work Cheyanne so efficiently and consistently that she developed an abscess alongside the braces in her seventeen-year-old mouth.  Trial Ex. 708 at 13 ("Her abcess [sic] is oozing out of control and it looks disgusting and is giving her a headache.").  Duncan made thousands of dollars by victimizing Cheyanne in this way, until law enforcement temporarily recovered her shortly after Duncan deposited her outside her father's Sacramento apartment one day in late September 2018.  PSR ¶¶ 6–7, 16–17.

### B.   Duncan Extracted Cheyanne From a Children's Home and Put Her Back to Work.

Cheyanne was temporarily safe in a Woodland children's home after law enforcement rescued her from Duncan's control in September 2018.  PSR ¶ 7.  But Duncan deployed Christian to smuggle Cheyanne a cellular phone so that he could recruit her back to him.  PSR ¶ 8.  He used that cellular phone to contact Cheyanne while she was at the children's home.  *See* Trial Ex. 159 (containing image of videoconference between Duncan, Christian, and Cheyanne).  When the time was right in mid-October, Duncan sent Christian to the children's home in the dead of night to retrieve Cheyanne and bring her back under his control.  PSR ¶ 8.

Once Cheyanne returned to Duncan's Natomas apartment, he quickly sent her back to Oakland to resume having sex with strangers for his benefit.  PSR ¶ 9.  Duncan kept Cheyanne in his Natomas apartment thereafter whenever she was not working, the better to track and control her movements.  *See* PSR ¶¶ 16, 18.  Duncan trafficked Cheyanne to have sex with strangers for money for approximately two more weeks in October, until she was recovered once again during an anti-prostitution sting in Oakland.  PSR ¶ 11.

### C.   Duncan Escaped From Custody and Hospitalized a Law Enforcement Officer.

When Duncan was arrested for trafficking Cheyanne, he did everything possible to evade accountability.  He persuaded one of the arresting officers to loosen his handcuffs and broke out of a

federal law enforcement vehicle that was taking him into custody, after which he went sprinting through the streets of Sacramento. *See* PSR ¶¶ 21–22. When agents tracked him down and ordered him to submit, he refused to obey their instructions and continued running. PSR ¶ 22. Duncan fought the parole agent who re-arrested him so violently that he tore the officer's biceps muscle from its bone. PSR ¶¶ 23, 27. The agent required surgery to re-attach it and continues to suffer lingering pain and limited range of motion in his dominant hand. PSR ¶¶ 23, 27.

### D. Duncan Flagrantly Attempted to Obstruct Justice.

Besides escaping from custody, Duncan also attempted to evade accountability for his crimes by obstructing the workings of the Court and the justice system. He did so blatantly—by sending Christian a letter while they were both detained in the Sacramento County Main Jail, telling her to lie about his knowledge that Cheyanne was seventeen at the time he trafficked her:



Trial Ex. 800 at 1; *see also* PSR ¶ 20. Duncan's letter told Christian to blame memory loss if questioned by authorities about what happened to Cheyanne:



Trial Ex. 800 at 2. His letter also instructed Christian to lie about incriminating text messages Duncan sent to her about his victimization and use of Cheyanne's body:



Trial Ex. 800 at 2; *see also* PSR ¶ 20. At trial, Duncan doubled down on this obstruction and testified falsely that he had no role in trafficking Cheyanne for sex. *See* PSR ¶ 19. He also tried to justify the letter he wrote Christian by characterizing it as an attempt to escape prosecution for a separate sex crime that he actually did admit on the stand: his own sexual intercourse with seventeen-year-old Cheyanne. PSR ¶ 20.

## II.      **BRIEF PROCEDURAL BACKGROUND**

After a seven-day trial, the jury saw through Duncan's false testimony and convicted him on all counts in the superseding indictment:  one count of conspiring to traffic Cheyanne (Count One), one count of trafficking Cheyanne (Count Two), and one count of escaping from custody (Count Three).  Verdict Form, ECF No. 195.

The jury's verdict came following a trial in which the United States presented overwhelming evidence of Duncan's guilt.  His cellular phone records proved that Duncan posted online advertisements of Cheyanne and that he repeatedly transported her to Oakland so that she would have sex with strangers for money that he kept.  Trial Exs. 302 (containing map-based representation of location and call detail records relating to Duncan and Cheyanne), 400 (depicting online advertisement of Cheyanne posted to adultsearch.com).  His text messages proved that Duncan monitored Cheyanne's physical location while she was working for him, that he forced her to make a certain amount of money each night, and that he harbored her in a Natomas apartment after her parents—and law enforcement—initially discovered what he was doing to her.  *See, e.g.*, Trial Exs. 707 at 2 (containing text messages from Duncan to Christian discussing Cheyanne's location), 715 at 6 (containing text message from Duncan asking Cheyanne why she "keep moving and stopping").  His voice on wiretapped phone calls proved that Duncan knew Cheyanne was a child and that he trafficked her nonetheless.  Trial Ex. 64 (containing Duncan's recorded statement on wiretap that Cheyanne "look hella young").

A video Duncan recorded of himself showed how he intimidated, degraded, assaulted, and punished Cheyanne if she failed to make enough money having sex with strangers.  Trial Ex. 167.  It is no surprise that she developed an open abscess in her mouth as a result of being so ruthlessly exploited by Duncan.  Trial Ex. 708 at 13.  And consistent with his contempt for his child victim, a letter Duncan wrote Christian from jail proved that he will say and do anything to avoid accountability for his crimes.  Trial Ex. 800.  His own false testimony—one of the only truthful portions of which was Duncan's admission that he himself had sex with seventeen-year-old Cheyanne while she was under his control—showed that Duncan is an incorrigible liar who does not and will not accept responsibility for what he did to her.  *See* PSR ¶ 19.

///

**A.      Sentencing and Guidelines Calculations**

The maximum sentence the Court can impose on Count One is imprisonment for life.  18 U.S.C. §§ 1591(a)(1), 1594(c).  The maximum sentence the Court can impose on Count Two is imprisonment for life with a mandatory minimum of ten years of imprisonment.  *Id.* § 1591(a)(1), (b)(2).  The maximum sentence the Court can impose on Count Three is five years of imprisonment.  *Id.* § 751(a).

The PSR in this case calculates that Duncan's total offense level is 43.  PSR ¶¶ 30–52.  His criminal history category is III because he sustained a prior conviction for assault with a semiautomatic firearm and he trafficked Cheyanne while on parole for that offense.  PSR ¶¶ 54–63.  Accordingly, Duncan's guideline sentence is life imprisonment.  PSR ¶ 83; U.S.S.G. ch. 5, pt. A.  Duncan filed no objections to the PSR, and the United States agrees with the Guidelines calculations contained in the PSR.

**III.      SENTENCING RECOMMENDATION**

**A.      The Nature and Circumstances of Duncan's Offenses Merit a Forty-Year Sentence.**

A forty-year prison sentence would adequately reflect the extremely serious nature and circumstances of Duncan's offenses.  *See* 18 U.S.C. § 3553(a)(1).

1.      Duncan Victimized and Controlled Cheyanne on a Near-Daily Basis.

Duncan's offense conduct defines what it means to victimize a child.  His ruthlessly efficient use of Cheyanne's young body to make money for himself is unforgiveable.  *See* PSR ¶¶ 16 (describing evidence admitted at trial that Cheyanne "prostituted almost every night and gave the money to Duncan"), 17 (describing evidence admitted at trial that Duncan became angry if Cheyanne did not earn at least $500 each night).  Because of Duncan, a seventeen-year-old girl lived a miserable months-long existence of sexual exploitation by strangers and by her pimp.  *See* PSR ¶¶ 16–18 (describing evidence admitted at trial that Cheyanne stayed in Oakland motels while prostituting and that Duncan directed Cheyanne's commission of sex acts for money in the Oakland area).

No child should have to experience the humiliation Cheyanne endured at Duncan's hand for the months he controlled her.  Cheyanne was forced to walk the streets without underwear on to seek sex buyers, advertised on the internet for anyone with a computer to view her at her most vulnerable, called a "bitch" and a "fag" and told to keep her "pussy lips" away from the wandering eyes of other pimps,

headbutted and made to stand in a corner if she refused to call Duncan "Daddy" or failed to earn enough money selling her body, and all so that Duncan could take whatever money she generated by enduring this degrading daily routine. *See* Trial Exs. 715 at 13–14 (containing text messages between Duncan and Cheyanne referring to her "pussy lips" and how he made her walk the streets without underwear), 167 (containing Duncan's recorded instructions telling Cheyanne to stand in a corner after turning her nightly earnings over to him); PSR ¶ 9 (describing online advertisements depicting Cheyanne).

That Duncan did all these things while he closely monitored Cheyanne's every move only underscores the extent of his control over his child victim. *See* PSR ¶¶ 14 (detailing Duncan's use of Life360 to track how long Cheyanne was in a car and where she was moving in search of sex buyers), 16 ("Duncan required that Christian and [Cheyanne] text him when they had a date and when they got back from a date."). And he used Christian to keep Cheyanne under his control just as efficiently and purposefully as he used technology. PSR ¶ 16; Trial Ex. 708 at 3 (containing Duncan's text message to Christian that Cheyanne's underperformance was "falling on you"). Given the extent of his control over Cheyanne and of the power dynamic between an adult male and a seventeen-year-old girl, Duncan did not have to resort to frequent use of violence against Cheyanne to get what he wanted out of her. *See* PSR ¶ 17 (describing Duncan's manipulation and statement to Cheyanne about how he headbutted her and learned that she was a "'hardheaded little bitch'" as a result, and describing how Duncan's threats sometimes turned violent).

Forty years in prison appropriately accounts for what Duncan did to Cheyanne, for how he victimized her and used Christian to control her, and for how long he subjected Cheyanne to this torture.

2.  Duncan Went to Extreme Lengths to Keep Cheyanne Under His Control.

The circumstances of Duncan's offense are aggravated by his persistence and dedication to wringing as much money from Cheyanne's body as he could. He was neither deterred nor dissuaded from obtaining Cheyanne even after she was recovered by law enforcement outside her father's residence and sent to the relative safety of a Woodland children's home. PSR ¶ 8 (describing how Duncan used Christian first to smuggle a cellular phone to Cheyanne while she was residing in a children's home, and subsequently to extract Cheyanne from that residence and "bring her to Christian and Duncan's apartment in Natomas"). Rather, Duncan used his tried and true methods—technology,

persuasion and manipulation, and his trusted deputy Christian—to bring Cheyanne back to him and back to the streets where she could make him money.  PSR ¶ 9 (describing how Cheyanne and Christian "went to Oakland the next day to prostitute" following Cheyanne's return to Natomas).

Duncan's conduct shows how committedly and aggressively he trafficked Cheyanne.  *See* Trial Ex. 62 (containing Duncan's recorded description of how he told his "bitch [to] walk up to the car and press" in search of sex buyers).  He would not and did not allow her to be a child.  Instead, he went to extreme lengths to ensure she remained his victim and his source of income.  *See* PSR ¶ 17 (describing how "Duncan became upset if Christian and [Cheyanne] did not each earn between $500.00 to $1,000.00 per day").  Duncan's persistence and diligence in using Cheyanne for his own benefit merit a forty-year prison sentence because they show that incarceration is the only thing that will stop his criminal impulses to victimize children.

### 3.   Duncan Went to Extreme Lengths to Avoid Arrest.

Duncan's violent and desperate attempt to avoid going to jail following his arrest demonstrates that he understood the serious criminal nature of what he did to Cheyanne.  *See* PSR ¶¶ 21–22 (describing Duncan's escape from custody and subsequent flight, including that he "jumped over the fence of a house in a nearby neighborhood" and then "crossed over W Street against one-way heavy traffic, disregarding public safety").  It also highlights the lengths to which he will go, and the extent to which he will put other people in danger, to evade the consequences of his actions.  *See* PSR ¶ 27 (noting that Duncan's conduct "showed a complete disregard for law enforcement and public safety as he put numerous people at risk during his attempted escape").

Duncan will clearly do whatever he can to avoid paying the price for trafficking Cheyanne, even at the expense of injuring innocent people.  A forty-year sentence would be an appropriate punishment for Duncan's doubling down on his victimization of Cheyanne by creating additional victims during his attempted escape.  *See* PSR at 29 ("Given the injury sustained by the parole agent in the separate crime charged in Count 3, a consecutive sentence of 36 months is recommended . . . .").

### B.   **Duncan's History and Characteristics Also Merit a Forty-Year Prison Sentence.**

Nothing in Duncan's past or in his character excuses making Cheyanne have sex with strangers for money while she was a child.  *See* 18 U.S.C. § 3553(a)(1).

1. <u>Duncan's Criminal History Shows That He Does Not Respect the Law or the Officers and Courts That Uphold It.</u>

Duncan's disregard for other people and for the law that protects them stretches back to his own childhood.

His criminal history includes convictions for threatening school employees, battery on a peace officer, attempted burglary, and gang-related assault with a semiautomatic firearm.  PSR ¶¶ 56–59. Duncan also has an extensive history of violating his probation and parole conditions.  PSR ¶¶ 56 (detailing Duncan's new law violation while on probation for threatening a school employee), 58 (describing Duncan's many violations while on probation for attempted burglary), 59 (noting that Duncan "incur[red] three violations that resulted in jail time and location monitoring" while on parole). That he trafficked a seventeen-year-old girl while he was on parole for shooting a semiautomatic firearm at an inhabited dwelling only underscores Duncan's refusal to act as if the law applies to him.  *See* PSR ¶ 61.  Duncan's history shows that he is a danger to society who will continue to commit crimes unless he is incarcerated.  A forty-year sentence and, nearly as important, a lifetime of supervision would finally put a stop to Duncan's escalating, violent, and abhorrent criminal behavior.

Additionally, Duncan's past and most recent criminal conduct specifically shows that he does not respect law enforcement officers whatsoever.  He calls them derogatory names, spits on them, and is disruptive and insubordinate while in their custody.  *See* PSR ¶¶ 56, 57, 59.  Given his history, it is not surprising that Duncan injured a parole agent so severely following his escape from custody in this case that the agent required surgery to reattach muscle to bone.  PSR ¶¶ 23, 27.  Forty years in prison accounts for Duncan's criminal history and protects the public by incapacitating a victimizer of children with a violent past who is a danger to the public and to the officers who protect the public.  *See* 18 U.S.C. § 3553(a)(2)(C).

Duncan's conduct in this case shows that he has almost as little respect for the judicial system as he does for law enforcement officers.  Duncan's letter that he sent to Christian from jail represents a straightforward attempt to suborn perjury from her.  *See* PSR ¶ 28 ("While the defendant was in jail and pending trial in the instant offense, he willfully attempted to obstruct or impede the administration of justice when he sent a letter to his codefendant . . . .").  To that end, Duncan's letter tried to assure

Christian that perjury is a relatively minor offense.  PSR ¶ 20 (containing Duncan's statement to Christian that perjury "'aint shit they probably wont even press charges for that'").  And even if Duncan's characterization of this letter as an attempt to avoid a statutory rape charge for his intercourse with Cheyanne is true—which, as the jury found, it is not—it still does not excuse his contempt for the criminal justice system that motivated Duncan to write and send the letter in the first place.

Duncan's letter—and his own false trial testimony about its motivation—proves that Duncan's only goal is to evade accountability for what he did to Cheyanne.  To do that, he will lie to the Court himself and he will try to make others lie to the Court on his behalf.  *See* PSR ¶ 28 (noting that Duncan "encouraged Christian to commit perjury when she took the stand").  These facts demonstrate that Duncan is incorrigible in his disrespect for the law and for the Court; he is a person who believes that the rules that apply to everyone else—and that are designed to uncover the truth—do not apply to him.

Forty years of imprisonment is an appropriate sentence because Duncan's past and recent conduct shows him to be a violent, manipulative, and dishonest person who presents a danger to the greater Sacramento community unless he is incarcerated.  *See* PSR ¶ 27 (noting that Duncan's actions "showed a complete disregard for law enforcement and public safety as he put numerous people at risk during his attempted escape").

> 2.    Duncan's Childhood Does Not Explain or Excuse His Conduct in This Case.

It is apparent that Duncan's childhood was challenging.  *See* PSR ¶¶ 68–71.  The United States' recommendation accounts for Duncan's upbringing because it urges a sentence below the guideline range, which is life imprisonment.  *See* PSR at 28.  However, there are at least two reasons why Duncan's childhood does not merit the Court sentencing him to less than forty years in custody.

First, Duncan was no longer a juvenile when he trafficked a child for sex.  He was a grown man who should have known that what he was doing to Cheyanne was reprehensible and criminal.  *See* PSR at 3 (containing Duncan's date of birth).  His extensive efforts to suborn perjury and avoid responsibility for his crime show that Duncan did, in fact, know that trafficking a seventeen-year-old girl was wrong and against the law.  *See* PSR at 28 (stating that Duncan "interfered with the investigation and prosecution of the offense").  He repeatedly victimized Cheyanne anyway, despite being an adult while he did so.

Second, Duncan's childhood does not excuse what he did because while he actively trafficked Cheyanne, he received a significant amount of support from his family.  *See* PSR ¶¶ 69, 79.  Duncan's mother not only welcomed him into her home upon his release on parole, she also provided him with employment to supplement his income.  PSR ¶¶ 73, 79.  Clearly, the presence of a positive family figure and a close relationship with his siblings did not keep Duncan from trafficking a seventeen-year-old girl for sex while he was a fully mature adult.  Hence, whatever difficulties Duncan faced as a child do not provide a basis for the Court to sentence him to less than the forty years that his egregious conduct earned, because those childhood challenges were no longer present during his adulthood.

### 3. Duncan Will Not Take Responsibility for His Actions.

Duncan refuses to accept what the jury readily found to be true—that he trafficked a child for money.  *See* ECF No. 195 (finding Duncan guilty of sex trafficking Cheyanne).

Duncan is not a defendant who simply put the government to its burden of proof at trial—instead, he took the stand and denied the veracity of incontrovertible evidence showing his guilt.  For example, he claimed not to know that Cheyanne was underage when he trafficked her, even though the jury heard a wiretapped call in which he told a fellow pimp that Cheyanne looked "hella young" and "like she fuckin' thirteen years old."  Trial Ex. 64; *see also* PSR ¶¶ 19–20.  Further, Duncan testified that he never trafficked Cheyanne—his claim was that he merely had sex with her while he was an adult and she was seventeen—despite recordings of him telling a fellow pimp about his "bitch" named "Shy."  Trial Exs. 62, 65; PSR ¶¶ 19, 20, 51.  Duncan insisted he was not a pimp even though he recorded himself calling Christian and Cheyanne "bitches" and "hoes," making them address him as "Daddy" and flying into a rage when they did not, telling them to "make [him] a million dollars," and commanding, "when you get home, put my money on the dresser, bitch, and go in your favorite corner that you like so much."  Trial Ex. 167; PSR ¶¶ 17, 19, 51.  Duncan's own words showed his trial testimony to be false.

Additionally, Duncan claimed that he never advertised Cheyanne even though the jury saw an internet post directing sex buyers to call his cellular phone to set a date with her.  Trial Ex. 400; PSR ¶¶ 9, 19, 34.  He denied using certain cellular phones to traffic Cheyanne, despite evidence that those devices were either registered in his name, used to make recorded voice calls about Cheyanne, or contained messages referencing facts that only he could realistically have known.  *See* Trial Exs. 51

GOVERNMENT SENTENCING MEMORANDUM

12

(containing registration information for one of Duncan's cellular phones in his name), 62 (containing recording of Duncan using this same phone), 708 at 11 (containing text message from another of Duncan's cellular phones stating, "Im on ankle"), 708 at 13 (containing text message from Duncan's cellular phone referencing his abscess medication); PSR ¶ 19.  To this day, he will not admit that the jury was correct to credit this overwhelming evidence.  PSR at 29 ("The defendant has maintained his innocence and continues to deny any involvement associated with prostitution.").

Duncan will not own up to the despicable things he did to Cheyanne.  Given his repeated efforts to obfuscate and deny his culpability before and during trial, the Court should be skeptical of any attempt he might make to present himself as contrite.  Instead, the Court should sentence Duncan to forty years of imprisonment because his own conduct makes clear that is the only way to show him that what he did to Cheyanne was wrong and criminal.  *See* 18 U.S.C. § 3553(a)(2)(A) (requiring courts to consider the need to "promote respect for the law, and to provide just punishment for the offense").

## C.   A Forty-Year Sentence Would Advance Specific and General Deterrence.

The interests of specific and general deterrence would be furthered by the Court imposing a forty-year sentence.  *See* 18 U.S.C. § 3553(a)(2)(B), (a)(2)(C).

### 1.   Duncan Needs to Be Incapacitated to Protect the Public.

Sentencing Duncan to forty years in prison would protect the greater Sacramento community from Duncan himself in at least two ways.

First, it would incapacitate him for a sufficient amount of time to ensure that he does not commit further crimes against vulnerable victims.  *See id.* § 3553(a)(2)(C).  Duncan's criminal history make plain that he is a danger to the public unless he is incarcerated.  *See* PSR at 28–29 (describing Duncan's criminal conduct, attempted obstruction of justice, and violent criminal history).  Duncan should be behind bars for forty years because his own criminal record shows that when he is out of prison—even when under law enforcement supervision—he commits heinous and violent crimes against vulnerable members of the community.  *See* PSR at 29 ("He was on parole [for assault with a firearm] for less than one year before evidence showed he was connected to sex trafficking the victim.").  Accordingly, a forty-year sentence will protect Cheyanne—and other potential victims like Cheyanne who Duncan would likely target if not incarcerated—from his predations.  *See* Cmty. Against Sexual Harm,

*Estimating Sex Trafficking in Sacramento County:  Final Report* 61 (2022), https://htv-prod-media.s3.amazonaws.com/files/cash-est-sextrf-sacramento-final-report-7-15-22-rev2-sm-1658438293.pdf (noting that longer sentences can help survivors rebuild their lives by giving them time to separate from their traffickers).  The longer Duncan is in a place where he cannot create additional victims like Cheyanne, the better for the community.  A forty-year sentence will accomplish this by keeping Duncan away from vulnerable children until he is in or approaching his sixties.

Second, a forty-year sentence would impress upon Duncan that his serious criminal acts carry serious criminal consequences.  *See* 18 U.S.C. § 3553(a)(2)(B).  The fact that Duncan began trafficking a child for sex so soon after paroling from state prison following a seven-year sentence suggests that he still thinks little about the consequences of his criminal actions.  *See* PSR at 29 ("He was on parole for less than one year before evidence showed he was connected to sex trafficking the victim.").  Unfortunately, even though Duncan has been in custody or under supervision since he was around thirteen years old, he continues to commit additional crimes.  PSR ¶¶ 3, 56–59.  Hence, the Court's sentence must be substantial enough to deter Duncan from engaging in further criminality when he is eventually released from custody.  A sentence of forty years strikes the right balance because it is long enough to have a chance to make Duncan understand that he cannot victimize children, while also being no greater than necessary because the Guidelines call for him to spend the rest of his life in prison.  *See* 18 U.S.C. § 3553; PSR ¶ 83 (stating that "the guideline imprisonment range is life").

### 2.   A Forty-Year Sentence Would Advance the Interests of General Deterrence.

Sex trafficking of children is a significant problem in the Sacramento region, with hundreds of vulnerable juveniles becoming victims of this awful crime every year.  Cmty. Against Sexual Harm, *Estimating Sex Trafficking in Sacramento County:  Final Report* 19 (2022), https://htv-prod-media.s3.amazonaws.com/files/cash-est-sextrf-sacramento-final-report-7-15-22-rev2-sm-1658438293.pdf (noting that approximately 1,600 children were trafficked for sex in the Sacramento region between 2014 and 2020).  The Court's sentence in this case can and should help combat this tragically high number of child victims.  A forty-year sentence would do so by making clear that traffickers who are caught and convicted will suffer consequences commensurate with the extreme harm their actions visit upon the most vulnerable members of the community.

Indeed, the evidence presented at trial shows that the Court's sentence will have a general deterrent effect because Sacramento's pimps communicate with one another about their trafficking activities. *See, e.g.*, Trial Ex. 62 (containing wiretap recording of Duncan's conversation with fellow pimp Jaquorey Carter, in which Duncan told Carter that he instructed his "bitches" to "walk up to the car and press" potential sex buyers for dates). These traffickers also communicate with one another about law enforcement's efforts to interrupt those activities. *See* Trial Ex. 63 (containing wiretap recording of Duncan recounting for Carter how law enforcement became aware of his sex trafficking of Cheyanne). A forty-year sentence will send an unmistakable message to sex traffickers in Sacramento and across northern California that the consequences of selling children for sex are severe because the act of selling children for sex is a heinous and unjustifiable crime.

## IV.   CONCLUSION

The Court should sentence Robert Duncan to forty years of imprisonment and a lifetime of supervised release to follow. This sentence would be a just and appropriate punishment for Duncan's conduct because he trafficked a seventeen-year-old girl for months so that she could have sex with strangers for his benefit. He continued to victimize her even after she was initially recovered by law enforcement and sent to a children's home for safekeeping. He escaped from custody and seriously injured a parole agent in the process. He tried to suborn perjury and lied when confronted with evidence of his crimes.

Someone who commits such heinous acts without a shred of remorse, and while on parole for assault with a semiautomatic firearm no less, must be incapacitated for a significant amount of time. A forty-year sentence for Robert Duncan will adequately protect the community at large and will ensure that no other children like Cheyanne fall victim to his predatory and exploitative nature.

Dated:  September 8, 2022

PHILLIP A. TALBERT
United States Attorney

By:   /s/ SAM STEFANKI
SAM STEFANKI
Assistant United States Attorney